# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALISON RAY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| AT&T INC., et al., | : | No. 18-3303 |
| Defendants. | : | |

## MEMORANDUM OPINION

**Timothy R. Rice**                                                                                                      **January 11, 2019**
**U.S. Magistrate Judge**

      Plaintiff Alison Ray moves for partial summary judgment, claiming the General Release and Waiver (the "Release") she executed in connection with her termination from employment with Defendant AT&T Mobility Services, LLC ("AT&T") is invalid and unenforceable as to her Age Discrimination in Employment Act ("ADEA") claim.[1] Pl. Mot. (doc. 13) at 1. AT&T also seeks summary judgment, arguing that the Release is valid and bars Ray from bringing her ADEA claim. Def. Mot. (doc. 19) at 1. Because I find AT&T failed to meet the statutory requirements for a valid ADEA waiver by failing to disclose the decisional unit involved in the reduction-in-force, I find the Release invalid and unenforceable, and therefore grant partial summary judgment in favor of Ray as to Count II of her complaint.

---

[1] Ray additionally seeks to enjoin AT&T from asserting identical releases as a defense to age discrimination claims brought by other terminated workers. Pl. Mot. at 1. Ray has not moved for class certification or provided any other basis for seeking this relief. Her motion is denied to the extent she seeks relief on behalf of any individuals other than herself. See Warth v. Seldin, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally.").

## I.  LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The evidence and any inferences from the evidence must be viewed in the light most favorable to the non-moving party.  See Ray v. Warren, 626 F.3d 170, 173 (3d Cir. 2010).  If reasonable minds could conclude that there are sufficient facts to support one party's claims, the other party's summary judgment motion should be denied.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  It should be granted if no "reasonable jury could return a verdict for the nonmoving party," based on the evidentiary record.  Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010).

## II.  UNDISPUTED FACTS

AT&T's Reduction-in-Force[2]

Prior to November 16, 2017, AT&T launched an employee termination program,[3] or reduction-in-force.  AT&T alleges that its purpose was to "reduce layers of management and increase operational efficiencies in the Mobility Retail Sales and Services – East Region."  Def. SOF ¶ 58.  AT&T identified Affected Work Groups, "comprised of employees in the same or similar job titles who shared similar characteristics," in the Mobility Retail Sales and Services – East Region for reduction.  Id. ¶ 61.

---

[2]  Ray disputes the facts in this paragraph, which were alleged by AT&T in its reply brief.  However, viewing these facts as true, and in the light most favorable to AT&T, Ray is still entitled to partial summary judgment, for the reasons described infra.

[3]  "An 'employment termination program' takes place when a group or class of employees are involuntarily terminated and 'offered additional consideration for their decision to sign a waiver.'"  Recchia v. Kellogg Co., 951 F. Supp. 2d 676, 692 (D.N.J. 2013) (quoting 29 C.F.R. § 1625.22(f)(1)(iii)(A) (2012)).  "Typically, an involuntary termination program is a standardized formula or package of benefits that is available to two or more employees." 29 C.F.R. § 1625.22(f)(1)(iii)(B).

Surplus Notification Letter

Alison Ray was employed as a Director of Sales with AT&T from September 2011 until January 15, 2018. Def. SOF (doc. 19-2) ¶ 50. She oversaw various southeastern Pennsylvania retail locations within the Ohio/Pennsylvania Market, part of the East Region of AT&T Mobility Retail Sales and Services led by Region President Jennifer Van Buskirk. Id. ¶¶ 51-52.

On November 16, 2017, Ray received a letter from AT&T (the "Surplus Notification Letter") stating:

> After a thorough and careful review, we have determined that the position which you currently hold will be eliminated. This is due to a reduction in positions within your level and organization. As a result of this decision, you will be placed on surplus status, effective the day following the date that appears at the top of this letter, and you may receive severance benefits if you meet the eligibility criteria.

Pl. SOF (doc. 13-3) ¶ 1; Pl. Mot., Ex. 1 at 1. The Surplus Notification Letter then provided additional information regarding the "surplus process" and further steps that must be taken by surplus-designated employees. Pl. Mot., Ex. 1 at 2-3.

Ray had two options. Pl. SOF ¶ 5. "Option 1 allow[ed] [Ray] to continue employment with the company for up to 60 days in order to pursue other positions within AT&T. This 60-day period [began] the day following the date of [the Surplus Notification Letter] and end[ed] on 01/15/2018." Pl. Mot., Ex. 1 at 2. The Surplus Notification Letter stated the following regarding Option 1:

> Please keep in mind that there are no guarantees that you will be selected for another position. If you have not accepted another position by the end of the 60-day period, your employment will end at the conclusion of the period. If you have not declined a request to nominate or interview for a position at your same or higher level which does not require relocation OR if you have not been offered a position at your same or higher level which does not require relocation, you may be eligible to receive benefits under the terms of the applicable severance plan if you acknowledge your acceptance of the provisions of the [Release].

Id. Option 2 provided that Ray's employment would end on 12/07/2017, without a surplus period to pursue another internal position, and that she would be eligible to receive severance benefits if she executed the Release. Id. at 3.

Ray elected Option 1. Pl. SOF ¶ 8.

Accompanying Documentation

1. Severance Pay Plan

The Surplus Notification Letter directed Ray to several online resources, Pl. Mot., Ex. 1 at 1, including the AT&T Inc. Severance Pay Plan (the "Plan"), wherein Section 1.3 addressed eligibility. Pl. SOF ¶ 17; Pl. Mot., Ex. 4. It stated that "[a]n individual is an 'Eligible Employee' and is eligible for benefits under this Plan" if the individual meets certain requirements, including if the individual:

> D. is selected for involuntary termination by the Participating Company, including as a direct result of force surplus, technological, operational, organizational and/or structural changes affecting the Company or a Participating Company . . . ,
>
> E. Has received a written Severance Notification Letter . . . , and
>
> F. has properly executed a Participating Company-approved [Release] of all rights and claims relating to the employee's employment and termination, and delivered it to the designated Participating Company representative within a specified period from the date the employee initially received the [Release] from the Participating Company. The period the individual will have to review and consider the [Release] and the title/address of the designated Participating Company representative will be included in the terms of the document.

Id. § 1.3.

2. ADEA Notice and Listing

Ray also received a second letter with the same date as the Surplus Notification Letter, Pl. SOF ¶ 21; Pl. Mot., Ex. 5, and several attached documents: (1) the "Age Discrimination in Employment Act (ADEA) Information Notice Under the Older

Workers Benefit Protection Act" ("ADEA Notice"), Pl. SOF ¶ 24; Pl. Mot., Ex. 6; (2) an attached ADEA Listing, Pl. SOF ¶ 25; Pl. Mot., Ex. 7; and (3) the Release, Pl. SOF ¶ 35; Pl. Mot., Ex. 8.

The ADEA Notice provided "[i]nformation required under the [ADEA] and Older Workers Benefit Protection Act." Pl. Mot., Ex. 6. Under the heading "Decisional Unit," the ADEA Notice stated that "[t]he Decisional Unit is comprised of the combined Affected Work Group(s) identified in the document entitled 'ADEA Listing' . . . . Each Affected Work Group within the Decisional Unit is comprised of positions at the same level with similar definable characteristics from which the surplus employees are selected." Id. The ADEA Notice directed Ray to review the ADEA Listing. Id.; Pl. SOF ¶ 25.

The ADEA Listing identified the applicable Organization as "Mobility Retail Sales and Service – East Region[;] Jennifer Van Buskirk – Region President – Large Business." Pl. SOF ¶ 26; Pl. Mot., Ex. 7 at 1. The ADEA Listing also contained a table consisting of several columns with the headings: Title, Age, AWG, Total, Selected, Not Selected, and Expressed IIL. Pl. Mot., Ex. 7 at 1. Above the table, the ADEA Listing read as follows:

> **Affected Work Groups (AWG)** are comprised of positions at the same level with similar definable characteristics from which the surplus employees are selected. . . . The combined AWGs comprise the Decisional Unit for this business case.

Id. (emphasis in original).[4]

---

[4] Ray claims that the headings "AWG" and "IIL" were not clearly defined or explained by the ADEA Listing. Pl. SOF ¶¶ 29-30. However, the ADEA Listing clearly and unambiguously contains the above-quoted language, along with a similarly clear elaboration on the term "IIL,"

3. Release

Ray also received a copy of the Release along with her Surplus Notification Letter. Pl. SOF ¶ 35; Pl. Mot., Ex. 8. The Release stated the following:

> I understand that I was designated for company-initiated involuntary termination of employment on 11/16/2017, and that in order to receive the benefits of the Plan, I must accept this [Release] . . . . The [Release] will be considered valid only if I have terminated my employment on or before the date I acknowledge or sign it and the date of my acknowledgement/signature is within 90 days of my last date on payroll.

Pl. Mot., Ex. 8 at 1. The Release featured multiple warnings that Ray should consult an attorney before acceptance. See, e.g., id. at 1 ("You are advised to consult with an attorney before accepting this [Release]."); id. at 8 ("I have been encouraged to consider this document carefully and to seek legal and financial advice before signing it."). The Release stated: "I expressly understand and agree that this is a [Release] that, to the fullest extent permitted by law, waives, surrenders, and extinguishes all claims that I have or may have against [AT&T], including but not limited to claims under . . . the [ADEA]." Id. at 7. Above the space for the employee's signature, the Release stated: "By signing below, I acknowledge that my election to accept the benefits of the Plan, and to release any claims described above, is knowing, free and voluntary and will become irrevocable seven calendar days after I sign this [Release]." Id.

Ray's Termination

As of January 15, 2018, Ray had not declined a request to nominate or interview for, nor was she offered, a position at the same or higher level than her current level that did not require relocation. Pl. SOF ¶ 48. She was terminated from employment with AT&T effective January

---

which is not relevant to my decision. Ray also fails to support her contention with a citation to the record, as required by Federal Rule of Civil Procedure 56(c)(1)(A).

6

15, 2018. Id. ¶ 49. On January 16, 2018, Ray signed the Release and returned it to AT&T, and at no point revoked the Release. Def. SOF ¶ 85. AT&T then made severance payments to Ray. Id. ¶ 86.

## III. DISCUSSION

Ray argues the Release is invalid and unenforceable because it violates the Older Workers Benefit Protection Act of 1990 ("OWBPA"), which sets statutory requirements for an ADEA waiver to be considered knowing and voluntary. Pl. Mot. at 1. She claims the Release and accompanying disclosures: (1) did not properly identify the decisional unit at issue; (2) were not provided at the requisite time; (3) were not written in a manner calculated to be understood by the average individual eligible to participate; (4) did not properly identify the pertinent eligibility factors; (5) did not appropriately discuss the applicable time limits; and (6) did not identify the job titles and ages of individuals eligible or selected for the program.[5] See generally Pl. Mot.

To effectively waive an ADEA claim, a release must be "knowing and voluntary," meaning it must satisfy the requirements of 29 U.S.C. § 626(f)(1)(A)-(H). "[T]he party asserting the [waiver's] validity" must prove its compliance. Id. § 626(f)(3). At issue here are the following statutory requirements:

> (H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F)) [must] inform[] the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to--

---

[5] The parties focus much of their briefing on whether AT&T had a duty to supplement the information provided to Ray with later information reflecting who was actually terminated through the reduction-in-force. I do not address this issue because I find AT&T's failure to adequately identify the decisional unit sufficient to invalidate the Release.

7

> (i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and
>
> (ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1)(H)(i)-(ii).

The OWBPA's statutory requirements are "strict" and "unqualified," and "incorporate[] no exceptions or qualifications." Oubre v. Entergy Operations, Inc., 522 U.S. 422, 426-27 (1998). Some courts have interpreted this to mean that "[t]he absence of even one of the OWBPA's requirements invalidates a waiver." See, e.g., Butcher v. Gerber Prods. Co., 8 F. Supp. 2d 307, 314 (S.D.N.Y. 1998). Other courts have distinguished Oubre, and noted that "the disclosure required under § 626(f)(1)(H) is "so imprecise, it cannot possibly require strict application." Romero v. Allstate Ins. Co., 1 F. Supp. 3d 319, 377, 379 (E.D. Pa. 2014) (internal citation omitted); see also Ribble v. Kimberly-Clark Corp., No. 09-C-643, 2012 WL 589252, at *5 (E.D. Wis. Feb. 22, 2012) ("[T]he nomenclature of § 626(f)(1)(H) of Title 29 is [so] ambiguous" that "a rigid and mechanical interpretation of that provision is inappropriate."). Even courts requiring strict compliance have done so with the goal of adhering to the underlying principles of the OWBPA. See, e.g., Adams v. Ameritech Servs., Inc., 231 F.3d 414, 431 (7th Cir. 2000) ("As a form of worker protection legislation, the OWBPA demands information that allows people to ascertain whether they are being treated fairly vis-à-vis their peers."). Compliance with the OWBPA should be measured against the congressional purpose in passing the act. See, e.g., Ribble, 2012 WL 589252, at *5.

Permeating all requirements of Section 626(f)(1)(H) is its mandate that an employer requesting the execution of an ADEA waiver in connection with an employment termination program must make the disclosures "in writing in a manner calculated to be understood by the

8

average individual eligible to participate." 29 U.S.C. § 626(f)(1)(H). Regulations promulgated by the Department of Labor to enforce the OWBPA state that "[t]he purpose of the informational requirements is to provide an employee with enough information regarding the program to allow the employee to make an informed choice whether or not to sign a waiver agreement." 29 C.F.R. § 1625.22(f)(1)(iv). Even if technical compliance with OWBPA requirements is met, a waiver "must not have the effect of misleading, misinforming, or failing to inform participants and affected individuals." Id. § 1625.22(a)(3).

1. **Decisional Unit**

"The terms 'class,' 'unit,' or 'group' . . . and 'job classification or organizational unit,' [as used in Section 626(f)(1)(H),] . . . refer to examples of categories or groupings of employees affected by a program within an employer's particular organizational structure," and the scope of such terms is "determined by examining the 'decisional unit' at issue." 29 C.F.R. § 1625.22(f)(3)(i)(A), 1625.22(f)(3)(i)(A). A "decisional unit" is "that portion of the employer's organizational structure from which the employer chose the persons who would be offered consideration for the signing of a waiver and those who would not be offered consideration for the signing of a waiver." Id. Reference to a "decisional unit" should reflect the process by which employees are chosen for a reduction-in-force. Id.

"Assuming that the employer's identification of class, unit or group of employees from which the employees selected for separation were chosen reasonably describes an existing organizational unit within the company, the employer's designation should stand." Ribble, 2012 WL 589252, at *12. If termination decisions were made from only a subset of the decisional unit, however, information as to all employees in the decisional unit must be disclosed. 29 C.F.R. § 1625.22(f)(4)(v).

9

The determination of the appropriate population of the decisional unit must be made on a case-by-case basis. Id. § 1625.22(f)(3)(ii)(A). Because "it is certainly possible that an employer will want to fiddle with the definition [of the decisional unit] to mask the possible evidence of age discrimination," in interpreting the requirements of this section of the statute, the "touchstone should be the 'understandable to the average worker' standard." Raztak v. Ameritech Corp., 103 F.3d 1257, 1263 (6th Cir. 1997).

Ray argues that AT&T's identification of the decisional unit involved in its reduction-in-force was insufficient to provide any meaningful understanding as to its composition. Pl. Mot. at 14. I agree. AT&T's purported decisional unit definition, even combined with the attached list of employees sorted by age and job title, was not understandable to the average worker, and therefore failed to provide Ray with sufficient information to assess whether she was being discriminated against because of her age. See Raztak, 103 F.3d at 1263.

The decisional unit is intended to reflect the employer's process in selecting employees for the reduction-in-force. 29 C.F.R. § 1625.22(f)(3)(i)(B). Upon receipt of the Surplus Notification Letter, Ray was informed she was losing her job in connection with a reduction-in-force, and that the pool from which the terminated employees were chosen was "the combined Affected Work Group(s)" in the ADEA Listing. The ADEA Listing then defined "Affected Work Groups" as being "comprised of positions at the same level with similar definable characteristics from which the surplus employees are selected," and states that the Affected Work Groups may be "any portion of an organization, described in terms of level, job title, similar job functions, geography, lines of organization or other definable attributes based on needs of the business." Pl. Mot., Ex. 7 at 1. This vague and circuitous definition fails to provide the average terminated employee with any meaningful information as to how the process of

10

identifying those included in the reduction-in-force was conducted. See 29 C.F.R. § 1625.22(f)(3)(i)(B).

Analyzed in parts, the disclosure still fails. The decisional unit was composed of "combined Affected Work Group(s) in the ADEA Listing." Pl. Mot., Ex. 6. However, those groups were created as part of the reduction, Def. SOF ¶ 61, and were not pre-existing established divisions of AT&T's organizational structure before the reduction, such as in the cases cited by AT&T. Compare Collison v. Bank of N.Y. Mellon, No. 17-cv-809 (PKC)(SDA), 2018 U.S. Dist. LEXIS 15952, at *15 (S.D.N.Y. Jan. 30, 2018) ("all active United States employees in the AIS, AS Insurance, AS Latin America, AS Investment Managers & Banks, and Asset Servicing Americas Business Unit Designators"); Ribble, 2012 WL 589252, at *17 ("Consumer Sales employees in Customer Team East, Customer Team Metro, Customer Team Retail, Customer Team Safeway, Category Space Management, Eastern Region, Midwest Region, and Western Region"). Because AT&T's combined work groups were assembled solely to effectuate the reduction, terminated employees such as Ray had no meaningful understanding of their composition or origin. Although AT&T attempted to define the Affected Work Groups, it used—perhaps purposefully—vague language such as "positions . . . with similar definable characteristics" and "any portion of an organization," without identifying those characteristics or what portions of the organization they encompassed. This definition was not understandable to the average worker and did not reflect the process utilized in selecting employees for the reduction. See 29 C.F.R. § 1625.22(f)(3)(i)(B); Raztak, 103 F.3d at 1263.

Even the subset's title, "Affected Work Groups," suggests that the employees in those groups are simply the employees whom AT&T decided would be affected by the reduction. Although an employer has discretion to define the decisional unit, "[g]iven the concerns

11

regarding an employer's incentive to manipulate statistics and the relevant decisional pool, the regulations understandably prohibit an employer from arguing, tautologically, that its decisional unit is simply the employees it decided were eligible." Ribble, 2012 WL 589252, at *13 (internal quotation marks omitted).

Congress intended the OWBPA's disclosure requirements to arm employees with enough information to make an informed decision whether to release any potential ADEA claims against an employer. 29 C.F.R. § 1625.22(f)(1)(iv). AT&T's disclosure did not serve that goal. Although AT&T disclosed the ages and job titles of those employees in the Affected Work Groups, along with whether they were selected for surplus status, the average employee could not meaningfully know whether the reduction had a disproportionate impact on older workers without further information stating how the Affected Work Groups were composed—and more importantly, which employees within the Mobility Sales and Services – East Region were excluded from the Affected Work Groups.

An example provided in the enforcing regulations is instructive. See 29 C.F.R. § 1625.22(f)(4)(v) ("For example, if the employer decides that a 10% [reduction-in-force] in the Accounting Department will come from the accountants whose performance is in the bottom one-third of the Division, the employer still must disclose information for all employees in the Accounting Department, even those who are the highest rated."). This example illustrates that if AT&T wished to make reductions within the Mobility Retail Sales and Services – East Region from within its Affected Work Groups, AT&T was still required to disclose the job titles and ages of every employee in that organization who was selected and not selected for surplus

12

status.[6] See id. AT&T, instead, only disclosed the ages and job titles of those employees selected and not selected within certain groups it determined would be impacted by the reduction.

Although AT&T argues that the OWBPA does not require employers to explain how it determined groupings within a decisional unit, Def. Mot. at 12, its groupings actually comprised the decisional unit, rendering them integral to the definition. As a result, the cases cited by AT&T fail to apply in this unique context. See Barnes v. Hershey Co., No. 3:12-cv-01334-CRB, 2015 WL 4129573, at *14 (N.D. Cal. July 9, 2015) (disclosure was mere "extra language" that did not satisfy a specific OWBPA requirement); Diehl v. Bank of Am. Corp., No. 3:09-cv-1220-J-25MCR, 2010 U.S. Dist. LEXIS 94876, at *5 n.2 (M.D. Fla. Aug. 23, 2010) ("Defendant went beyond the requirements of the OWBPA by providing information beyond the 'decisional unit' at issue."). AT&T's Affected Work Groups were set forth to satisfy the OWBPA's requirement of disclosing the decisional unit at issue, and therefore required meaningful explanation.

Finally, this is not a case where holding AT&T accountable "would elevate form over substance" for an otherwise de minimis technical violation. Raztak, 103 F.3d at 1260; see also Romero, 1 F. Supp. 3d at 379-80. AT&T's circuitous decisional unit definition is precisely the

---

[6] AT&T does not argue that the combined Affected Work Groups comprised the entire named organization, and based upon its papers, it does not appear that is the case. See Def. SOF ¶ 61 ("As part of the workforce reduction process, AT&T identified Affected Work Groups in the Mobility Retail Sales and Service – East Region for reduction. These Affected Work Groups were comprised of employees in the same or similar job titles who shared similar characteristics." (internal citations omitted)). The lack of clarity on this point also does not create an issue of fact. In opposing Ray's motion for partial summary judgment, AT&T must demonstrate the lack of genuine issues of material fact, and, as the party asserting the validity of the Release, AT&T must demonstrate how the Affected Work Groups were assembled in order to respond to Ray's contentions that the decisional unit was not adequately disclosed. Peterson v. Seagate US LLC, Civ. No. 07-2502, 2008 WL 2230716, at *4 (D. Minn. May 28, 2008); see also 29 U.S.C. § 626(f)(3); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

13

type of disclosure the OWBPA seeks to prevent.  See Ribble, 2012 WL 589252, at *13.  Its Release violates the OWBPA and is unenforceable.  Ray is entitled to partial summary judgment as to Count II of her complaint.

   **2. Additional Arguments and Discovery Request**

Because I find the Release invalid based upon its failure to appropriately define the decisional unit, I do not address Ray's remaining arguments, and Ray's request for discovery related to the Release is denied as moot.

An appropriate Order follows.