# GAGE DECLARATION EXHIBIT 26

## Alison Ray

**Director of Sales– Liberty States**

Alison has over 26 years of wireless industry experience.  She began her career at AT&T in 1994 as Director of Business Development for Comcast Cellular. In 1999, she became Director of Marketing when SBC purchased Comcast. In 2010, Alison became Director of Sales Operations and took over the Indirect Sales Director position in 2011, leading both National Retail and Local Dealer Distribution. In January 2014, Alison was given sole responsibility to lead the Authorized Retailer team. Today, Alison is responsible for 122 AT&T Retail, Authorized Retail and National Retail locations in Southeastern PA.  Alison graduated from Drexel University with a BS in Business Administration, double majoring in Marketing/Operations Management and earned a Master's degree from Penn State University. Alison previously served as a mentor in the RMDP Program and currently sits on the Board for the Women of AT&T-Philadelphia.  She is also a two-time Summit Winner (Regional President's Choice).  Alison lives in Collegeville, PA with her husband Paul and 2 dogs. She is an avid golfer and enjoys photography.

# GAGE DECLARATION
# EXHIBIT 27

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALISON RAY
   Collegeville, PA 19426,

Plaintiff,

v.

AT&T MOBILITY SERVICES LLC.
   1025 Lenox Park Blvd., NE.
   Atlanta, GA 30319,

Defendant.

No. 2:18-cv-03303-TR

Magistrate Judge Timothy R. Rice

### Declaration of Kyle Mundis

  1.  I am a Human Resources Business Partner at AT&T. For roughly the past three years, I have been responsible for providing human resources support to the Ohio/Pennsylvania Market of AT&T Mobility Sales and Services. I submit this declaration in support of AT&T Mobility Services LLC's cross-motion for partial summary judgment in the above-captioned matter. I have personal knowledge of the facts contained in this declaration and if called to testify under oath, I could and would testify competently to them. I have reviewed Exhibit 1 to the Declaration of Alison Ray submitted in connection with the above-captioned matter.

  2.  Alison Ray was a Director of Sales from September 2011 through January 15, 2018. Ms. Ray had responsibility over various retail locations in Southeastern Pennsylvania, a territory within the Ohio/Pennsylvania Market of AT&T Mobility Sales and Services. As of November 16, 2017, the Ohio/Pennsylvania Market was part of the East Region of Mobility Retail Sales and Services, led by Region President Jennifer Van Buskirk. Throughout this declaration, I refer to the East Region of Mobility Sales and Services as the "East Region."

1

3.     Prior to November 16, 2017, AT&T engaged in a decision-making process to select employees in the East Region of Mobility Sales and Services for participation in an employment surplus program. Throughout this declaration, I refer to this decision-making process as the "Restructuring."  The Restructuring was assigned the Business Case ID 17-350.

4.     Prior to the Restructuring, Jennifer Van Buskirk was the President of the Northeast Region of Mobility Retail Sales and Services.  On August 17, 2017, Ms. Van Buskirk announced via email that the Northeast Region (which included the Ohio/Pennsylvania Market) was consolidating with the Heartland States, Georgia/South Carolina, and Florida markets to form the "East Region."  That email announcement is attached to this declaration as Exhibit A. Ms. Van Buskirk sent the email to the employees in the East Region and signed it under her new title: "President – East Region." Ex. A.

5.     On August 17, 2017, AT&T announced the formation of the East Region to employees in the East Region, stating that "Jennifer Van Buskirk, Region President – Northeast will now be Region President – East."  That email announcement is attached to this declaration as Exhibit B.  The email also confirmed that going forward, the Vice Presidents and General Managers responsible for the Heartland States, Georgia/South Carolina, and Florida markets would report to Ms. Van Buskirk.

6.     Company documents that employees in the East Region commonly interacted with in the normal course of business identified them as part of the East Region of Mobility Retail Sales and Services.  For example, Alison Ray's "People Profile" in the company directory identified her as a "DIRECTOR OF SALES" in the "RETAIL SLS & SVC – PA/OH" market, within the "MOBILITY RTL SLS & SVC – EAST REG."  A copy of a relevant excerpt of Ms. Ray's People Profile is attached to this declaration as Exhibit C.

DEF_0000318

7.     The purpose of the Restructuring was to reduce layers and increase operational efficiencies in the East Region.  To achieve this goal, the East Region was tasked with ensuring that each manager had at least 10 employees directly reporting to her or him.  Prior to the Restructuring, many managers in the East Region had fewer than 10 direct reports.

8.     Employees in the East Region were asked whether they had an interest in leaving the company.

9.     As part of the Restructuring, AT&T identified Affected Work Groups ("AWGs") in the East Region for reduction, which were comprised of employees in the same or similar job titles who shared similar characteristics (e.g., sharing common managers or being responsible for geographic areas proximate to other employees in the same AWG).

10.     There were 36 AWGs in the East Region for the purposes of the Restructuring, which collectively comprised the Decisional Unit.

11.     Alison Ray was in AWG 12, which was comprised of the employees in the Director of Sales position who were responsible for territories in what was called the Ohio/Pennsylvania market.

12.     There were eight Directors of Sales in AWG 12. Based on its review of the East Region for the Restructuring, AT&T determined that the number of Director of Sales positions in AWG 12 would be reduced by two. To that end, these employees were rated by their supervisors, Alyson Woodard and Judith Cavalieri, in several categories: Performance, Leadership (comprised of five sub-categories), Skills, and Experience.  The supervisors assigned scores of 1-5 to each employee in each category.

13.     After the rating process, the two Directors of Sales in AWG 12 who received the lowest numerical scores were selected for participation in the group surplus program and were

3

DEF_0000319

thus placed on surplus status as of November 16, 2017. Their positions were accordingly eliminated.

14.     Alison Ray was one of the two lowest-ranked Directors of Sales in AWG 12, and as a result was selected for participation in the group surplus program and placed on surplus status as of November 16, 2017. Her position was eliminated. The territory that she covered was divided among other Directors of Sales.

15.     On November 16, 2017, AT&T provided to Ms. Ray the Surplus Notification Letter, a true and accurate copy of which is attached as Exhibit 1 to the Declaration of Alison Ray submitted in connection with the above-captioned matter. The Surplus Notification Letter directed Ms. Ray to access several resources on the Mechanized Employee Surplus Administration ("MESA") website including an "ADEA Listing" generated by the MESA system. These documents, which I refer to collectively in this declaration as the "Package," constituted the company's final offer to Ms. Ray with respect to the severance package she was offered in exchange for a release of claims. The company did not make any subsequent offer to Ms. Ray in this respect.

16.     AT&T did not provide the Package to any employees in the East Region prior to November 16, 2017.

17.     On January 16, 2018, Ms. Ray returned the executed General Release and Waiver provided in the Package. She did not revoke her acceptance. The Company made the severance payments to Ms. Ray in full. Ms. Ray has not returned any portion of those severance payments.


I declare under penalty of perjury that the foregoing is true and correct. Executed this 29 day of October 2018, in Dauphin County, Pennsylvania.

4

Kyle Mundis

DEF_0000321

# EXHIBIT A

**From:** Jennifer Van Buskirk - Northeast Region
**Sent:** Thursday, August 17, 2017 4:03 PM
**To:** Jennifer Van Buskirk - Northeast Region <g47278@att.com>
**Subject:** Announcing the New East Region



# Announcing the New East Region

Team,

I am thrilled to announce that the Heartland States, Georgia/South Carolina, and Florida markets will join our former Northeast Region to create the powerful East Region.  These three markets are known for their execution and dedication to excellence.  Combined with the Northeast Region's passion to win, the new East Region will be unstoppable.  I could not be more excited to see what we can accomplish together.



As we become one, it is important to stay focused on our priorities – taking care of our customers and driving sales growth.  This change is an opportunity to share best practices, step up our game, and execute.

I look forward to working with all of you.  Welcome to the new East Region team!

#biggER

#strongER
#bettERtogether

Jennifer Van Buskirk
President – East Region

1

DEF_0000323

# EXHIBIT B

DEF_0000324

**From:** Rasesh Patel - AT&T Entertainment Group
**Sent:** Thursday, August 17, 2017 3:18 PM
**To:** Rasesh Patel - AT&T Entertainment Group <g06826@att.com>
**Subject:** Our Entertainment Group Digital, Retail and Care leadership team



**To**: All AT&T Entertainment Group Digital, Retail and Care employees

As we stay focused on serving our customers and exceeding our objectives, I wanted to clarify for you the next level of appointments for our AT&T Entertainment Group Digital, Retail and Care leadership team. Your leadership may share additional announcements clarifying roles on their teams.

Thank you for continuing to work together, to be the face and voice of AT&T to our customers and to deliver on our EG goal of a premium, effortless mobile and entertainment experience.


Rasesh Patel

- Rasesh

Rasesh Patel
Senior Executive Vice President
Digital, Retail and Care
AT&T Entertainment Group

## Sales & Distribution

The following report to **Brian Shay**, President – Sales & Distribution:

    **Jennifer Van Buskirk**, Region President – Northeast will now be Region President – East.  Jennifer will remain in Bedminster, New Jersey.  In addition to her current direct reports the following will also report to Jennifer:
        **Marvy Moore:** Vice President and General Manager - Georgia/South Carolina
        **Cristy Swink:** Vice President and General Manager - Florida
        **Kristi Turner:**  Vice President and General Manager - Heartland States

    **Shelley Goodman –** will assume an Interim leadership role for the Central Region. In addition to the current Central Region VPGMs, **Eric Goldfeld**, Vice President and General Manager - Gulf States, will also report to Shelley. Shelley will remain in Chicago.

DEF_0000325

**Jeff Bradley**, Region President – West. There are no changes to Jeff's VPGM direct reports. Jeff will remain in Redmond, Washington.

**JJ Davila**, Vice President and General Manager - Puerto Rico/USVI. JJ will remain in Guaynabo, Puerto Rico.

**Ed Balcerzak**, Senior Vice President – Connected Communities. **Doug Eichler,** Vice President – Commercial Sales, will be transitioning to the Business Solutions organization under **Anne Chow,** President – National Business. Ed's other direct reports remain the same. Ed will remain in Dallas.

**Rob Forsyth**, Vice President – In-Home Experts. Rob has responsibility for leading our newest sales channel that provides a premier, white-glove service to customers who order DIRECTV service. Rob will remain in Dallas.

**Jennifer Chrisco**, Chief of Staff. Jennifer will remain in Dallas.

**Holly Poe**, Executive Assistant. Holly will remain in Dallas

## Distribution Channel Partners

The following report to **Mike Wittrock,** Senior Vice President – Distribution Channel Partners:

**Rich Guidotti**, Vice President – Local Channel Partners. Rich will continue to be responsible for sales and distribution through local strategic partners and door to door partners and continue to shape those partner channels towards our full bundles strategy.  Rich will remain in Dallas.

**Charlie Conway**, Assistant Vice President – Carrier Partners. Charlie will maintain responsibility for our strong carrier partnerships as we continue to expand our distribution reach for all consumer products.  Charlie will remain in Dallas.

**Vacant**, Assistant Vice President – Indirect eComm, will be responsible for E-commerce partnerships as we continue to expand our digital bundling strategies.

**Dale Rayman**, Assistant Vice President – National Retail and Third Parties. Dale will continue to lead our national retail and third party labor relationships and shape those relationships toward our full bundles strategy.  Dale will remain in Dallas.

**Steve Menard**, Assistant Vice President – Dealer Operations – Business Development. Steve will be responsible for building our contractual relationships for consumer products nationally as we strive to create new types of partnerships around our bundles strategy.  Steve will remain in Dallas.

**Vacant**, Assistant Vice President – Sales Strategy and Planning. This position will be responsible for designing and executing competitive channel strategies to enhance the productivity and growth of our consumer product sales.

**Debra Gaymon-Mcnair**, Chief of Staff. Debra will remain in Dallas.

**Erika Rawcliffe**, Executive Assistant. Erika will remain in Dallas.

## Care and Sales Centers

The following report to **Jamie Barton,** Executive Vice President – Care and Sales Centers:

**Carmen Nava**, Senior Vice President – Premium Care and Customer Loyalty. Carmen's teams span across Customer Loyalty, Connected Communities, Commercial, Retail Support, Office of the President, National Back Office, and Chronic Care. Carmen will remain in Dallas.

DEF_0000326

**LeAnn Priebe**, Senior Vice President – Technical Care. LeAnn continues leading our Technical Care and Chat teams who provide technical and digital support for all video, internet, and wireless services including DIRECTV NOW. LeAnn will remain in Dallas.

**Anthony Tuggle**, Vice President – Sales. Anthony continues leading our Sales teams including Mobility Sales and Service, U-verse, Direct Sales, Outbound Telemarketing, Movers, Reconnects, Sales Support, and Mobility Prepaid. Anthony will remain in Atlanta.

**Brenda Kittila**, Vice President – Business Customer Service. Brenda will be transitioning to the Business Solutions organization under **Anne Chow,** President – National Business.

**John DeVaul**, Assistant Vice President – Service and Productivity. John oversees the teams who handle our Integrated Service Model multi-product single bill customers, our DIRECTV service customers, and our existing U-verse customers. John will remain in Orange Park, Florida.

**Mimi Gourley**, Assistant Vice President – Center Strategy and Planning. Mimi is responsible for call center strategy, labor support, and expense management, as well teams servicing our low-cost broadband and Lifeline customers. Mimi will remain in San Antonio, Texas.

**Nathan Watt**, Director – Lead Project Manager. Nathan will continue serving as Jamie's Chief of Staff and will oversee strategic projects for the organization. Nathan will remain in Dallas.

**Nick Grande**, Senior Manager – Lead Analyst and Ops Support. Nick's functions include reports and analytics, operational review support, and monitoring performance results. Nick will be located in Dallas.

**Tina Dennis**, Executive Assistant. Tina will remain in Dallas.

## Digital

The following report to **Fred Devereux,** Senior Vice President – Digital:

**Brian Collins**, Vice President – Digital Sales, Service, and Support Planning and Management. Brian's team enables a Learn, Buy, Get, Use, Pay, Support (LBGUPS) model that seamlessly emulates how customers do business with AT&T through the entire lifecycle. Brian will be located in Dallas.

**Devin Merrill**, Vice President – Digital Strategy, Experience & Execution. Devin's team will drive our digital vision, customer experience strategy, and design across the Digital Sales, Service, and Support flow, to deliver a seamless experience across all customer touch points. Devin will be located in Dallas.

**Nicole Rafferty**, Vice President – Customer Experience and Operations Support, is appointed Vice President – Customer Enablement and Digital Transformation. Nicole will lead the newly formed Customer Enablement and Digital Transformation Program.  This creates the structure to deliver our digital strategy in a rapidly changing environment that requires agile and integrated execution of seamless customer experiences. Nicole will remain in Dallas.

**David King**, Assistant Vice President – Digital Intelligence and Advanced Analytics. David's team enables the organization to achieve business goals through data, performance measurement and insights. David will be located in Dallas.

**Eva Torrence**, Principal Project Program Manager. Eva is responsible for Chief of Staff duties including all internal communications, presentations, events, planning and support. Eva will be located in Dallas.

**Lauren Howard**, Executive Assistant. Lauren is responsible for executive support to Fred Devereux. Lauren will remain in Dallas.

## Customer Experience & Analytics

DEF_0000327

The following report to **Frank Hironaka,** Senior Vice President – Customer Experience & Analytics:

**Jeanet Mika**, Vice President – Product Customer Experience. Jeanet will be responsible for improvements to fielded product performance, new product customer introduction, and multi-platform automated test and diagnostics across all Entertainment Group products. Jeanet will remain in El Segundo.

**Woody Berner**, Assistant Vice President – Service Customer Experience. Woody will be responsible for improving the service experience, including how customers modify accounts, interact with billing and payments processes, and resolve non-technical interactions.  Woody will remain in Dallas.

**Lonnie Hansen**, Assistant Vice President – Advanced Analytics. Lonnie will be responsible for leading the insights, analytics, and data strategy for improving the customer experience. Lonnie will remain in El Segundo.

**Baldeep Sadhal**, Assistant Vice President – Customer Experience Strategy. Baldeep will be responsible for defining the overall customer experience strategy and roadmap.  Baldeep will remain in El Segundo.

**Vacant**, Assistant Vice President – Sales Customer Experience. This position will be responsible for improving how customers engage in the sales process. This position will be located in El Segundo.

**Vacant**, Assistant Vice President – Customer Experience Trials. This position will be responsible for enhancing capabilities to allow for rapid iteration of test & trial improvements across any customer touch point.  This position will be located in Dallas.

**Rob Howayeck**, Director – Chief of Staff for Customer Experience & Analytics. Rob will remain in Dallas.

**Shonna Dudley**, Executive Assistant for Customer Experience & Analytics. Shonna will remain in Englewood, Colorado.


## Operations

The following report to **Vicki Jones**, Senior Vice President – Operations:

**Martin Chandler**, Vice President – Customer Experience and Operations. Martin will retain current responsibilities and assume leadership of employee engagement. Martin will be located in Dallas.

**Kevin Mairs**, Vice President – Compensation, Analytics, and Reporting. Kevin will retain current responsibilities and assume leadership of employee expense oversight and EG audits. Kevin will be located in Dallas.

**Vicki Martin**, Vice President – Program Execution. Vicki will retain current responsibilities. Vicki will remain in Dallas.

**Steve Schanz**, Vice President – Operations Support: Steve will retain current responsibilities and assume leadership of Connected Communities integrated platform implementation. Steve will remain in Dallas.

**Melissa Bolden,** Assistant Vice President – Project Program Management. Melissa will continue to lead the execution of our platform integration that will unify frontline capabilities across channels. Melissa will remain in Dallas.

**Andy Nolen,** Assistant Vice President – Project Program Management. Andy will retain current responsibilities for FCC Merger Conditions. Andy will remain in Atlanta.

**Anita O'Neal,** Lead Chief of Staff. Anita will retain current responsibilities and assume leadership of Corporate Real Estate planning and Operating Initiatives management. Anita will remain in Dallas.

**Rachel Najera,** Executive Assistant. Rachel will retain current responsibilities. Rachel will remain in Dallas.

DEF_0000328

# EXHIBIT C

DEF_0000329



## ALISON RAY

DIRECTOR OF SALES
RETAIL SLS & SVC - PA/OH,
MOBILITY RTL SLS & SVC -
EAST REG

City: KING OF PRUSSIA

State:PA

Country:USA

## My Profile

Personal Brand
Statement

### My Impact

No data

Employee
Information

### Job Information

| | |
|---|---|
| Job Title | **DIRECTOR OF SALES** |
| Job Key | **24601109** |
| Level | **3** |
| Skills Pivot Indicator: | **-** |
| NCS Date | **May 16, 1994** |
| Country Indicator | **USA** |
| Company Name | **AT&T Mobility Services LLC** |
| Business Unit | **MOBILITY RTL SLS & SVC - EAST REG** |
| Department | **RETAIL SLS & SVC - PA/OH** |
| Payroll ID | **00237622** |

### Personal Insights

No data

10/24/2018, 11:59 AM

DEF_0000330

# GAGE DECLARATION
# EXHIBIT 28

## ALLISON RAY

### Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3     .                * * *
 4     DONALD DOLENTI           :
                               :
 5              v.             :
                               :
 6     AT&T MOBILITY SERVICES, LLC,:
       D/b/a AT&T         :  NO. 18-05077
 7
 8                       * * *
 9              October 18, 2019
10                       * * *
11
12              Oral deposition of ALISON RAY,
13     held in the offices of Karpf, Karpf & Cerutti,
14     PC, 3331 Street Road, Two Greenwood Square,
15     Suite 128, Bensalem, Pennsylvania 19020,
16     commencing at 10:15 a.m., on the above date,
17     before Hope Agosto, a Professional Court
18     Reporter and a Notary Public.
19
                         * * *
20
21
22              R&K REPORTING
            Court Reporting Services
23               PO Box 1372
         Levittown, Pennsylvania 19058-1372
24     Phone (215) 946-7009    Fax (215) 949-1867
```

### Page 2

```
 1     A P P E A R A N C E S:
 2
 3        KARPF, KARPF & CERUTTI, PC
          BY:  CHRISTINE E. BURKE, ESQUIRE
 4        3331 Street Road
          Two Greenwood Square
 5        Suite 128
          Bensalem, Pennsylvania 19020
 6        (215) 639-0801
          CBurke@karpf-law.com
 7        -- Counsel for the Plaintiff
 8
 9        LITTLER MENDELSON, PC
          BY:  WILLIAM J. LEAHY, ESQUIRE
10        Three Parkway
          1601 Cherry Street
11        Suite 1400
          Philadelphia, Pennsylvania 19102
12        (267) 402-3000
          WLeahy@littler.com
13        -- Counsel for the Defendant
14
15        CONSOLE MATTIACCI LAW
          BY:  DANIEL S. ORLOW, ESQUIRE
16        1525 Locust Street
          9th Floor
17        Philadelphia, Pennsylvania 19102
          (215) 545-7676
18        Orlow@consolelaw.com
          -- Counsel for the Witness
19
20
21
22
23
24
```

### Page 3

```
 1                    * * *
 2                    INDEX
 3                    * * *
 4     WITNESS                          PAGE NO.
 5     ALISON RAY
 6        By Ms. Burke                   6,265
 7        By Mr. Leahy                     223
 8                    * * *
 9                   EXHIBITS
10                    * * *
11     NO.     DESCRIPTION              PAGE NO.
12     Ray-1  Ray Civil Action Complaint      10
13     Ray-2  2017 Performance Goals          22
14     Ray-3  Gearing Up for the Cloud, AT&T  46
               Tells Its Workers:  Adapt,
15             Or Else Article
16     Ray-4  7/11/17 Letter to Dangleman re:  55
               Your AT&T Internal Job Offer
17
       Ray-5  Dangleman Application            55
18
19     Ray-6  3/31/17 Letter to Espinosa re:   55
20             Your AT&T Internal Job Offer
21     Ray-7  Espinosa Application             55
22     Ray-8  2106 My Performance Plan for     58
               Joales A Espinosa
23
24     Ray-9  Year Over Year Growth           118
               Spreadsheets
```

### Page 4

```
 1                    * * *
 2             EXHIBITS CONTINUED
 3                    * * *
 4     NO.     DESCRIPTION              PAGE NO.
 5     Ray-10 Dolenti ARSM Coaching Discussion 138
 6
 7     Ray-11 2017 Fall Director Ops Review    154
               Alison Ray
 8
       Ray-12 Director Overview (Alison Ray)   160
 9
       Ray-13 2015 My Performance Plan for     162
10             Donald Dolenti
11     Ray-14 4/11/13 Letter to Dolenti re     172
               Your AT&T Internal Job Offer
12
       Ray-15 2017 My Performance Plan for     186
13             Donald Dolenti
14     Ray-16 10/11/17 Email re: Rating and    224
               Ranking with Attachment
15
       Ray-17 10/16/17 Email re: Copy of       226
16             20171011.xlsx with Attachment
17     Ray-18 Complaint for Employment         233
               Discrimination
18
       Ray-19 10/10/17 Email Chain re: KPI     246
19             Market Leaders 2017-10-09
20     Ray-20 10/9/17 Email Chain re:          248
               Bottom 2
21
22
23
24
```

ALLISON RAY

Page 25

1     Q.   Could you turn to the second page,
2  please?
3     A.   (Witness complies with request.)
4     Q.   This second page, does that go with
5  the first page?
6     A.   Does it go with it?
7     Q.   Yes.
8     A.   Yes.
9     Q.   These are your documents.  I'm not
10 familiar with them.
11    A.   Yes.
12    Q.   Could you go to the third page,
13 please?
14    A.   Yes.
15    Q.   This says 9-Box, all employees levels
16 2 through 5 should be assigned a 9-Box rating.
17 It has performance on the left-hand side and
18 leadership on the bottom.  Do you see that?
19    A.   Yes.
20    Q.   What was this for?
21    A.   They used this document when they were
22 assessing high potential employees, and high
23 potential employees would typically be the ones
24 that would get promoted.  This 9-Box was part of

Page 26

1  that process.  It was called hi-po, high
2  potential, and this 9-Box rating would filter
3  into a high potential candidate.  Aside from
4  this with the hi-po designation, an employee had
5  to indicate whether or not they were mobile in
6  order to be considered hi-po.
7     Q.   Meaning willing to relocate?
8     A.   Yes.
9     Q.   Is this document provided to you in
10 connection with the first two pages of this
11 exhibit or this was a standalone document that
12 you were given otherwise for guidance in
13 potential promotions?
14    A.   I don't recall if this was sent at the
15 same time.
16    Q.   At some point in time in either 2016
17 or 2017 were you encouraging Mr. Dolenti to look
18 toward a promotion?
19    A.   Yes.
20    Q.   Did you ever use the 9-Box for him to
21 assess him?
22    A.   Yes.
23    Q.   You actually completed that process?
24    A.   Yes.

Page 27

1     Q.   And who did you give that to, if
2  anyone?
3     A.   It would have been Kyle Mundis, who is
4  our HR manager, and my boss, Judy Cavalieri, my
5  former boss.
6         MS. BURKE:  Can you mark the page,
7     please, Hope?
8              *  *  *
9     (Whereupon, Counsel requested the
10    transcript be marked.)
11             *  *  *
12 BY MS. BURKE:
13    Q.   Finally, the last three pages of this
14 document are labeled business case rating and
15 ranking categories.  Do you see that?
16    A.   Yes.
17    Q.   It says this document describes the
18 categories to be reviewed and assessed by
19 supervisors designated as assessors or raters
20 during the surplus process.
21    Do you see that?
22    A.   Yes.
23    Q.   Instruction or, whatever term you want
24 to use, was this particular document, all three

Page 28

1  pages here, Ray 89 through 91, given to you in
2  connection with the directive for you to rate
3  your team members in the fall of 2017?
4     A.   Yes.
5     Q.   Was this attached to an email?
6     A.   Yes.
7     Q.   Beyond this business case rating and
8  ranking carries, which I would agree with you
9  contains various descriptions or definitions,
10 were you given any other instructions that you
11 can remember in connection with the rating
12 process?
13    A.   Just to use my best judgment.
14    Q.   You say that with some emphasis.  Is
15 there a reason for that?
16    A.   Well, I just recall that, you know,
17 when I opened up the actual spreadsheet, the
18 performance category, I believe we had to enter
19 their performance rating, and we did not have
20 any performance reviews in 2017.  So I called
21 our HR manager and said, what am I supposed to
22 put in here, and he said use your best judgment.
23    Q.   I'm going to go over the spreadsheet
24 with you.  Okay?

R&K REPORTING, INC.

ALLISON RAY

Page 29

1    A.   Yep.
2    Q.   **When you say HR manager, you're**
3    **referring to Mundis?**
4    A.   Yes.
5    Q.   **We got way off track here, but the**
6    **reason why we got to Exhibit Ray-2 to begin**
7    **with, and in particular the last three pages**
8    **which are the business case rating and ranking**
9    **categories, is I was having a discussion with**
10   **you about what impact, if any, there may be in**
11   **the rating process based on some of the current**
12   **ratings in a performance review.  Do you**
13   **remember that line of questioning?**
14   A.   Yes.
15   Q.   **If you could to Bates stamped Ray 90**
16   **in Exhibit Ray-2, do you see where it says**
17   **performance definitions?**
18   A.   Yes.
19   Q.   **You told me you were given various**
20   **definitions and this was part of an employee**
21   **email that was provided to you, correct?**
22   A.   Yes.
23   Q.   **It says consider performance**
24   **demonstrated by your employees over time (the**

Page 30

1    last two to three years.)
2    Q.   **Did you see that?**
3    A.   Yes.
4    Q.   **In rating your subordinates, did you**
5    **understand that you were not supposed to**
6    **consider their performance just as it stood in**
7    **2017 but to look back for the last two to three**
8    **years?**
9    A.   Did I understand that?
10   Q.   **Yes.**
11   A.   Yes.
12   Q.   **Did you actually do that or did you**
13   **look at their performance as it stood in time?**
14   A.   I don't remember exactly what I did on
15   that day that I did it.
16   Q.   **Is there any documents in the whole**
17   **world that would help you remember?**
18   A.   I don't know.
19   Q.   **Did you take any of your own personal**
20   **notes in connection with the rating process and**
21   **keep them for yourself?**
22   A.   For the rating process, no.
23   Q.   **Like on a notepad of your own and take**
24   **them with you when you left your employment?**

Page 31

1    A.   I had a personal notebook with
2    work-related information, but I no longer have
3    it.  I mean, when I got surplused, I got rid of
4    my notebooks.  I had no need for them.
5    Q.   **Did you know that you were going to**
6    **sue the company at the time of that surplus?**
7    A.   Not on the day of my surplus.
8    Q.   **And the notebook, did you actually**
9    **take notes of the rating process?**
10   A.   No.
11   Q.   **Like, for example, anything you had to**
12   **say about Don Dolenti or any of his peers?**
13   A.   No.
14   Q.   **So looking at these performance**
15   **definitions, you would agree with me that**
16   **certain ratings correspond with a point scale.**
17   **Do you see that?**
18   A.   Yes.
19   Q.   **For example, if someone is fully**
20   **meets, which you were in your business category,**
21   **right?**
22   A.   Uh-huh.
23   Q.   **It corresponded a point value of 3,**
24   **right?**

Page 32

1    A.   Correct.
2    Q.   **If someone got an exceeds, they would**
3    **get a higher point scale, 4, right?**
4    A.   Correct.
5    Q.   **When you were completing the ratings**
6    **for your employees, did you use this point scale**
7    **in assessing their prior evaluations?**
8    A.   Yes.
9    Q.   **Had you made up your mind one way or**
10   **the other when you did Don Dolenti's rating**
11   **exactly what you were going to give him in**
12   **February of 2018 when the performance**
13   **evaluations were to roll out?**
14        MR. ORLOW:  Objection to form.  I
15        don't understand it, but you can
16        answer the question if you understand
17        it the question.
18        THE WITNESS:  I don't understand
19        the question.
20   BY MS. BURKE:
21   Q.   **Don Dolenti's performance formal**
22   **evaluation for 2017 would not have come out**
23   **until early 2018, correct?**
24   A.   Correct.

ALLISON RAY

Page 33

1    Q.   And so when you were notified that you
2    had to rate your employees, had you already
3    decided for any of your employees what score you
4    were going to give them on their performance
5    evaluations?
6       A.   I'm having a hard time coming up with
7    an answer to that because I was asked to rate in
8    October; that wouldn't have impacted a February
9    2018 rating.  That's maybe I'm not
10   understanding.
11      Q.   I would agree with you.  I'll try to
12   be more clear in my question.
13           When did you first learn that anybody
14   on your team may be impacted by the surplus?
15      A.   We were notified in October of 2017.
16      Q.   Immediately before you were notified
17   of the surplus, had you already started
18   commencing any of the performance reviews for
19   your team members?
20      A.   No, I don't believe I did.
21      Q.   And at that point, had you made a
22   decision as to what score Don Dolenti would get
23   in his upcoming annual review?
24      A.   No.

Page 34

1       Q.   Were you anticipating rating him does
2    not meet, meets some, or you had no idea at that
3    point in time?
4       A.   I had no idea.
5       Q.   As we sit here right now, do you know
6    one way or the other whether or not the
7    individuals who rated you in connection with
8    your notification of job elimination used
9    similar rating instructions as you were given
10   for your team members?
11      A.   My assumption is that they used the
12   same.
13      Q.   Looking at Ray 98 within exhibit
14   Ray-2, do you believe that if individuals had
15   exceeds or far exceeds on their performance
16   evaluations they would have gotten higher point
17   scores than you in the performance category?
18      A.   Can you repeat the question?
19      Q.   Looking at this instruction page, do
20   you believe that if your peers had exceeds or
21   far exceeds on their reviews, they would have
22   gotten a higher point score than you in the
23   performance category?
24      A.   I would make that assumption.

Page 35

1       Q.   Now, going back to your Complaint,
2    which is Ray-1, again, despite your excellent
3    performance through your 23 years of service
4    with defendants -- did you believe that AT&T
5    should have taken your years of service into
6    account when making the decision about the
7    reduction in force?
8           MR. LEAHY:  Objection to form.
9           THE WITNESS:  Yes.
10   BY MS. BURKE:
11      Q.   Why?
12      A.   I felt my tenure there was a good
13   indication of the experience.
14      Q.   Did you think it was a good indication
15   of your skill set?
16      A.   It's a different category.
17      Q.   I know that.  I'm asking if you think
18   it was a good indication of your skill set?
19      A.   No.
20      Q.   You just think that was a good
21   indicator regarding your experience?
22      A.   Yes.
23      Q.   So if someone hypothetically had been
24   there for one year and you were there 23 years,

Page 36

1    do you believe you should have gotten a higher
2    points rating in the category of experience?
3       A.   Yes.
4       Q.   Just a logical connection, right?
5       A.   Yes.
6       Q.   Again, I'm going on Exhibit Ray-1.
7    You say you were terminated on account of your
8    age (49 at the time of the termination) as a
9    result of AT&T's company wide Workforce 2020
10   plan to reduce what it perceived to be an aging
11   workforce.
12           Do you see that?
13      A.   Where are you?
14      Q.   Page 1, the second paragraph.  Do you
15   want me to read it to you again?
16      A.   Nope.
17      Q.   When you filed this lawsuit in August
18   of 2018, what, if anything, did you know about
19   AT&T's company wide Workforce 2020 plan?
20      A.   I was aware of it because when I
21   worked at the company, I saw various stories,
22   you know, from Randall Stephenson indicating the
23   vision, and leadership would send out emails
24   about training initiatives.

R&K REPORTING, INC.

Page 65

1      Q.   I want to look at Paragraph 30.
2      A.   Yes.
3      Q.   Employees are selected for surplus
4  based on centrally-determined company-wide
5  ill-defined and/or subjective criteria in a
6  process infected with age bias.
7          Do you believe that's true?
8      A.   Yes.
9      Q.   Do you believe that only applied to
10  your rating process or you also believe that
11  applied to the rating process that was applied
12  to Mr. Dolenti?
13     A.   Yes.
14     Q.   Yes, it also applied to Mr. Dolenti?
15     A.   Yes.
16     Q.   Without limitation, employees are
17  assigned a rating for, quote, skills.  However,
18  the, quote, skills supposedly assessed are not
19  those necessary to perform an actual job but a
20  job of the, quote, future per vision 2020; thus
21  permitting managers to assign ratings based on
22  the ageist stereotype that older workers could
23  not or would not acquire, quote, high tech
24  skills necessary for these future jobs.

Page 66

1          Do you see that?
2      A.   Yes.
3      Q.   Do you believe that that was applied
4  to Mr. Dolenti when he was rated?
5          MR. ORLOW:  Objection to form.
6          You can answer.
7          THE WITNESS:  Yes.
8  BY MS. BURKE:
9      Q.   Why?
10     A.   I just feel like the category or the
11  ratings had to be -- they're subjective.  There
12  was no -- there was no information that was
13  factual that would provide you with the
14  opportunity to put a specific rating in.
15  Everything for this category as the others was
16  based on how you felt about their skills.  It
17  was subjective.
18     Q.   Did you feel Don had good skills?
19     A.   Over what period of time?
20     Q.   In general.
21     A.   Don had very good skills when it came
22  to understanding the processes and the policies
23  of the company.  I felt, however, his leadership
24  skills in 2017 were not as good as what they had

Page 67

1  previously been.
2      Q.   Well, in 2016, did you tell him that
3  his leadership skills were exceeds?
4      A.   Yes.
5      Q.   And you knew that in rating the
6  managers, you were specifically directed to look
7  back at least two to three years, right?
8      A.   Yes.
9      Q.   Not just look at 2017?
10     A.   Yes.
11     Q.   So you personally weren't going to let
12  anything that may have had happened in 2016
13  taint your overall rating process, were you?
14         MR. ORLOW:  Objection to form.
15         MR. LEAHY:  Objection to form.
16         THE WITNESS:  Repeat the question.
17             * * *
18         (Whereupon, the court reporter
19  read back the pertinent testimony.)
20             * * *
21         MR. LEAHY:  Same objection.
22         MR. ORLOW:  Objection.
23         THE WITNESS:  I used feedback in
24  my observations in 2017 as part of the

Page 68

1          process that I rated.
2  BY MS. BURKE:
3      Q.   Were you going off how Don was doing
4  only in 2017 or did you actually take into
5  consideration the last two to three years?
6      A.   I took the prior years into
7  consideration but I also included 2017.
8      Q.   In 2017, your perception regarding
9  that his leadership was not as good as years
10  prior, was that based on any Inspire and Engage
11  surveys?
12     A.   That was a piece of it.
13     Q.   You yourself were subject to Inspire
14  and Engage surveys, right?
15     A.   That is correct.
16     Q.   Did you put a lot of stock in those?
17     A.   Personally, which we're not supposed
18  to, yes, but I did.
19     Q.   How were yours?
20     A.   They were improved from 2016.
21     Q.   2016, yours weren't that great, right?
22     A.   No.
23     Q.   In fact, what, 38 or 40 percent of
24  your team, they didn't give the best ratings of

ALLISON RAY

Page 69

1   you from a leadership standpoint?
2         A.   For me personally?
3         Q.   Yeah.
4         A.   I don't remember the exact score.  I
5   remember they were not good.
6         Q.   Do you believe that that should have
7   been held against you as part of your overall
8   leadership rating when it came to determining
9   whether you should be subject to a job
10  elimination?
11             MR. LEAHY:  Objection to form.
12             THE WITNESS:  If that was part of
13        the criteria of looking at performance
14        and leadership, then why should I be
15        held any different than everybody
16        else:
17  BY MS. BURKE:
18        Q.   You knew leadership was one of the
19  categories, right?
20        A.   Correct.
21        Q.   And you didn't have the greatest score
22  for leadership in 2016, based on your Inspire
23  and Engage survey?
24             MR. ORLOW:  Objection to form.

Page 70

1             THE WITNESS:  I don't remember the
2        exact score, but my scores were not
3        good.
4   BY MS. BURKE:
5         Q.   Those Inspire and Engage surveys are
6   done by the subordinates, right?
7         A.   Correct.
8         Q.   And there are any number of factors
9   that may prompt them to give you less than
10  stellar comments, right?
11             MR. LEAHY:  Objection to form.
12             THE WITNESS:  Sure.
13  BY MR. BURKE:
14        Q.   Including if an employee is being
15  counseled, coached, put on a PIP?
16             MR. LEAHY:  Objection to form.
17             THE WITNESS:  Could you repeat
18        that?
19  BY MS. BURKE:
20        Q.   If the employee is being actively
21  disciplined, you think they're going to give you
22  a good score?
23        A.   Probably not.
24        Q.   So Mr. Dolenti, you said part of your

Page 71

1   consideration of his leadership score was
2   Inspire and Engage survey in 2017?
3         A.   Yes, part of it.
4         Q.   Did he have any employees to your
5   knowledge that were being actively coached or
6   put on any kind of disciplinary PIPs?
7         A.   At what point?
8         Q.   In '17.
9         A.   Yes, I believe there was Alyse Brock
10  was put on -- I think she was put on a plan, and
11  one of his assistant managers was on a plan.  I
12  can't remember, his name was Matt something.
13        Q.   Were those people excluded from
14  participating in the Inspire and Engage survey
15  or they were allowed to participate like anyone
16  else?
17        A.   They were able to participate.  The
18  Inspire and Engage survey I believe was in
19  February.  So I don't know the timing of when
20  these employees were on plans.  I don't know if
21  that falls within the same time that the Inspire
22  and Engage survey was.
23        Q.   Do you believe that being assigned
24  ratings based on ageist stereotypes was

Page 72

1   something that only happened to you or do you
2   believe that that also transpired with Dolenti?
3   I'm just trying to understand.
4             MR. LEAHY:  Objection to form.
5             MR. ORLOW:  Objection to form.
6   BY MS. BURKE:
7         Q.   You can answer.
8         A.   I did not have that age bias when I
9   was rating Don.
10        Q.   Yours was completely objective, even
11  though every category was essentially subjective
12  and subject to your discretion?
13        A.   Repeat that.
14        Q.   Yours was entirely objective, even
15  though you could essentially give him whatever
16  numbers you wanted, right?
17        A.   I rated him based on what I thought
18  was the appropriate rating based on my
19  observations and feedback that I had received on
20  him.
21        Q.   But you understood that you had full
22  discretion to give him any numerical rating you
23  wanted from a 1 to a 5, right?
24             MR. LEAHY:  Objection to form.

ALLISON RAY

Page 89

1   or was it prepopulated for you?
2       A.   For 2016 it should have been
3   prepopulated.
4       Q.   I'm talking for '15 and '16, and that
5   actual 2016 numeric rating?
6       A.   Yes.
7       Q.   Did that come prepopulated?
8       A.   I believe it , yes, if I remember
9   correctly.
10      Q.   Did you have to go back and physically
11  pull these employees' performance evaluations to
12  see what they were rated and then look at your
13  chart and give them a score?
14      A.   No.  If it was prepopulated, it was
15  already there.
16      Q.   I'm not telling you it's prepopulated.
17  I'm asking you.
18      A.   If I remember correctly, it was
19  prepopulated.
20      Q.   Again, using Jessica Costigan as an
21  example, fully meets for 2015, fully meets for
22  2016 and the 2016 numerical rating of 3, that
23  was there when you got this spreadsheet?
24      A.   Yes.

Page 90

1       Q.   Now I want to go to the spreadsheet
2   that actually has scores in it.  If you could go
3   to -- you can X out of this one, and we're in
4   the same folder, which is the ESI folder and
5   we're still in natives and the spreadsheet is
6   21, ESI AT&T Dolenti 21.
7       A.   Okay.
8       Q.   Let's go down to row 4, which is Don
9   Dolenti.  Okay?
10      A.   Okay.
11      Q.   It says the rater is Alison Ray, you.
12  Do you see that?
13      A.   Yes.
14      Q.   You did, in fact, rate all these
15  employees?
16      A.   Yes.
17      Q.   Now, in terms of years of service,
18  that was prepopulated for you as well, right?  I
19  just want to clarify that.
20      A.   Yes.
21      Q.   Out of your ARSMs, Linda Swayze had
22  the most years of service and then Don Dolenti?
23      A.   Yes.
24      Q.   Now, for Don Dolenti, we're still in

Page 91

1   row 4, if you follow it over, his 2015 was fully
2   meets and '16 was fully meets.  Do you see that?
3       A.   Yes.
4       Q.   We discussed this earlier.  Fully
5   meets is a good score, correct?
6       A.   Yes.
7       Q.   In your mind, right?
8       A.   Yes.
9       Q.   And then it says 2016 numeric rating,
10  3, that was prepopulated, right?
11      A.   Yes.
12      Q.   And then it says business
13  justification needed if current rating is out of
14  range from previous ratings.  You give him a
15  current performance rating of 2.  Do you see
16  that?
17          MR. ORLOW:  Objection to form.
18          THE WITNESS:  That's what it says.
19  BY MS. BURKE:
20      Q.   Did you give him a current performance
21  rating of 2?
22      A.   I don't recall what I specifically
23  gave him.  For all I know, this could have been
24  changed.

Page 92

1       Q.   Do you know if you gave him a 2 or
2   not?
3       A.   I don't remember what I gave him.
4       Q.   It says meeting some metrics, but not
5   all.  Did you write that?
6       A.   I don't remember writing that.
7       Q.   You would actually have to verify the
8   email that you sent and what you attached?
9       A.   Yeah.
10          MS. BURKE:  That was not produced
11      to me and the subject of a current
12      motion with the court.
13          Can you mark the page, please,
14      Hope?
15                    * * *
16      (Whereupon, Counsel requested the
17      transcript be marked.)
18                    * * *
19          MR. LEAHY:  I'll tell you for the
20      record the email attaching it is
21      Dolenti 157.  I have it as an exhibit
22      if you'd like it.
23          MS. BURKE:  No, I can pull it up
24      myself.

ALLISON RAY

Page 105

1      A.   Okay.
2      Q.   Column R, do you see where it
3  struggling in 2017?
4      A.   I do.
5      Q.   Then do you see above that for a
6  different employee it says struggling in 2017
7  and it's misspelled for Jeffrey Carson?
8      A.   Yes.
9      Q.   Jeffrey Carson was not someone that
10  you oversaw, right?
11      A.   I used to but not in 2017.
12      Q.   Did you rate him in 2017?
13      A.   I did not.
14      Q.   Did you provide any input as to what
15  his rating should be in 2017?
16      A.   No, I did not.
17      Q.   Did you write this here for Don
18  Dolenti, struggling in 2017?
19      A.   I did not.  This is the first time I'm
20  seeing this spreadsheet.
21      Q.   Other than what you told me earlier, I
22  just want to go to exactly what I wrote down,
23  that you felt his leadership skills in 2017 were
24  not as good as previously, did you actually

Page 106

1  believe that he was, quote, struggling 2017, as
2  the person indicated here?
3      A.   I don't believe he was struggling.  I
4  think that he was having a rough patch, because
5  I knew from previous years that he's had -- he
6  has the capability of being a good leader.  I
7  don't know if he just lost motivation, if it was
8  the pressure of, you know, sales and, you know,
9  performance wasn't that good.  I don't know.
10  But I just saw a decline in his leadership and I
11  got feedback from some of his managers that they
12  weren't happy.
13      Q.   Going back to my original question
14  which was about leadership, in terms of his
15  actual sales numbers though, were they
16  struggling?
17      A.   He was a low performer.
18      Q.   In what metrics?
19      A.   Well, you know, year over year results
20  were not good.  They weren't good for a lot of
21  people.  You could either, you know, be down a
22  lot year over year or you could be up but not as
23  good as other people.  But his overall rankings,
24  we used to look at a dashboard.  It's kind of

Page 107

1  what -- it was the dashboard for overall
2  rankings.  It was based on attainment, and this
3  was the dashboard that basically Judy would use
4  to recognize leaders in the market, like from a
5  shoutout perspective.  Oh, you know, the number
6  one store is or, you know, the number one sales
7  rep is or the number one ARSM is on a monthly
8  basis, we would look at this ranking dashboard.
9      Q.   If you wanted to go into the system at
10  any given time into the dashboard, let's just
11  use October of 2017 as an example, would it have
12  actually ranked all the current ARSMs under Judy
13  Cavalieri?
14      A.   Yes.
15          MS. BURKE:  Can you mark the page,
16  please, Hope?
17              *  *  *
18      (Whereupon, Counsel requested the
19      transcript be marked.)
20              *  *  *
21  BY MS. BURKE:
22      Q.   Now, looking at this document and the
23  other ARSMs here from Tanya Legaux, the very
24  first person.

Page 108

1      A.   Okay.
2      Q.   Are you familiar with her name?
3      A.   Yes.
4      Q.   She was an ARSM under a different
5  sales director?
6      A.   Yes.
7      Q.   And then all the way down through
8  Linda Swayze, who was one of your people, right?
9      A.   Correct.
10      Q.   Who was on a corrective action plan,
11  right?
12      A.   Yes.
13      Q.   Did you actually believe that Don
14  Dolenti, age 57 at the time, deserved to be at
15  the bottom out of all of these people?
16          MR. LEAHY:  Objection to the form.
17          THE WITNESS:  I'm not --
18          MR. ORLOW:  I'm going to object to
19      the form as well.
20          THE WITNESS:  I'm not
21      understanding the question.  Did he
22      deserve to be on the bottom of this
23      form?
24  BY MS. BURKE:

ALLISON RAY

Page 125

1  literally the month of 2016 at 846 versus
2  October 2017 at 920?
3     A.   That is a monthly count.
4     Q.   It's not year to year cumulative?
5     A.   It's over to the right.
6     Q.   That's the cumulative?
7     A.   Yes.
8     Q.   Where it says 16 through October and
9  17 through October?
10    A.   Yes.
11    Q.   Year over year he was down by 9
12 percent?
13    A.   That Berkshire Mall.
14    Q.   For that store?
15    A.   Correct.
16         MR. ORLOW:  If you feel like you
17    need to review the rest.
18         THE WITNESS:  Sorry, I thought you
19    had said these were based on documents
20    I provided.
21         MS. BURKE:  These were documents
22    given to me by your attorney this
23    morning.
24         MR. ORLOW:  Yes, these are.

Page 126

1         THE WITNESS:  Yeah, I don't
2    remember them.  Sorry, I don't
3    remember the graphs.  My apologies.
4  BY MS. BURKE:
5     Q.   Is there anything that you just told
6  me that you believe is inaccurate?
7     A.   No, not at all, not at all.
8     Q.   For the Berkshire Mall store only, the
9  year over year comparison, that store was down
10 by 9 percent?
11    A.   Year to date, yes, yep.
12    Q.   Now, some of these other stores were
13 down by almost, one of them 32 percent, for
14 Swayze's Tilghman store.  Do you see that?
15    A.   Yes.
16    Q.   Now, is this significant to you or,
17 again, is it all relative because every store
18 may have different foot traffic or is a
19 different size?
20    A.   Yes.
21    Q.   How did you gauge this?
22         MR. LEAHY:  Objection to form.
23         THE WITNESS:  Yeah, the -- there
24    were a lot of the factors that could

Page 127

1    cause year over year growth to change
2    and, you know, foot traffic is
3    certainly one of them, management
4    changes are another.
5  BY MS. BURKE:
6     Q.   Well, when you're doing your ratings
7  for your ARSMs, did you actually go into
8  dashboard and look at their year and year
9  growth?
10    A.   Yes.
11    Q.   Is this the report that you looked at?
12    A.   I don't remember if this was specific
13 one.  You know, I had printed information when I
14 was surplused, you know, for my personal
15 benefit, but I don't remember if this was the
16 specific data that I looked at.
17    Q.   We know that you turned your
18 spreadsheet in at least as of October 16th,
19 right?
20         MR. ORLOW:  Objection to form.
21 BY MS. BURKE:
22    Q.   The completed ratings that you emailed
23 to Kyle?
24    A.   Oh, yes, yes.  The data I pulled was

Page 128

1  from the dashboard, so yes.
2     Q.   So you would have only had roughly two
3  weeks of data in October, right?
4     A.   Correct.  What I was saying though is
5  I don't know if this was the specific sheet that
6  I used.
7     Q.   Would the categories have been the
8  same, it would show you your ARSMs by their
9  store and their KPIs to date?
10    A.   Yes.
11    Q.   Let me ask you this:  Did Dolenti's
12 performance in your mind change dramatically
13 from the first week of October until you
14 completed the ratings on October 16th, 2017?
15 Was there a big change?
16    A.   I don't remember.
17    Q.   The next KPI for your ARSMs is the
18 postpaid voice GA count.  Do you see that?
19    A.   Yes.
20    Q.   What's that for?
21    A.   That's new subscribers for voice, so
22 who are purchasing wireless, or yeah, so think
23 of it as a cell phone versus a tablet, which was
24 data.

ALLISON RAY

Page 229

1  the ones that you gave for each of those
2  employees; is that right?
3      A.   According to the spreadsheet.  I don't
4  remember my actual ratings, but if this is my
5  spreadsheet that I submitted, then those are the
6  ratings.
7      Q.   And the numbers that you see here for
8  these employees, are there any that you look at
9  and think are incorrect?
10     A.   Can you -- incorrect as in back then
11 or --
12     Q.   Are they inconsistent with what your
13 perception was at the time you rated these
14 employees?
15     A.   Well, I don't remember specifically
16 the ratings and my thought process on that
17 particular day that I was doing this.  So would
18 it be any different, I can't answer that right
19 this second.
20     Q.   Based on what you remember at the
21 time, it looks like the current performance
22 rating for Mr. Dolenti was a 2?
23     A.   Okay.
24     Q.   Is that consistent with your

Page 230

1  recollection?
2      A.   Of what I entered or his performance?
3      Q.   Both.
4      A.   I'm having a hard time answering that
5  right now, because again, I don't remember.  I
6  mean, he was a low performer.
7      Q.   And would 2 be consistent with
8  somebody being a low performer?
9      A.   Yes.
10     Q.   And it looks like you gave Ms. Swayze,
11 according to this spreadsheet, a 1.  Was she
12 also a low performer?
13     A.   Yes.
14     Q.   And if you go over a couple of
15 columns, Mr. Dolenti is listed on here as having
16 a 2 under leadership, leading change rating; is
17 that correct?
18     A.   Correct.
19     Q.   And is that consistent with your
20 recollection of his performance at the time?
21     A.   Yes.
22     Q.   The next one is leadership
23 interpersonal skills rating, 2.  Is that your
24 consistent with your recollection of his

Page 231

1  performance at the time?
2      A.   At that time, yes.
3      Q.   The next one over, leadership personal
4  capability rating, 2.  Is that consistent with
5  what you remember at the time?
6      A.   Yes.
7      Q.   And the next one, leadership focus on
8  results rating, also a 2.  Is that consistent
9  with your recollection of his performance at the
10 time?
11     A.   Yes.
12     Q.   Now, for the other employees listed
13 here, if we take Mr. Dangleman, for example, it
14 looks like he had 4s across the board.  Is that
15 consistent with your recollection of his
16 performance at the time?
17     A.   Yes.
18     Q.   And how about Mr. Espinosa, it looks
19 like Mr. Espinosa had a mix of 3s and 4s.  He
20 had a 3 for current performance.  Is that
21 consistent with what you remember at the time?
22     A.   Yes.
23     Q.   And he had a 4 for leadership
24 character rating.  Is that consistent with what

Page 232

1  you remember?
2      A.   Yes.
3      Q.   He had a 3 for leadership leading
4  change rating.  Consistent with what you
5  remember?
6      A.   Yes, sorry.  I lost my spot.
7           MR. ORLOW:  Leading change.
8           THE WITNESS:  Yes, yes.
9  BY MR. LEAHY:
10     Q.   And 4s then in the remaining
11 categories, is that consistent with what you
12 remember?
13     A.   Yes.
14     Q.   Based on the total rating that came
15 out from the scores that you put in, for the
16 four ARSMs who reported to you, Ms. Swayze was
17 the lowest rated; is that correct?
18     A.   Yes, by this ranking here with the
19 spitout, yes.
20     Q.   And is that your consistent with your
21 perception if you looked at the four of them,
22 that she was the lowest performing of the four?
23     A.   At that time?
24     Q.   Yes.

ALLISON RAY

Pages 233 to 236

Page 233

1      A.   Yes.
2      Q.   The next lowest would be Mr. Dolenti
3   at 2.6 of the rating that was generated; is that
4   correct?
5      A.   Yes.
6      Q.   Is that consistent with your
7   recollection; that is, of the four at that time,
8   he was the second worst performing?
9      A.   Yes.
10                    * * *
11        (Whereupon, Exhibit Ray-18 was
12        marked for identification.)
13                    * * *
14   BY MR. LEAHY:
15      Q.   Ms. Ray, I'm showing you now a
16   document. I'll ask you, have you seen it
17   before?  I can tell you that this is the
18   Complaint that Mr. Dolenti originally filed with
19   the court.  Have you ever seen it before?
20      A.   Yes.
21      Q.   When did you see it before?
22      A.   A few weeks ago.
23      Q.   In what context did you see it?
24      A.   When my attorney --

Page 234

1              MR. ORLOW:  That's enough.
2   BY MR. LEAHY:
3      Q.   It was with your attorney?
4      A.   Yes.
5      Q.   Good enough for me.
6         Let me ask you to turn to, if you look
7   at the top right, do you see a numbering on it,
8   it says Page blank of 19?
9      A.   Yes.
10      Q.   Turn to Page 7 of 19.  I did it double
11   sided just to save a tree or two.  Do you see
12   there's the third full paragraph on the page
13   that begins when we were first notified?
14      A.   Yes.
15      Q.   I'd like you to go down to -- I'm
16   going to read some of this quickly just to put
17   some of it in context.  But it refers on the
18   second sentence to, on November 16th, 2017, I
19   received a call from Judy Cavalieri and was told
20   that it shouldn't be a surprise that you are
21   receiving this call.
22         Do you see that?
23      A.   Yes.
24      Q.   Regarding your surplus?

Page 235

1      A.   Yes.
2      Q.   When I asked why, she said that my
3   year over year results were not good and my
4   engagement scores were also not good and that I
5   was coached on this during the year.
6         Did I read that correctly?
7      A.   Yes.
8      Q.   Are each of those things true?
9      A.   His year over year results were not
10   good; his engagement scores in the beginning of
11   the year were not good, and he was coached.  I
12   gave feedback to Don throughout the year.
13      Q.   The next sentence, Judy also said that
14   HR followed up with skip level meetings with my
15   team regarding engagement.
16         Were you aware of that?
17      A.   Yes, I was.
18      Q.   Were you involved in it?
19      A.   Not in the actual meetings.  I
20   actually -- when I was giving feedback to Don
21   during the year, as I mentioned in my earlier
22   testimony, where he was not very accepting or
23   open to feedback, I had been getting feedback
24   from his managers about them not being happy,

Page 236

1   and in, in fact, one manager said that he didn't
2   want to work for Don anymore.  I did not tell
3   Don that part though because the sales manager
4   wanted me to keep in confidence.  However,
5   because Don was not open to the feedback, I felt
6   like I had to get an outside party to
7   investigate what was going on.  And one of my
8   peers, Jerry Fornwald, had suggested that I
9   reach out to Kyle Mundis, because Kyle did the
10   same thing for Jerry, which was to get his -- he
11   would get Don's managers in a room and his
12   assistant managers in a room to try and dig into
13   what's actually going on from an engagement
14   standpoint.  And I asked Kyle to do that for
15   Don, and I also asked him to do it for Linda.
16         I don't remember the exact time that
17   it occurred.  It was probably towards the end of
18   the summer, early fall.  It was definitely
19   before the surplus.  But I never saw the actual
20   results of what happened.  I asked for them, and
21   Kyle was kind of procrastinating in getting back
22   to me.  And, you know, I would get excuses like
23   he had to gather his thoughts and his notes, and
24   he'd get them to me, but I never got them.  And

R&K REPORTING, INC.

ALLISON RAY

Page 245

1    MR. ORLOW:  I'm going to object
2  just because I am a little confused by
3  the question, but if you understand.
4    THE WITNESS:  Can you repeat the
5  question?
6  BY MR. LEAHY:
7    Q.   You wouldn't say something like that
8  because it's wrong to say, isn't it?
9    A.   Yes.
10    Q.   Did you know an employee named Harry
11  Del Buono?
12    A.   Yes.
13    Q.   Who was Mr. Del buono?
14    A.   He was one of my old employees.
15    Q.   Did you ever go on rides with him?
16    A.   Yes.
17    Q.   Did you ever refer to him as an old
18  man during those rides?
19    A.   No.
20    Q.   In rating the performance that you did
21  of your employees that we have gone through on
22  the spreadsheet a little while ago, did you
23  consider anybody's age in doing that?
24    A.   No.

Page 246

1    Q.   Now, the fact that, for example,
2  Mr. Dangleman was younger than Mr. Dolenti, is
3  that a reason that he received a better rating
4  than Mr. Dolenti?
5    A.   No.
6    Q.   Why did he get a better rating than
7  Mr. Dolenti?
8    A.   Why?
9    Q.   Yes.
10    A.   Overall rating?
11    Q.   Yes.  Well, the ratings in the
12  individual categories, why did he get individual
13  ratings that were better than Mr. Dolenti's in
14  those categories?
15    A.   Why did he get better --
16    Q.   Why did you rate him higher?
17    MR. ORLOW:  Objection to form.
18  You can answer.
19    THE WITNESS:  I thought that his
20  performance was better.
21      * * *
22  (Whereupon, Exhibit Ray-19 was
23  marked for identification.)
24      * * *

Page 247

1  BY MR. LEAHY:
2    Q.   Ms. Ray, do you have Exhibit Ray-19 in
3  front of you?
4    A.   Yes.
5    Q.   Ray-19 is an email from Ms. Cavalieri
6  to you on October 10th of 2017.  Do you see
7  that?
8    A.   Yes.
9    Q.   And the subject is KPI market leaders?
10    A.   Yes.
11    Q.   Do you see that?
12    A.   Yes.
13    Q.   Do you recall this email?
14    A.   No.
15    Q.   The first line says Linda and Don both
16  down YOY, which I think is year over year, by
17  over 50 percent in premium video and down in
18  postpaid voice as well.
19      Did I read that correctly?
20    A.   Yes.
21    Q.   Do you remember that being an issue at
22  that point in time?
23    A.   I don't remember the exact numbers.
24  I'd have to look at the report, but they could

Page 248

1  have been down.
2    Q.   And then she says, how can I help?  Do
3  you remember discussing their performance then
4  with Ms. Cavalieri after this email?
5    A.   No, I don't remember because I don't
6  remember this email, so I don't remember a
7  conversation with her.
8      * * *
9  (Whereupon, Exhibit Ray-20 was
10  marked for identification.)
11      * * *
12  BY MS. BURKE:
13    Q.   Ms. Ray, Exhibit Ray-20 is a series of
14  email exchanges between you and Mr. Dolenti.
15  The top one is October 9th of 2017.  Do you see
16  that?
17    A.   Yes.
18    Q.   Do you recall this email?
19    A.   Not necessarily.  I mean, if I can
20  read this.
21    Q.   Take your time.  Only the first one is
22  a standalone email.
23    A.   I need to understand this in the
24  context.  There's no other information.

ALLISON RAY

Page 253

1    Did I read that correctly?
2       A.   Yes.
3       Q.   Do you recall getting this from
4    Mr. Dolenti?
5       A.   It's from -- it's familiar.  I mean, I
6    remember him sending me a spreadsheet that just
7    had tons and tons of data, which is why I asked
8    him to go back and provide me a summary; that I
9    didn't want to have to go through them all
10   myself.
11      Q.   Were you disappointed in his
12   performance at this point for this task?
13      A.   Well, he didn't provide me for what I
14   was looking for in this email.
15      Q.   Let me ask you to go back to Exhibit
16   Ray-1.  That was your Complaint.  Do you have in
17   it front of you?
18      A.   I do.
19      Q.   Let me ask you to turn first to
20   Paragraph 30 of the Complaint.  Do you see
21   Paragraph 30, it says employees are selected for
22   surplus based on centrally determined
23   company-wide ill-defined and/or subjective
24   criteria and a process infected with age bias.

Page 254

1    Did I read that correctly?
2       A.   Yes.
3       Q.   Without limitation, employees are
4    assigned a rating for skills; however, the
5    skills supposedly assessed are not those
6    necessary to perform an actual job but a job of
7    the future Provision 2020.
8       Did I read that correctly?
9       A.   Yes.
10      Q.   Thus, permitting managers to assign
11   ratings based on the ageist stereotype that
12   older workers could not or would not acquire
13   high tech skills necessary for these future
14   jobs.
15      Did I read that correctly?
16      A.   Yes.
17      Q.   Did you assess Mr. Dolenti's skills
18   when you rated his performance?
19      A.   Yes.
20      Q.   What ageist stereotype did you apply
21   in assessing those skills?
22      MR. ORLOW:  Objection to form.
23      Mischaracterization of testimony.
24   BY MR. LEAHY:

Page 255

1       Q.   Did you apply any ageist stereotypes
2    in assessing Mr. Dolenti's skills?
3       A.   No.
4       Q.   Did you apply ageist stereotypes in
5    assessing any employee's skills of those you
6    rated?
7       A.   Not at all.
8       Q.   But you think others did so in rating
9    you?
10      A.   I'm not sure what specifically or --
11   I'm not sure who made the decision to terminate
12   me, so I don't know exactly what -- I don't know
13   what they were thinking.
14      Q.   I'd like you to turn to Paragraph 69
15   of your Complaint.
16      A.   (Witness complies with request.)
17      Q.   Paragraph 69, this is referring to
18   your own termination.  It says per the ADEA
19   listing of the eight individuals assigned to AWG
20   12, plaintiff was one of two selected for
21   surplus by defendants.
22      Do you see where I read that?
23      A.   Yes.
24      Q.   Of the eight employees assigned to AWG

Page 256

1    12, the two employees, including plaintiff and
2    an employee older than plaintiff, who were
3    selected for surplus were the two oldest
4    employees in AWG 12.
5       Did I read that correctly?
6       A.   Yes.
7       Q.   Now, we went through the ratings that
8    you did of employees who reported to you,
9    correct?
10      A.   Yes.
11      Q.   And of those employees we discussed
12   the fact that, for example, Mr. Dangleman
13   received higher ratings than Mr. Dolenti in each
14   of the categories, didn't he?
15      A.   Yes.
16      Q.   And Mr. Dolenti was older than
17   Mr. Dangleman, wasn't he?
18      A.   Yes.
19      Q.   Did Mr. Dangleman's age play any role
20   in that?
21      A.   No.
22      Q.   You just rated them honestly, didn't
23   you?
24      A.   Yes.

R&K REPORTING, INC.

Page 257

1      Q.   And in doing that, the older employee
2  in this case was rated lower than the younger
3  employee?
4      A.   Yes.
5      Q.   You testified earlier in response to
6  Ms. Burke's questions that you told Mr. Dolenti
7  he needs to connect better with his team.
8        Do you remember that?
9      A.   Yes.
10     Q.   What did you tell him about that?
11  What specifically did you discuss him?
12     A.   I don't remember the specific comments
13  or feedback that I gave him.
14     Q.   You just remember that you told him he
15  needed to connect better?
16     A.   Yes.
17     Q.   What was it that led you to tell him
18  that?
19     A.   I was getting complaints and feedback
20  from his store managers.
21     Q.   The only thing you remember telling
22  him is that he needs to connect better?
23     A.   I'm sure -- yeah, I mean, I remember
24  telling him that he needed to connect better

Page 258

1  with his teams.  I don't remember the specific
2  words that I used in the conversations that I
3  had with him, but that was the general theme.
4      Q.   And it was that he just --
5      A.   I'm sorry, I also told him that he
6  needed to help coach his people, he needed to
7  help show them how to do things, because the
8  feedback that I was getting was that Don would
9  just tell them how to do things, not show them
10  how to do things.  But I don't remember the
11  specific words that I used when having those
12  conversations.
13     Q.   But that was the general idea of it?
14     A.   Yes.
15     Q.   And I think you also testified that he
16  wasn't receiving feedback well; is that right?
17     A.   That is correct.
18     Q.   What led you to conclude that he
19  wasn't receiving feedback well?
20     A.   Because he was very argumentative with
21  me and he just -- he just didn't believe what I
22  was saying.  He just challenged me and
23  questioned me.
24     Q.   Do you remember what specific things

Page 259

1  he would say?
2      A.   No.
3      Q.   Now, in rating Mr. Dolenti's skills,
4  do you believe that the way you rated him was
5  based on how you felt about his skills?
6      A.   Yes.
7      Q.   Do you believe that how you felt about
8  his skills was in any way affected by his age?
9      A.   No.
10     Q.   When you say how you felt about his
11  skills, what did you base it on?
12     A.   I don't remember what I based it on at
13  that specific time.
14     Q.   You did rate employees a number of
15  times over the time --
16     A.   I'm sorry.
17     Q.   You rated employees a number of times
18  over the time you were AT&T, correct?
19     A.   Correct.
20     Q.   You would have to rate skills most of
21  those times when you did it?
22     A.   Yes.
23     Q.   And when you say you rated them based
24  on how you felt about their skills, what would

Page 260

1  you typically base that on?
2      A.   Based on their ability to do the job,
3  if they have the skill set.
4      Q.   And that's what you used in rating
5  Mr. Dolenti?
6      A.   More than likely.
7      Q.   Is there anything else you can think
8  of that you would have used?
9      A.   For skills?
10     Q.   Yes.
11     A.   Not that I'm aware of right now.
12     Q.   I know you testified, and you may have
13  answered this already, that you were involved in
14  other surpluses and had done ratings like this
15  before?
16     A.   Yes.
17     Q.   In terms of what you did for this one,
18  was it any different from any of the other
19  surpluses?
20     A.   The only thing that was different was
21  that the performance rating was already entered
22  into that column.
23     Q.   Is that the one that would calculate
24  it?

# GAGE DECLARATION EXHIBIT 29

# FILED UNDER SEAL

# GAGE DECLARATION EXHIBIT 30

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ALISON RAY
    Collegeville, PA 19426,

Plaintiff,

v.

AT&T MOBILITY SERVICES LLC.
    1025 Lenox Park Blvd., NE.
    Atlanta, GA 30319,

Defendant.

No. 2:18-cv-03303-TR

Magistrate Judge Timothy R. Rice

**Declaration of Elizabeth Alba**

1.    I am an Associate Director – Benefits at AT&T. I submit this declaration in support of AT&T Mobility Services LLC's cross-motion for partial summary judgment in the above-captioned matter. I have personal knowledge of the facts contained in this declaration and if called to testify under oath, I could and would testify competently to them.

2.    In my position at AT&T, I am responsible for the maintenance and general oversight of the Mechanized Employee Surplus Administration system (the "MESA System"). When AT&T undertakes a reduction in force ("RIF"), we use the MESA System to gather information regarding the RIF, populate documents provided in connection with the RIF, and distribute documents related to the RIF to employees affected by it. This is a routine business process at AT&T.

3.    Each RIF is assigned a Business Case Number. The MESA System was used for Business Case 17-350.

1

4.     The MESA System uses data from CENET, the company's human resources information system.   For each RIF, the responsible Human Resources Business Partner ("HRBP") identifies in the MESA System each of the employees who will be considered as part of the RIF.  The HRBP also identifies in the MESA System the employees (the "Raters") who will review and assign ratings to the employees who will be considered as part of the RIF.

5.     The Raters use the MESA System to enter their ratings for each employee whom they are assigned to rate.   After the Raters have entered their ratings, the MESA System populates the RIF data with the ratings and sorts the employees within each Affected Work Group ("AWG") from highest-rated to lowest-rated.

6.     The MESA System automatically identifies the employees within each AWG who are rated the lowest and therefore fall below the line established by the target headcount reduction for that AWG.  For example, if the target headcount reduction for an AWG is three, the MESA system will identify the three employees in that AWG who were assigned the lowest ratings by the Raters.  Then the HRBP uses the MESA System to select each of those employees for participation in the employment surplus program.

7.     During some RIFs, employees who are being considered are asked to use the MESA System to notify the company if they are interested in leaving the company as part of the RIF.  If an employee uses the MESA System to notify the company that they are interested in leaving as part of the RIF, the MESA System reliably stores that information.

8.     The MESA System automatically generates an "ADEA Listing" for each RIF, based on the employee records from the CENET system (including job title and age), the AWGs entered by the HRBP, whether or not each employee is selected for participation in the employment surplus program, and whether each employee expressed an interest in leaving.

2

DEF_0000315

9.    Through the MESA website, the ADEA Listing for each RIF is provided to employees who are selected for participation in the employment surplus program as part of that RIF.   AT&T preserves the ADEA Listings and maintains them in the ordinary course of business.

10.    In my experience, the MESA System consistently and reliably generates the ADEA Listings accurately based on data from CENET and the input from the HRBP, the Raters and the employees expressing an interest in leaving.  I have worked on roughly 200 Business Cases and in every one of those cases the MESA System generated an accurate ADEA Listing.

11.    I have reviewed the document attached as Exhibit 7 to the Declaration of Alison Ray (the "ADEA Listing 17-350"). The ADEA Listing 17-350 is a true and accurate copy of the ADEA Listing generated by MESA, pursuant to the process described above, for Business Case ID: 17-350.


I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29 day of October 2018, in Dallas County, Texas.


Elizabeth Alba

DEF_0000316

# GAGE DECLARATION EXHIBIT 31

 

# Equal Employment Opportunity (EEO) and Harassment Policies

AT&T Proprietary (Internal Use Only) Not for use or disclosure outside the AT&T companies except under written agreement.  4/1/2016

AT&T_Dolenti0000012

DEF_0002591





## Introduction and Policy Statement

AT&T is strongly committed to a workplace that values diversity and inclusion and that is free of discrimination and harassment of any kind. AT&T's EEO and Harassment Policies apply to all AT&T employees.

AT&T employees are protected from unlawful discrimination on the basis of race, color, religion, religious creed, national origin, ancestry, age, sex, sexual orientation, gender, gender identity, gender expression, physical disability, mental disability, pregnancy, medical condition, genetic information, marital status, citizenship status, military status, veteran status, or any other characteristic protected by federal, state, or local laws. For instance, New York City also prohibits discrimination on the basis of creed. AT&T complies with these and other applicable EEO laws, and prohibits unlawful discrimination.

AT&T also strictly prohibits all forms of abusive conduct or workplace harassment, including sexual and racial harassment and harassment based on any of the protected characteristics described above. An employee's actions, words, or behavior must not create an intimidating, hostile, or offensive environment. Employees are not permitted to ridicule, intimidate, threaten, demean, or bully other employees, customers, vendor employees, or any other individuals with whom they interact. Remarks, comments, jokes, slurs, images, or gestures of an offensive nature will not be tolerated.

It is a violation of this policy to unlawfully discriminate against or harass anyone while working on behalf of AT&T, including co-workers, contractors, vendors, or customers.

**Employee Responsibilities**

AT&T employees are responsible for understanding and complying with the Company's EEO and Harassment Policies. Failure to comply may result in disciplinary action, which can include dismissal even for a first offense.

2

AT&T_Dolenti0000013

DEF_0002592



We all have a responsibility to ensure that AT&T is free of discrimination and harassment. Therefore, employees are responsible for reporting any violations of the EEO and Harassment Policies.

**Manager Responsibilities**

All managers are responsible for enforcement of the Company's EEO and Harassment Policies by ensuring a work environment free of unlawful discrimination and harassment. If a manager observes or receives any reports or allegations of conduct that could potentially violate the EEO and Harassment Policies, the manager has a responsibility to report it immediately to Human Resources or the AT&T Hotline. Such allegations are investigated by Human Resources professionals. Therefore, managers must always report them immediately and receive guidance from Human Resources or an investigator on the next steps.    In addition, supervisors are expected to:

- Ensure coverage of the EEO and Harassment Policies with each direct report.
- Ensure that coverage with each direct report is documented in his/her training history.
- Acknowledge employees' differences and their individual value to AT&T.

**Reporting a Concern**

Employees should report a violation of the EEO and Harassment Policies to a supervisor, any manager, Human Resources, directly to the AT&T Hotline (1-888-871-2622), or the AT&T Hotline Web Reporting site (www.tnwgrc.com/att).

AT&T has established the AT&T Hotline for reporting EEO or harassment concerns anonymously and confidentially. The Hotline is staffed by an independent third-party vendor contracted by AT&T. The reported complaint will be summarized and forwarded to AT&T for further review.

Reports to the AT&T Hotline will be kept confidential to the extent permitted by law and by the Company's need to properly investigate. If an investigation is undertaken, AT&T will address the matter, and if needed, take appropriate corrective action.

**Non-Retaliation Policy**

Any individual who suspects an EEO violation and makes a report is acting responsibly in accordance with the EEO and Harassment Policies. The Company forbids retaliation against any person who makes a report or who participates in the investigative process. Allegations of retaliation will be investigated and appropriate action will be taken. Any individual engaging in retaliatory behavior will be subject to disciplinary action, which may include termination of employment. For any suspected retaliation concerns, contact the AT&T Hotline immediately.

Additional information on AT&T's non-retaliation policy can be found at the following link:

http://intranet.att.com/corp-policies/Default.aspx?section=1&page=44

**Internal Investigations**

AT&T investigates possible violations of federal, state, and local EEO statutes, and AT&T's EEO and Harassment Policies. Employees are required to cooperate fully with the Company's investigations, may not lie to investigators, obstruct the investigation, or retaliate against those who participate. To the extent possible, confidentiality will be maintained consistent with legal and ethical responsibilities on behalf of the Company.

All complaints will be followed by a fair, complete and timely investigation. Remedial action will be taken if any misconduct is found.

3

AT&T_Dolenti0000014

DEF  0002593



Important additional Company guidance on internal investigations should be reviewed at the following link:

http://intranet.att.com/corp-policies/Default.aspx?section=1&page=44&subpage=142

**Diversity**

Diversity means respecting many backgrounds, cultures, and ways of thinking. AT&T recognizes and embraces all differences – from race, gender, sexual orientation, and mental/physical ability to perspectives, experiences, and outlooks. It is more than the right thing to do – diversity is essential to the success of AT&T in the global marketplace. AT&T employees are responsible for promoting an environment of inclusion: one in which each individual is valued and every voice is heard. Actions that guide employee commitment to diversity include:

- Treating others with respect.
- Encouraging and skillfully incorporating opinions and ideas.
- Viewing differences as assets.
- Accommodating various strengths.
- Working together in mixed teams to design and implement creative solutions for our business suppliers and customers.
- Serving our broad markets effectively and sensitively.
- Creating win-win solutions.
- Being open to many viewpoints, cultures, and lifestyles.
- Participating in wide-ranging activities that support self-development and positive business relationships.

**Equal Employment Opportunity**

AT&T provides Equal Employment Opportunity for all employees and applicants in the administration of personnel policies such as:

- Appraisals
- Benefits and privileges of employment
- Compensation
- Disciplinary actions
- Recruiting, hiring, placements, upgrades, promotions, and lateral movement
- Social and recreational programs
- Terminations of employment, layoffs, and recalls
- Training and educational assistance
- Working conditions

All employees are prohibited from engaging in any discrimination based on a protected characteristic.

**The Americans With Disabilities Act**

The Americans with Disabilities Act (ADA) is a federal law that prohibits discrimination against individuals with disabilities. AT&T's policies provide reasonable accommodations to qualified employees with disabilities when medical restrictions preclude them from performing an essential function of their current or desired job, unless the accommodation poses an undue business hardship for AT&T.

4

AT&T_Dolenti0000015

DEF_0002594



Under the law and these policies, AT&T, through the Integrated Disability Service Center (IDSC), engages in an interactive process with employees who may require a reasonable accommodation of a disability as defined under the law. The IDSC has established processes and procedures regarding accommodating disabilities. Supervisors of employees who have requested an accommodation of a disability should refer such employees to the IDSC at 866-276-2278. In certain cases, a leave may be appropriate as an accommodation. Supervisors should consult Human Resources for advice in these situations.

**Confidentiality**

Confidentiality is assured for applicants and employees regarding medical information, and it will be kept confidential except to the following extent: Supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and any necessary reasonable accommodations. First aid and safety personnel may be informed where and to the extent appropriate, if the disability might require emergency treatment or assistance during evacuations. Government officials who conduct compliance reviews may be informed.

All persons with responsibilities that may require information about the disability, physical or mental, are advised to treat and protect the information as strictly confidential.

More information regarding the job accommodation process may be found at:

http://ebiz.sbc.com/hronestop/index.cfm?fuseaction=Display&type=JAHome

**Pregnancy Discrimination**

It is illegal and in violation of this policy to discriminate against or harass an employee because of pregnancy. Pregnancy discrimination involves treating a pregnant employee unfavorably because of pregnancy, childbirth, or other medical condition related to pregnancy or childbirth. Employees who are disabled by pregnancy, childbirth, or related medical conditions are entitled to apply for applicable disability benefits.

**Religious Discrimination**

AT&T's commitment to diversity extends to its commitment to respecting the religious beliefs of its employees. It is illegal and in violation of this policy to discriminate or to harass an employee because of that employee's sincerely held religious beliefs. AT&T's policies provide reasonable accommodations where an employee's sincerely held religious beliefs or practices are impacted by job requirements, unless the accommodation imposes an undue business hardship for AT&T. Supervisors of employees who request a religious accommodation should consult with Human Resources for guidance.

**Military Status**

AT&T respects and supports its employees who serve in the uniformed services. AT&T employees called to active duty may apply for a military service leave of absence under the Company's applicable leave policies.

**Harassment Policy**

The Company prohibits all forms of harassment while working on behalf of AT&T. This includes all offensive behavior, whether physical, verbal, written, printed, or displayed as inappropriate objects or images. Remarks, comments, jokes, or gestures of an offensive nature will not be tolerated. Employees are prohibited from using any Company property, including computers, mobile phones, or any other devices, to view, send, or receive offensive material. In addition,

5

AT&T_Dolenti0000016

DEF_0002595



employees are never permitted to display offensive material in the workplace, whether on Company or personal devices. All offensive materials are prohibited, including but not limited to material offensive to another person's gender, race, or other protected characteristic.

Sexual harassment is specifically prohibited in the workplace. In order to eliminate sexual harassment in the workplace, AT&T prohibits all unprofessional behaviors including some that may go beyond the legal definition of sexual harassment.

**What is Sexual Harassment?**

Sexual harassment may involve unwelcome romantic or sexual advances, requests for sexual favors, and/or visual materials, verbal comments, or physical contact of a sexual nature, regardless of gender. Involved parties, either victim or harasser, could be a co-worker, a subordinate, a contractor, or even a customer.

Such conduct is a violation of this policy, regardless whether an employee engaging in such behavior meant it as a joke. Such communications, comments, actions of a sexual nature, or unwelcome advances are prohibited at AT&T, whether or not other employees were offended.

The most obvious examples of sexual harassment involve physical behavior or physical contact. The following is a non-exhaustive list of physical behaviors that may be considered offensive:

- Touching an individual by massaging their neck or shoulders, hugging, kissing, patting, pinching, fondling, or touching/pulling an individual's clothing or hair.
- Physical gestures that imply a sexual act or sexual anatomy; touching oneself in a sexual manner.
- Brushing up against another person, standing too close, or lingering.

However, sexually harassing behavior does not always involve physical contact. The following is a non-exhaustive list of examples of verbal and non-verbal/visual behavior that may be considered offensive:

- Suggestive behavior such as "elevator eyes" (looking a person up and down), leering, staring, sexual gestures, whistling, cat-calls, winking, throwing kisses, making kissing sounds, howling, groaning, or smacking/licking lips.
- Sexual comments or innuendoes about clothing, anatomy, appearance, or sexual jokes or stories.
- Discussions or inquiries about sexual fantasy, preferences, history, or sex life; participation in workplace rumors about an individual's sex life.
- Displaying sexually suggestive objects or pictures in the workplace.
- Repeated invitations and/or pressuring for dates or sexual favors; harassing phone calls, e-mails, or other communication.
- Giving personal gifts that imply an intimate relationship.
- Sending sexually suggestive communications (e.g., instant messaging, Company message portals and/or devices, notes, letters, texts, e-mails); displaying or transmitting suggestive visual materials (e.g., pictures, calendars, posters).
- Stalking, following, or blocking an individual's path.

In addition, it is a violation of this policy, and the law, for any employee to ever state, imply, or suggest that dating or engaging in sexual conduct with another employee could result in a workplace benefit such as a promotion, raise, better terms and conditions of employment – or that a refusal to date or engage in sexual conduct will negatively affect a person's conditions of employment or career.

6

AT&T_Dolenti0000017

DEF_0002596



AT&T's harassment rules apply in the workplace and in work-related settings outside the workplace, such as business trips, customer visits, social events, or other functions. AT&T also does not tolerate such conduct from outside vendors and other providers of goods or services to AT&T when they are working in AT&T-related settings.

**Personal Relationships Policy**

In accordance with AT&T's Harassment and Conflict of Interest Policies, a dating relationship, or any special personal relationship, should never exist between a supervisor and an employee for whom the manager has some responsibility, including employees who report directly or indirectly within that supervisor's chain of command. In other words, a manager and another employee above or below that manager in the same chain of command, even if not directly above or below that manager, may not have a romantic or other close, personal relationship. This includes any manager who has influence over the employee's work, productivity, or terms and conditions of employment, such as an employee's trainer, manager who regularly fills in as a relieving manager over the employee, or a manager who has any input regarding the employee's performance. Moreover, such a relationship should never exist between an AT&T employee and a vendor employee where that AT&T employee has some responsibility for recommending the services of or interacting with that vendor or providing input on the vendor's work. These relationships can interfere with the supervisor's independent judgment, create employee morale problems, ethical issues, or conflict of interest, and may create a hostile work environment.

To avoid these problems and to foster a positive team environment, a personal relationship that may create a potential conflict or the appearance of a conflict under this policy must be reported immediately to Human Resources. After reviewing the facts, the Company will take appropriate action, which could include transfer of either employee through job reassignment or voluntary resignation. Failure to disclose the relationship immediately or comply with the Company's decision is a violation of the EEO and Harassment Policies and the Code of Business Conduct (COBC) Conflict of Interest Policy, and may result in discipline up to and including dismissal.

More information may be found at:

http://intranet.att.com/corp-policies/Default.aspx?section=7&page=99

**Sexual Harassment Prevention Training**

Certain states require employers to provide sexual harassment training for employees. More information may be found at:

https://intra.att.com/hronestopadmin/doc/State_Requirements_for_Harassment_Training.pdf

**Additional Complaint Procedures**

In addition to internal Company reporting methods, employees have the right to file a charge of discrimination with a federal, state, or local agency. All charges of discrimination in which the Company is identified as a Respondent, including charges received by a Company field location, should be immediately directed to the EEO group (which is responsible for all Company communication with the agencies) at eeooffice@att.com.

**For California Employees and Their Supervisors:**

California state law requires employers to distribute to employees in California certain information about sexual harassment. This information is available on the brochure titled "Sexual Harassment: The Facts About Sexual Harassment" (DFEH-185) and is available at

7

AT&T_Dolenti0000018

DEF_0002597



https://spfd03.web.att.com/sites/MandatoryPosters/Mandatory%20Facility%20Posters/California%20Posters/CA%20DFEH-185%20Sexual%20Harassment.pdf.  **Please note that all California employees and their supervisors are required to access this brochure and review the information.**

Supervisors, managers, co-workers and third parties are prohibited from engaging in unlawful behavior under the California Fair Employment and Housing Act.

California employees or job applicants who believe that they have been sexually harassed may file a complaint with the California Department of Fair Employment and Housing (DFEH) within one year of the alleged harassment. For more information, contact the DFEH toll free at (800) 884-1684, Sacramento and out of state at (916) 478-7200, or TTY at (800) 700-2320. You may also contact the DFEH via email at contact.center@dfeh.ca.gov or visit the DFEH's Web site at http://www.dfeh.ca.gov/.

California law requires employers to provide employees notice of their rights and obligations under the Fair Employment and Housing Act with respect to pregnancy, childbirth, and related medical conditions. This information is available in Notice B, "Family Care and Medical Leave and Pregnancy Disability Leave" and is available at https://spfd03.web.att.com/sites/MandatoryPosters/Mandatory%20Facility%20Posters/California%20Posters/California%20FMLA.pdf. **Please note that all California employees and their supervisors are required to access this notice and review the information.**

**Frequently Asked Questions**

**Your Responsibility as an Employee and/or Supervisor**

Q. Are all AT&T employees responsible for ensuring their actions are conducted in accordance with AT&T's Equal Employment Opportunity (EEO) and Harassment Policies?

A. Yes. Failure to comply with these policies may result in disciplinary action, which can include dismissal even for a first offense. Supervisors are responsible for ensuring the work environment is free of unlawful discrimination and harassment.

Q. If you believe you have been subjected to unlawful discrimination, harassment, and/or retaliation or have knowledge of conduct prohibited under the Policy, are you responsible for reporting the matter?

A. Yes. We are all responsible for speaking up if we believe that someone at AT&T has violated the EEO and Harassment policies. If a manager observes or receives any reports or allegations of conduct which could potentially violate the EEO and Harassment policies, the manager has a responsibility to report it immediately to Human Resources or the AT&T Hotline.

**Non-Retaliation Policy**

Q. Are employees who raise concerns or who participate in an internal investigation protected from retaliation?

A. Yes. Any individual who seeks advice, raises a concern, or reports an EEO concern is following the EEO and Harassment Policies. AT&T will not tolerate retaliation against such a person.

**Internal Investigations**

Q. Are employees guaranteed complete confidentiality or anonymity?

A. Investigators will maintain confidentiality or anonymity to the extent allowable by law and where the confidentiality and anonymity does not impede the integrity of the investigation.

8

AT&T_Dolenti0000019

DEF_0002598



**Sexual and Other Harassment**

Q.  Is it okay for a supervisor and a subordinate to have a close personal relationship or a dating relationship?

A.  No.  Any dating relationship or close personal relationship within the chain of command is prohibited. This also includes a supervisor who has influence over an employee's work, productivity, or terms and conditions of employment.  Failure to report the relationship immediately is a violation of the policy.

Q.  Can sexual harassment occur between individuals of the same sex?

A.  Yes. Sexual harassment can happen between individuals of the same sex as well as the opposite sex.

Q.  Are jokes about sex, race, age, religion, ethnicity, or any other jokes made at the expense of others appropriate in the work place?

A.  No. Jokes made at the expense of any person or class of persons are prohibited.

**Disability**

Q.  Does AT&T accommodate disabilities?

A.  Yes.  It is AT&T's policy to provide reasonable accommodations to qualified employees with disabilities when medical restrictions preclude them from performing an essential function of their current or desired job, unless the accommodation poses an undue business hardship for AT&T.

9

AT&T_Dolenti0000020

DEF_0002599

# GAGE DECLARATION EXHIBIT 32





# Equal Employment Opportunity (EEO) and Harassment Policies

AT&T Proprietary (Internal Use Only) Not for use or disclosure outside the AT&T companies except under written agreement. 7/13/2018

AT&T_Dolenti0000021

DEF_0002600





## Introduction and Policy Statement

AT&T is strongly committed to a workplace that values diversity and inclusion and that is free of discrimination and harassment of any kind. AT&T's EEO and Harassment Policies apply to all AT&T employees.

AT&T employees are protected from unlawful discrimination on the basis of race, color, religion, religious creed, national origin, ancestry, age, sex, sexual orientation, gender, gender identity, gender expression, physical disability, mental disability, pregnancy, medical condition, genetic information, marital status, citizenship status, military status, veteran status, or any other characteristic protected by federal, state, or local laws. For instance, New York City also prohibits discrimination on the basis of creed.  AT&T complies with these and other applicable EEO laws, and prohibits unlawful discrimination.

AT&T also strictly prohibits all forms of abusive conduct or workplace harassment, including sexual and racial harassment and harassment  based on any of the protected characteristics described above.  An employee's actions, words, or behavior must not create an intimidating, hostile, or offensive environment.  Employees are not permitted to ridicule, intimidate, threaten, demean, or bully other employees, customers, vendor employees, or any other individuals with whom they interact.  Remarks, comments, jokes, slurs, images, gestures, messages, or social media posts of an offensive nature will not be tolerated.

It is a violation of this policy to unlawfully discriminate against or harass anyone while working on behalf of AT&T, including co-workers, contractors, vendors, or customers.

**Employee Responsibilities**

AT&T employees are responsible for understanding and complying with the Company's EEO and Harassment Policies. Failure to comply may result in disciplinary action, which can include dismissal even for a first offense.

2

AT&T_Dolenti0000022

DEF_0002601



We all have a responsibility to ensure that AT&T is free of discrimination and harassment. Therefore, employees are responsible for reporting any violations of the EEO and Harassment Policies.

**Manager Responsibilities**

All managers are responsible for enforcement of the Company's EEO and Harassment Policies by ensuring a work environment free of unlawful discrimination and harassment. If a manager observes or receives any reports or allegations of conduct that could potentially violate the EEO and Harassment Policies, the manager has a responsibility to report it immediately to Human Resources or the AT&T Hotline. Such allegations are investigated by a team of EEO investigators. Therefore, managers must always report them immediately and receive guidance from an investigator on the next steps. In addition, supervisors are expected to:

- Ensure coverage of the EEO and Harassment Policies with each direct report.
- Ensure that coverage with each direct report is documented in his/her training history.
- Acknowledge employees' differences and their individual value to AT&T.

**Reporting a Concern**

Employees should report a violation of the EEO and Harassment Policies to a supervisor, any manager, Human Resources, directly to the AT&T Hotline (1-888-871-2622), or the AT&T Hotline Web Reporting site
https://app.mycompliancereport.com/report.aspx?cid=att.

AT&T has established the AT&T Hotline for reporting EEO or harassment concerns anonymously and confidentially. The Hotline is staffed by an independent third-party vendor contracted by AT&T. The reported complaint will be summarized and forwarded to AT&T for further review.

Reports to the AT&T Hotline will be kept confidential to the extent permitted by law and by the Company's need to properly investigate. If an investigation is undertaken, and if needed, AT&T will take appropriate corrective action.

**Non-Retaliation Policy**

Any individual who suspects an EEO violation and makes a report is acting responsibly in accordance with the EEO and Harassment Policies. The Company forbids retaliation against any person who makes a report or who participates in the investigative process. Allegations of retaliation will be investigated and appropriate action will be taken. Any individual engaging in retaliatory behavior will be subject to disciplinary action, which may include termination of employment. For any suspected retaliation concerns, contact the AT&T Hotline immediately.

Additional information on AT&T's non-retaliation policy can be found at the following link:

http://intranet.att.com/corp-policies/Default.aspx?section=1&page=44

**Internal Investigations**

AT&T investigates possible violations of federal, state, and local EEO statutes, and AT&T's EEO and Harassment Policies. Employees are required to cooperate fully with the Company's investigations, may not lie to investigators, obstruct the investigation, or retaliate against those who participate. Anyone who refuses to cooperate with an investigation, lies to investigators, obstructs or attempts to obstruct an investigation, or engages in retaliatory conduct will be subject to discipline, including termination. To the extent possible, confidentiality will be maintained consistent with legal and ethical responsibilities on behalf of the Company.

All complaints will be investigated and remedial action will be taken if any misconduct is found.

AT&T_Dolenti0000023

DEF_0002602



Important additional Company guidance on internal investigations should be reviewed at the following link:

http://intranet.att.com/corp-policies/Default.aspx?section=1&page=44&subpage=142

**Diversity**

Diversity means respecting many backgrounds, cultures, and ways of thinking. AT&T recognizes and embraces all differences – from race, gender, sexual orientation, and mental/physical ability to perspectives, experiences, and outlooks. It is more than the right thing to do – diversity is essential to the success of AT&T in the global marketplace. AT&T employees are responsible for promoting an environment of inclusion: one in which each individual is valued and every voice is heard. Actions that guide employee commitment to diversity include:

• Treating others with respect.
• Encouraging and skillfully incorporating opinions and ideas.
• Viewing differences as assets.
• Accommodating various strengths.
• Working together in mixed teams to design and implement creative solutions for our business suppliers and customers.
• Serving our broad markets effectively and sensitively.
• Creating win-win solutions.
• Being open to many viewpoints, cultures, and lifestyles.
• Participating in wide-ranging activities that support self-development and positive business relationships.

**Equal Employment Opportunity**

AT&T provides Equal Employment Opportunity for all employees and applicants in the administration of personnel policies such as:

• Appraisals
• Benefits and privileges of employment
• Compensation and benefits
• Disciplinary actions
• Recruiting, hiring, placements, upgrades, promotions, and lateral movement
• Social and recreational programs
• Terminations of employment, layoffs, and recalls
• Training and educational assistance
• Working conditions

All employees are prohibited from engaging in any discrimination based on a protected characteristic.

**The Americans With Disabilities Act**

The Americans with Disabilities Act (ADA) is a federal law that prohibits discrimination against individuals with disabilities. AT&T's policies provide reasonable accommodations to qualified employees with disabilities when medical restrictions preclude them from performing an essential function of their current or desired job, unless the accommodation poses an undue business hardship for AT&T.

4

AT&T_Dolenti0000024

DEF_0002603



Under the law and these policies, AT&T, through the Integrated Disability Service Center (IDSC), engages in an interactive process with employees who may require a reasonable accommodation of a disability as defined under the law. The IDSC has established processes and procedures regarding accommodating disabilities. Supervisors of employees who have requested an accommodation of a disability should refer such employees to the IDSC at 866-276-2278. In certain cases, a leave may be appropriate as an accommodation. Supervisors should consult Human Resources for advice in these situations.

### Confidentiality

Confidentiality is assured for applicants and employees regarding medical information, and it will be kept confidential except to the following extent: Supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and any necessary reasonable accommodations. First aid and safety personnel may be informed where and to the extent appropriate, if the disability might require emergency treatment or assistance during evacuations. Government officials who conduct compliance reviews may be informed.

All persons with responsibilities that may require information about the disability, physical or mental, are advised to treat and protect the information as strictly confidential.

More information regarding the job accommodation process may be found at https://www.e-access.att.com/hronestop/group/hr-onestop/job-accommodations

### Pregnancy Discrimination

It is illegal and in violation of this policy to discriminate against or harass an employee because of pregnancy. Pregnancy discrimination involves treating a pregnant employee unfavorably because of pregnancy, childbirth, or other medical condition related to pregnancy or childbirth, including but not limited to lactation. Employees who are disabled by pregnancy, childbirth, or related medical conditions are entitled to apply for applicable disability benefits.

### Religious Discrimination

AT&T's commitment to diversity extends to its commitment to respecting the religious beliefs of its employees. It is illegal and in violation of this policy to discriminate or to harass an employee because of that employee's sincerely held religious beliefs. AT&T's policies provide reasonable accommodations where an employee's sincerely held religious beliefs or practices are impacted by job requirements, unless the accommodation imposes an undue business hardship for AT&T. Supervisors of employees who request a religious accommodation should consult with Human Resources for guidance.

### Military Status

AT&T respects and supports its employees who serve in the uniformed services. AT&T employees called to active duty may apply for a military service leave of absence under the Company's applicable leave policies.

### Harassment Policy

The Company prohibits all forms of harassment while working on behalf of AT&T. This includes all offensive behavior, whether physical, verbal, written, printed, or displayed as inappropriate objects or images. Remarks, comments, jokes, gestures, messages or social media posts of an offensive nature will not be tolerated. Employees are prohibited from using any Company property, including computers, mobile phones, or any other devices, to view, send, or receive offensive material. In addition,

5

AT&T_Dolenti0000025

DEF_0002604



employees are never permitted to display offensive material in the workplace, whether on Company or personal devices.   All offensive materials are prohibited, including but not limited to material offensive to another person's gender, race, or   other protected characteristic.

Sexual harassment is specifically prohibited in the workplace.  In order to eliminate sexual harassment in the workplace,  AT&T prohibits all unprofessional behaviors including some that may go beyond the legal definition of sexual harassment.

**What is Sexual Harassment?**

Sexual harassment may involve unwelcome romantic or sexual advances, requests for sexual favors, and/or visual materials, verbal comments, or physical contact of a sexual nature, regardless of gender.  Involved parties, either victim or harasser, could be a co-worker, a subordinate, manager/supervisor, a contractor, or even a customer.

Such conduct is a violation of this policy, even in instances where the offending employee may have acted jokingly.  Such communications, comments, actions of a sexual nature, or unwelcome advances are prohibited at AT&T, whether or not other employees were offended.

The most obvious examples of sexual harassment involve physical behavior or physical contact.  The following is a non-exhaustive list of physical behaviors that may be considered offensive:

- Touching an individual by massaging their neck or shoulders, hugging, kissing, patting, pinching, fondling, or touching/pulling an individual's clothing or hair.
- Physical gestures that imply a sexual act or sexual anatomy; touching oneself in a sexual manner.
- Brushing up against another person, standing too close, or lingering.

However, sexually harassing behavior does not always involve physical contact.  The following is a non-exhaustive list of examples of verbal and non-verbal/visual behavior that may be considered offensive:

- Suggestive behavior such as "elevator eyes" (looking a person up and down), leering, staring, sexual gestures, whistling, cat-calls, winking, throwing kisses, making kissing sounds, howling, groaning, or smacking/licking lips.
- Sexual comments or innuendoes about clothing, anatomy, appearance, or sexual jokes or stories.
- Discussions or inquiries about sexual fantasy, preferences, history, or sex life about self or others.
- Displaying sexually suggestive objects or pictures in the workplace.
- Repeated invitations and/or pressuring for dates or sexual favors; harassing phone calls, e-mails, or other communication.
- Giving personal gifts that imply an intimate relationship.
- Sending sexually suggestive communications (e.g., instant messaging, Company message portals and/or devices, notes, letters, texts, e-mails); displaying or transmitting suggestive visual materials (e.g., pictures, calendars, posters).
- Stalking, following, or blocking an individual's path.

In addition, it is a violation of this policy, and the law, for any employee to ever state, imply, or suggest that dating or engaging in sexual conduct with another employee could result in a workplace benefit such as a promotion, raise, better terms and conditions of employment – or that a refusal to date or engage in sexual conduct will negatively affect a person's conditions of employment or career.

AT&T_Dolenti0000026

DEF_0002605



AT&T's Harassment policy and COBC rules apply in the workplace and in work-related settings outside the workplace, such as business trips, customer visits, social events, or other functions. AT&T also does not tolerate such conduct from outside vendors and other providers of goods or services to AT&T when they are working in AT&T-related settings.

**Personal Relationships Policy**

In accordance with AT&T's Harassment and Conflict of Interest Policies, a dating relationship, or any special personal relationship, should never exist between a supervisor and an employee for whom the manager has some responsibility, including employees who report directly or indirectly within that supervisor's chain of command.  In other words, a manager and another employee above or below that manager in the same chain of command, even if not directly above or below that manager, may not have a romantic or other close, personal relationship. This includes any manager who has influence over the employee's work, productivity, or terms and conditions of employment, such as an employee's trainer, manager who regularly fills in as a relieving manager over the employee, or a manager who has any input regarding the employee's performance.  Moreover, such a relationship should never exist between an AT&T employee and a vendor employee where that AT&T employee has some responsibility for recommending the services of or interacting with that vendor or providing input on the vendor's work. These relationships can interfere with the supervisor's independent judgment, create employee morale problems, ethical issues, or conflict of interest, and may create a hostile work environment.

To avoid these problems and to foster a positive team environment, a personal relationship that may create a potential conflict or the appearance of a conflict under this policy must be reported immediately to Human Resources. After reviewing the facts, the Company will take appropriate action, which could include transfer of either employee through job reassignment or voluntary resignation. Failure to disclose the relationship immediately or comply with the Company's decision is a violation of the EEO and Harassment Policies and the Code of Business Conduct (COBC) Conflict of Interest Policy, and may result in discipline up to and including dismissal.

More information may be found at:

http://intranet.att.com/corp-policies/Default.aspx?section=7&page=99

**Sexual Harassment Prevention Training**
Certain states require employers to provide sexual harassment training for employees. More information may be found at:
https://www.e-access.att.com/hronestop/documents/33859/10774655/State_Requirements_for_Harassment_Training.pdf/fa7d0d55-41db-ca77-3818-0abdd0de5e81

**Additional Complaint Procedures**

In addition to internal Company reporting methods, employees have the right to file a charge of discrimination with a federal, state, or local agency.  All charges of discrimination in which the Company is identified as a Respondent, including charges received by a Company field location, should be immediately directed to the EEO group (which is responsible for all Company communication with the agencies) at eeooffice@att.com.

**For Illinois Employees and Their Supervisors:**

In addition to the reporting channels identified above, Illinois employees may also report allegations of sexual harassment to the Illinois Secretary of State Inspector General's Office {(217) 785-2012 or (630) 424-2564} or the Department of Human Rights {Chicago office: (312) 814-6200 or Springfield office (217) 785-5100}.  Whistleblower protections are also available under the Illinois Whistleblower Act and the Illinois Human Rights Act.

7

AT&T_Dolenti0000027

DEF_0002606



**For California Employees and Their Supervisors:**

California state law requires employers to distribute to employees in California certain information about sexual harassment. This information is available on the brochure titled "Sexual Harassment: The Facts About Sexual Harassment" (DFEH-185) and is available at https://www.e-access.att.com/hronestop/documents/33859/10774655/CA_SexualHarassmentPamphlet.pdf/1238b39c-77a0-2049-9e4b-06d7cbaeb641. **Please note that all California employees and their supervisors are required to access this brochure and review the information.**

Supervisors, managers, co-workers and third parties are prohibited from engaging in unlawful behavior under the California Fair Employment and Housing Act.

California employees or job applicants who believe that they have been sexually harassed may file a complaint with the California Department of Fair Employment and Housing (DFEH) within one year of the alleged harassment. For more information, contact the DFEH toll free at (800) 884-1684, Sacramento and out of state at (916) 478-7200, or TTY at (800) 700-2320. You may also contact the DFEH via email at contact.center@dfeh.ca.gov or visit the DFEH's Web site at https://www.dfeh.ca.gov/.

California law requires employers to provide employees notice of their rights and obligations under the Fair Employment and Housing Act with respect to pregnancy, childbirth, and related medical conditions. This information is available in Notice B, "Family Care and Medical Leave and Pregnancy Disability Leave" and is available at https://www.e-access.att.com/hronestop/documents/33859/10774655/CA_Rights_Obligations_Pregnant_Employee.pdf/4338c358-b600-51c1-b9a4-c1b311eb2eb2. **Please note that all California employees and their supervisors are required to access this notice and review the information.**

**For New Jersey Employees and Their Supervisors:**

The state of New Jersey requires that all employers notify employees annually of the New Jersey Gender Equity in Pay, Compensation, Benefits or Other Terms or Conditions of Employment Notification. New Jersey and Federal laws prohibit employers from discriminating against an individual with respect to his/her pay, compensation, benefits, or terms, conditions, or privileges of employment because of the individual's gender. This information is available on the NJ Gender Equity notification and is available at https://www.e-access.att.com/hronestop/documents/33859/10774655/NJ_Gender_Equity.pdf/c538fad7-4af6-1671-7c4d-179754e945b4

**Frequently Asked Questions**

**Your Responsibility as an Employee and/or Supervisor**

Q. Are all AT&T employees responsible for ensuring their actions are conducted in accordance with AT&T's Equal Employment Opportunity (EEO) and Harassment Policies?

A. Yes. Failure to comply with these policies may result in disciplinary action, which can include dismissal even for a first offense. Supervisors are responsible for ensuring the work environment is free of unlawful discrimination and harassment.

Q. If you believe you have been subjected to unlawful discrimination, harassment, and/or retaliation or have knowledge of conduct prohibited under the Policy, are you responsible for reporting the matter?

A. Yes. We are all responsible for speaking up if we believe that someone at AT&T has violated the EEO and Harassment Policies. If a manager observes or receives any reports or allegations of conduct which could potentially violate the EEO and Harassment policies, the manager has a responsibility to report it immediately to Human Resources or the AT&T

8



Hotline at 1-888-871-2622.

**Non-Retaliation Policy**

Q. Are employees who raise concerns or who participate in an internal investigation protected from retaliation?

A. Yes. Any individual who seeks advice, raises a concern, or reports an EEO concern is following the EEO and Harassment Policies. AT&T will not tolerate retaliation against such a person.

**Internal Investigations**

Q. Are employees guaranteed complete confidentiality or anonymity?

A. Investigators will maintain confidentiality or anonymity to the extent allowable by law and where the confidentiality and anonymity does not impede the integrity of the investigation.

**Sexual and Other Harassment**

Q. Is it okay for a supervisor and a subordinate (including contractors) to have a close personal relationship or a dating relationship?

A. No. Any dating relationship or close personal relationship within the chain of command is prohibited. This also includes a supervisor who has influence over an employee's work, productivity, or terms and conditions of employment. Failure by either party to  report the relationship immediately is a violation of the policy.

Q. Can sexual harassment occur between individuals of the same sex?

A. Yes. Sexual harassment can happen between individuals of the same sex as well as the opposite sex.

Q. Are jokes about sex, race, age, religion, ethnicity, or any other jokes made at the expense of others appropriate in the work place?

A. No. Jokes made at the expense of any person or class of persons are prohibited.

**Disability**

Q. Does AT&T accommodate disabilities?

A. Yes. It is AT&T's policy to provide reasonable accommodations to qualified employees with disabilities when medical restrictions preclude them from performing an essential function of their current or desired job, unless the accommodation poses an undue business hardship for AT&T.

9

AT&T_Dolenti0000029

DEF_0002608

# GAGE DECLARATION
# EXHIBIT 33




# Equal Employment Opportunity (EEO) and Harassment Policies

AT&T Proprietary (Internal Use Only) Not for use or disclosure outside the AT&T companies except under written agreement.  1/1/2018

AT&T_Dolenti0000030

DEF_0002609





## Introduction and Policy Statement

AT&T is strongly committed to a workplace that values diversity and inclusion and that is free of discrimination and harassment of any kind. AT&T's EEO and Harassment Policies apply to all AT&T employees.

AT&T employees are protected from unlawful discrimination on the basis of race, color, religion, religious creed, national origin, ancestry, age, sex,  sexual orientation, gender, gender identity, gender expression, physical disability, mental disability, pregnancy, medical condition, genetic information, marital status, citizenship  status, military status, veteran status, or any other characteristic protected by federal, state, or local laws.  For instance,  New York City also prohibits discrimination on the basis of creed.  AT&T complies with these and other applicable EEO  laws, and prohibits unlawful discrimination.

AT&T also strictly prohibits all forms of abusive conduct or workplace harassment, including sexual and racial harassment and harassment  based on any of the protected characteristics described above.  An employee's actions, words, or behavior must not  create an intimidating, hostile, or offensive environment.  Employees are not permitted to ridicule, intimidate, threaten,  demean, or bully other employees, customers, vendor employees, or any other individuals with whom they interact.  Remarks, comments, jokes, slurs, images, or gestures of an offensive nature will not be tolerated.

It is a violation of this policy to unlawfully discriminate against or harass anyone while working on behalf of AT&T, including co-workers, contractors, vendors, or customers.

### Employee Responsibilities

AT&T employees are responsible for understanding and complying with the Company's EEO and Harassment Policies. Failure to comply may result in disciplinary action, which can include dismissal even for a first offense.

2

AT&T_Dolenti0000031

DEF_0002610



We all have a responsibility to ensure that AT&T is free of discrimination and harassment. Therefore, employees are responsible for reporting any violations of the EEO and Harassment Policies.

**Manager Responsibilities**

All managers are responsible for enforcement of the Company's EEO and Harassment Policies by ensuring a work environment free of unlawful discrimination and harassment. If a manager observes or receives any reports or allegations of conduct that could potentially violate the EEO and Harassment Policies, the manager has a responsibility to report it immediately to Human Resources or the AT&T Hotline. Such allegations are investigated by Human Resources professionals. Therefore, managers must always report them immediately and receive guidance from Human Resources or an investigator on the next steps.    In addition, supervisors are expected to:

• Ensure coverage of the EEO and Harassment Policies with each direct report.
• Ensure that coverage with each direct report is documented in his/her training history.
• Acknowledge employees' differences and their individual value to AT&T.

**Reporting a Concern**

Employees should report a violation of the EEO and Harassment Policies to a supervisor, any manager, Human Resources, directly to the AT&T Hotline (1-888-871-2622), or the AT&T Hotline Web Reporting site https://app.mycompliancereport.com/report.aspx?cid=att.

AT&T has established the AT&T Hotline for reporting EEO or harassment concerns anonymously and confidentially. The Hotline is staffed by an independent third-party vendor contracted by AT&T. The reported complaint will be summarized and forwarded to AT&T for further review.

Reports to the AT&T Hotline will be kept confidential to the extent permitted by law and by the Company's need to properly investigate. If an investigation is undertaken, AT&T will address the matter, and if needed, take appropriate corrective action.

**Non-Retaliation Policy**

Any individual who suspects an EEO violation and makes a report is acting responsibly in accordance with the EEO and Harassment Policies. The Company forbids retaliation against any person who makes a report or who participates in the investigative process. Allegations of retaliation will be investigated and appropriate action will be taken. Any individual engaging in retaliatory behavior will be subject to disciplinary action, which may include termination of employment. For any suspected retaliation concerns, contact the AT&T Hotline immediately.

Additional information on AT&T's non-retaliation policy can be found at the following link:

http://intranet.att.com/corp-policies/Default.aspx?section=1&page=44

**Internal Investigations**

AT&T investigates possible violations of federal, state, and local EEO statutes, and AT&T's EEO and Harassment Policies. Employees are required to cooperate fully with the Company's investigations, may not lie to investigators, obstruct the investigation, or retaliate against those who participate. To the extent possible, confidentiality will be maintained consistent with legal and ethical responsibilities on behalf of the Company.

All complaints will be followed by a fair, complete and timely investigation. Remedial action will be taken if any misconduct is found.

3

AT&T_Dolenti0000032

DEF_0002611



Important additional Company guidance on internal investigations should be reviewed at the following link:

http://intranet.att.com/corp-policies/Default.aspx?section=1&page=44&subpage=142

**Diversity**

Diversity means respecting many backgrounds, cultures, and ways of thinking.  AT&T recognizes and embraces all differences – from race, gender, sexual orientation, and mental/physical ability to perspectives, experiences, and outlooks.  It is more than the right thing to do – diversity is essential to the success of AT&T in the global marketplace.  AT&T employees are responsible for promoting an environment of inclusion: one in which each individual is valued and every voice is heard.  Actions that guide employee commitment to diversity include:

• Treating others with respect.
• Encouraging and skillfully incorporating opinions and ideas.
• Viewing differences as assets.
• Accommodating various strengths.
• Working together in mixed teams to design and implement creative solutions for our business suppliers and customers.
• Serving our broad markets effectively and sensitively.
• Creating win-win solutions.
• Being open to many viewpoints, cultures, and lifestyles.
• Participating in wide-ranging activities that support self-development and positive business relationships.

**Equal Employment Opportunity**

AT&T provides Equal Employment Opportunity for all employees and applicants in the administration of personnel policies such as:

• Appraisals
• Benefits and privileges of employment
• Compensation
• Disciplinary actions
• Recruiting, hiring, placements, upgrades, promotions, and lateral movement
• Social and recreational programs
• Terminations of employment, layoffs, and recalls
• Training and educational assistance
• Working conditions

All employees are prohibited from engaging in any discrimination based on a protected characteristic.

**The Americans With Disabilities Act**

The Americans with Disabilities Act (ADA) is a federal law that prohibits discrimination against individuals with disabilities.  AT&T's policies provide reasonable accommodations to qualified employees with disabilities when medical restrictions preclude them from performing an essential function of their current or desired job, unless the accommodation poses an undue business hardship for AT&T.

4

AT&T_Dolenti0000033

DEF_0002612



Under the law and these policies, AT&T, through the Integrated Disability Service Center (IDSC), engages in an interactive process with employees who may require a reasonable accommodation of a disability as defined under the law. The IDSC has established processes and procedures regarding accommodating disabilities. Supervisors of employees who have requested an accommodation of a disability should refer such employees to the IDSC at 866-276-2278. In certain cases, a leave may be appropriate as an accommodation. Supervisors should consult Human Resources for advice in these situations.

**Confidentiality**

Confidentiality is assured for applicants and employees regarding medical information, and it will be kept confidential except to the following extent: Supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and any necessary reasonable accommodations. First aid and safety personnel may be informed where and to the extent appropriate, if the disability might require emergency treatment or assistance during evacuations. Government officials who conduct compliance reviews may be informed.

All persons with responsibilities that may require information about the disability, physical or mental, are advised to treat and protect the information as strictly confidential.

More information regarding the job accommodation process may be found at:
http://ebiz.sbc.com/hronestop/index.cfm?fuseaction=Display&type=JAHome.

**Pregnancy Discrimination**

It is illegal and in violation of this policy to discriminate against or harass an employee because of pregnancy. Pregnancy discrimination involves treating a pregnant employee unfavorably because of pregnancy, childbirth, or other medical condition related to pregnancy or childbirth. Employees who are disabled by pregnancy, childbirth, or related medical conditions are entitled to apply for applicable disability benefits.

**Religious Discrimination**

AT&T's commitment to diversity extends to its commitment to respecting the religious beliefs of its employees. It is illegal and in violation of this policy to discriminate or to harass an employee because of that employee's sincerely held religious beliefs. AT&T's policies provide reasonable accommodations where an employee's sincerely held religious beliefs or practices are impacted by job requirements, unless the accommodation imposes an undue business hardship for AT&T. Supervisors of employees who request a religious accommodation should consult with Human Resources for guidance.

**Military Status**

AT&T respects and supports its employees who serve in the uniformed services. AT&T employees called to active duty may apply for a military service leave of absence under the Company's applicable leave policies.

**Harassment Policy**

The Company prohibits all forms of harassment while working on behalf of AT&T. This includes all offensive behavior, whether physical, verbal, written, printed, or displayed as inappropriate objects or images. Remarks, comments, jokes, or gestures of an offensive nature will not be tolerated. Employees are prohibited from using any Company property, including computers, mobile phones, or any other devices, to view, send, or receive offensive material. In addition,

5

AT&T_Dolenti0000034

DEF_0002613



employees are never permitted to display offensive material in the workplace, whether on Company or personal devices.   All offensive materials are prohibited, including but not limited to material offensive to another person's gender, race, or   other protected characteristic.

Sexual harassment is specifically prohibited in the workplace.  In order to eliminate sexual harassment in the workplace,  AT&T prohibits all unprofessional behaviors including some that may go beyond the legal definition of sexual harassment.

**What is Sexual Harassment?**

Sexual harassment may involve unwelcome romantic or sexual advances, requests for sexual favors, and/or visual materials, verbal comments, or physical contact of a sexual nature, regardless of gender.  Involved parties, either victim or harasser, could be a co-worker, a subordinate, a contractor, or even a customer.

Such conduct is a violation of this policy, regardless whether an employee engaging in such behavior meant it as a joke.  Such communications, comments, actions of a sexual nature, or unwelcome advances are prohibited at AT&T, whether or not other employees were offended.

The most obvious examples of sexual harassment involve physical behavior or physical contact.  The following is a non-exhaustive list of physical behaviors that may be considered offensive:

- Touching an individual by massaging their neck or shoulders, hugging, kissing, patting, pinching, fondling, or touching/pulling an individual's clothing or hair.
- Physical gestures that imply a sexual act or sexual anatomy; touching oneself in a sexual manner.
- Brushing up against another person, standing too close, or lingering.

However, sexually harassing behavior does not always involve physical contact.   The following is a non-exhaustive list of examples of verbal and non-verbal/visual behavior that may be considered offensive:

- Suggestive behavior such as "elevator eyes" (looking a person up and down), leering, staring, sexual gestures, whistling, cat-calls, winking, throwing kisses, making kissing sounds, howling, groaning, or smacking/licking lips.
- Sexual comments or innuendoes about clothing, anatomy, appearance, or sexual jokes or stories.
- Discussions or inquiries about sexual fantasy, preferences, history, or sex life; participation in workplace rumors about an individual's sex life.
- Displaying sexually suggestive objects or pictures in the workplace.
- Repeated invitations and/or pressuring for dates or sexual favors; harassing phone calls, e-mails, or other communication.
- Giving personal gifts that imply an intimate relationship.
- Sending sexually suggestive communications (e.g., instant messaging, Company message portals and/or devices, notes, letters, texts, e-mails); displaying or transmitting suggestive visual materials (e.g., pictures, calendars, posters).
- Stalking, following, or blocking an individual's path.

In addition, it is a violation of this policy, and the law, for any employee to ever state, imply, or suggest that dating or engaging in sexual conduct with another employee could result in a workplace benefit such as a promotion, raise, better terms and conditions of employment – or that a refusal to date or engage in sexual conduct will negatively affect a person's conditions of employment or career.

6

AT&T_Dolenti0000035

DEF_0002614



AT&T's harassment rules apply in the workplace and in work-related settings outside the workplace, such as business trips, customer visits, social events, or other functions.  AT&T also does not tolerate such conduct from outside vendors and other providers of goods or services to AT&T when they are working in AT&T-related settings.

**Personal Relationships Policy**

In accordance with AT&T's Harassment and Conflict of Interest Policies, a dating relationship, or any special personal relationship, should never exist between a supervisor and an employee for whom the manager has some responsibility, including employees who report directly or indirectly within that supervisor's chain of command.  In other words, a manager and another employee above or below that manager in the same chain of command, even if not directly above or below that manager, may not have a romantic or other close, personal relationship. This includes any manager who has influence over the employee's work, productivity, or terms and conditions of employment, such as an employee's trainer, manager who regularly fills in as a relieving manager over the employee, or a manager who has any input regarding the employee's performance.  Moreover, such a relationship should never exist between an AT&T employee and a vendor employee where that AT&T employee has some responsibility for recommending the services of or interacting with that vendor or providing input on the vendor's work. These relationships can interfere with the supervisor's independent judgment, create employee morale problems, ethical issues, or conflict of interest, and may create a hostile work environment.

To avoid these problems and to foster a positive team environment, a personal relationship that may create a potential conflict or the appearance of a conflict under this policy must be reported immediately to Human Resources. After reviewing the facts, the Company will take appropriate action, which could include transfer of either employee through job reassignment or voluntary resignation. Failure to disclose the relationship immediately or comply with the Company's decision is a violation of the EEO and Harassment Policies and the Code of Business Conduct (COBC) Conflict of Interest Policy, and may result in discipline up to and including dismissal.

More information may be found at:

http://intranet.att.com/corp-policies/Default.aspx?section=7&page=99

**Sexual Harassment Prevention Training**

Certain states require employers to provide sexual harassment training for employees. More information may be found at:

https://intra.att.com/hronestopadmin/doc/State_Requirements_for_Harassment_Training.pdf

**Additional Complaint Procedures**

In addition to internal Company reporting methods, employees have the right to file a charge of discrimination with a federal, state, or local agency.  All charges of discrimination in which the Company is identified as a Respondent, including charges received by a Company field location, should be immediately directed to the EEO group (which is responsible for all Company communication with the agencies) at eeooffice@att.com.

**For Illinois Employees and Their Supervisors:**

In addition to the reporting channels identified above, Illinois employees may also report allegations of sexual harassment to the Illinois Secretary of State Inspector General's Office {(217) 785-2012 or (630) 424-2564} or the Department of Human Rights {Chicago office: (312) 814-6200 or Springfield office (217) 785-5100}.  Whistleblower protections are also available under the Illinois Whistleblower Act and the Illinois Human Rights Act.

7

AT&T_Dolenti0000036

DEF_0002615



**For California Employees and Their Supervisors:**

California state law requires employers to distribute to employees in California certain information about sexual harassment.  This information is available on the brochure titled "Sexual Harassment: The Facts About Sexual Harassment" (DFEH-185) and is available at http://www.dfeh.ca.gov/wp-content/uploads/sites/32/2017/06/DFEH_SexualHarassmentPamphlet.pdf.  **Please note that all California employees and their supervisors are required to  access this brochure and review the information.**

Supervisors, managers, co-workers and third parties are prohibited from engaging in unlawful behavior under the California Fair Employment and Housing Act.

California employees or job applicants who believe that they have been sexually harassed may file a complaint with the California Department of Fair Employment and Housing (DFEH) within one year of the alleged harassment.  For more information, contact the DFEH toll free at (800) 884-1684, Sacramento and out of state at (916) 478-7200, or TTY at (800) 700-2320.  You may also contact the DFEH via email at contact.center@dfeh.ca.gov or visit the DFEH's Web site at http://www.dfeh.ca.gov/.

California law requires employers to provide employees notice of their rights and obligations under the Fair Employment and Housing Act with respect to pregnancy, childbirth, and related medical conditions.  This information is available in Notice B, "Family Care and Medical Leave and Pregnancy Disability Leave" and is available at

https://www.dfeh.ca.gov/wp-content/uploads/sites/32/2017/06/RightsObligationsPregnantEe_ENG.pdf.  **Please note that all California employees and their supervisors are required to access this notice and review the information.**

**Frequently Asked Questions**

**Your Responsibility as an Employee and/or Supervisor**

Q.  Are all AT&T employees responsible for ensuring their actions are conducted in accordance with AT&T's Equal Employment Opportunity (EEO) and Harassment Policies?

A.  Yes. Failure to comply with these policies may result in disciplinary action, which can include dismissal even for a first offense.  Supervisors are responsible for ensuring the work environment is free of unlawful discrimination and harassment.

Q. If you believe you have been subjected to unlawful discrimination, harassment, and/or retaliation or have knowledge of conduct prohibited under the Policy, are you responsible for reporting the matter?

A. Yes. We are all responsible for speaking up if we believe that someone at AT&T has violated the EEO and Harassment policies.  If a manager observes or receives any reports or allegations of conduct which could potentially violate the EEO and Harassment policies, the manager has a responsibility to report it immediately to Human Resources or the AT&T Hotline.

**Non-Retaliation Policy**

Q.  Are employees who raise concerns or who participate in an internal investigation protected from retaliation?

A.  Yes.  Any individual who seeks advice, raises a concern, or reports an EEO concern is following the EEO and Harassment Policies.  AT&T will not tolerate retaliation against such a person.

**Internal Investigations**

Q.  Are employees guaranteed complete confidentiality or anonymity?

8

AT&T_Dolenti0000037

DEF_0002616



A. Investigators will maintain confidentiality or anonymity to the extent allowable by law and where the confidentiality and anonymity does not impede the integrity of the investigation.

AT&T_Dolenti0000038

DEF 0002617



**Sexual and Other Harassment**

Q.  Is it okay for a supervisor and a subordinate to have a close personal relationship or a dating relationship?

A.  No.  Any dating relationship or close personal relationship within the chain of command is prohibited.  This also includes a supervisor who has influence over an employee's work, productivity, or terms and conditions of employment.  Failure to report the relationship immediately is a violation of the policy.

Q.  Can sexual harassment occur between individuals of the same sex?

A.  Yes. Sexual harassment can happen between individuals of the same sex as well as the opposite sex.

Q.  Are jokes about sex, race, age, religion, ethnicity, or any other jokes made at the expense of others appropriate in the work place?

A.  No. Jokes made at the expense of any person or class of persons are prohibited.

**Disability**

Q.  Does AT&T accommodate disabilities?

A.  Yes.  It is AT&T's policy to provide reasonable accommodations to qualified employees with disabilities when medical restrictions preclude them from performing an essential function of their current or desired job, unless the accommodation poses an undue business hardship for AT&T.

1

AT&T_Dolenti0000039

DEF_0002618

# GAGE DECLARATION EXHIBIT 34

| Job Key | Job Title | FLSA | Level | Year |
|---------|-----------|------|-------|------|
| 24601109 | Director of Sales | E | 3 | 2017 |

| Job Description |
|---|

Overall Purpose: Directs teams led by Area Retail Sales Managers to manage the Retail Stores in a defined territory. Key Roles and Responsibilities: Responsible for successfully achieving sales, revenue targets, and customer satisfaction within assigned geographical area and customer base. Responsible for hiring, coaching, and development within his/her territory. The territory can consist of a region or a densely populated market. Overall leadership of sales team to include, but not limited to, staffing/retention, team development, performance and compensation management. Education: Bachelors or Advanced degree preferred. Experience: Typically requires 10 or more years of experience and at least two years of management responsibility. Sales Management experience preferred. Supervisory: Yes.

DEF_0000250

# GAGE DECLARATION EXHIBIT 35

# HR.LSO.8252.001 Training History

| Completion Date | |
| Completion Status | |
| Course (Session) Number | |
| Course Object Type | |
| Course Type Name | |
| Learner Name | |
| Key Figures | |

| Completion Date | Learner Name | Course Type Name | Course Type Abbreviation | Course Type Number | Course (Session) Number | Completion Status | Score | Training Hours |
|---|---|---|---|---|---|---|---|---|
| 11/10/2017 | ALISON RAY | Protecting and Understanding CPNI-ML | M-PRD0580 | 61775931 | # | Satisfactory | 90.000 | 0.310 |
| 11/10/2017 | ALISON RAY | FLSA Supervisor/Manager Wage and Hour | SUPWH | 61391805 | 61432784 | Satisfactory | 100.000 | 0.550 |
| 11/10/2017 | ALISON RAY | Policy Review EEO and Harassment | POL_EEO17 | 61873233 | # | Satisfactory | | 0.250 |
| 10/19/2017 | ALISON RAY | myCOACH:Coaching&Accountability-Leaders | MCD200 | 61951842 | 61979461 | Satisfactory | | 0.450 |
| 10/16/2017 | ALISON RAY | Win the Neighborhood | PRD557 | 61758195 | 61761951 | Satisfactory | | 0.083 |
| 10/02/2017 | ALISON RAY | Ethics@Work for Managers | EAWM17 | 61878786 | # | Satisfactory | | 0.750 |
| 08/27/2017 | ALISON RAY | Virtual Job Shadow | VRTJBSDW | 61865545 | # | Satisfactory | | |
| 08/05/2017 | ALISON RAY | Helping Others Embrace Change | MDHOEC11 | 60611018 | 61403208 | Satisfactory | | 1.983 |
| 08/05/2017 | ALISON RAY | Delegating to Get Results | MDDTGR11 | 60612230 | 61404258 | Satisfactory | | 1.000 |
| 08/05/2017 | ALISON RAY | 2020 Ldrshp, Innv, & Comm - Mgr/Dir | 2020LICMGR | 61865546 | # | Satisfactory | | |
| 08/05/2017 | ALISON RAY | eReading from Executives | ERDNGEXC | 61865543 | # | Satisfactory | | |
| 08/04/2017 | ALISON RAY | Value of Coaching Workshop | LACVALWKSHP | 61825134 | 61888661 | Satisfactory | | 8.000 |
| 08/03/2017 | ALISON RAY | Selling Entertainment Retail CE | PRD8000CE | 61873246 | 61888827 | Satisfactory | | 8.000 |
| 07/27/2017 | ALISON RAY | Entertainment & Content Fundamentals | ENTCONTFUN | 61838979 | 61863017 | Satisfactory | | 0.333 |
| 07/27/2017 | ALISON RAY | DIRECTV NOW | DTVNOW100 | 61853153 | 61901987 | Satisfactory | | 0.200 |
| 07/27/2017 | ALISON RAY | DIRECTV Equipment (Residential) | DTVRESEQMT | 61885510 | 61918826 | Satisfactory | | 0.383 |
| 07/27/2017 | ALISON RAY | DIRECTV Programming Residential | DTVRESPRGM | 61887851 | 61937720 | Satisfactory | 11.000 | 0.300 |
| 07/27/2017 | ALISON RAY | Mobile Advantage (Residential) | DTVRESMBAV | 61891226 | 61905857 | Satisfactory | 75.000 | 0.367 |
| 07/27/2017 | ALISON RAY | Broadband Advantage (Residential) | DTVRESBBAV | 61891228 | 61944833 | Satisfactory | 40.000 | 0.233 |
| 07/27/2017 | ALISON RAY | DIRECTV National Offer (Residential) | DTVRESNOMT | 61894428 | 61933357 | Satisfactory | 50.000 | 0.500 |

DEF_0000395

| Completion Date | Learner Name | Course Type Name | Course Type Abbreviation | Course Type Number | Course (Session) Number | Completion Status | Score | Training Hours |
|---|---|---|---|---|---|---|---|---|
| 07/27/2017 | ALISON RAY | Strategic Collaboration | STRGCOLB | 61865445 | # | Satisfactory | | 1.000 |
| 07/25/2017 | ALISON RAY | Digital Transformation | DIGFIRSTR | 61838977 | 61860626 | Satisfactory | | 0.533 |
| 07/25/2017 | ALISON RAY | AT&T 5G and Fiber Connectivity | FIBR5G | 61848070 | 61863668 | Satisfactory | | 0.667 |
| 07/21/2017 | ALISON RAY | Compliance and AT&T Customers-ML | M-CMPATTCST1 | 61892078 | # | Satisfactory | | 0.120 |
| 07/21/2017 | ALISON RAY | Sales Integrity_Retail-ML_EXT | M-SIR2017E | 61905479 | # | Satisfactory | | 0.150 |
| 06/21/2017 | ALISON RAY | AT&T Refunds for 3rd Party Charges 16-ML | M-REF301 | 61505854 | # | Satisfactory | | 0.250 |
| 06/21/2017 | ALISON RAY | Performance Development | PDLOTC17 | 61804242 | # | Satisfactory | | 1.500 |
| 06/20/2017 | ALISON RAY | Employee Resource Groups | ERGSATT | 61417383 | 61554595 | Satisfactory | 93.000 | 0.567 |
| 06/19/2017 | ALISON RAY | Every Voice Matters | EVYVM | 61762206 | 61775419 | Satisfactory | | 0.383 |
| 06/19/2017 | ALISON RAY | Additional Hours-Making Right Choices | AHMRC | 61860580 | 61877920 | Satisfactory | | 0.133 |
| 05/17/2017 | ALISON RAY | 2017 LwD General Managers Virtual | LWDGM17V | 61788743 | # | Satisfactory | | |
| 05/11/2017 | ALISON RAY | Provisioning Connected Car in Retail | PRVCCRTL | 61846630 | 61862871 | Satisfactory | 80.000 | 0.400 |
| 02/09/2017 | ALISON RAY | What to Expect in a Work Stoppage | W2EXPECT | 61376326 | 61463048 | Satisfactory | 100.000 | 0.533 |
| 01/10/2017 | ALISON RAY | AT&T Code of Business Conduct 2017 | COBC17 | 61764799 | # | Satisfactory | | |
| 10/02/2016 | ALISON RAY | mLearning Legal Disclaimer (d.1216)-ML | M-LEGAL16V2 | 61704440 | # | Satisfactory | | 0.010 |
| 09/29/2016 | ALISON RAY | Setting Up a Smartphone-ML | M-PRD532 | 61548932 | # | Satisfactory | 100.000 | 0.190 |
| 09/29/2016 | ALISON RAY | System Access Hot Button - ML | M-PRD547 | 61596043 | # | Satisfactory | 100.000 | 0.080 |
| 09/29/2016 | ALISON RAY | iPhone 7/iPhone 7 Plus-ML | M-PRD548 | 61692221 | # | Satisfactory | | 0.270 |
| 09/29/2016 | ALISON RAY | Apple Watch-ML | M-PRD549 | 61692223 | # | Satisfactory | | 0.270 |
| 09/29/2016 | ALISON RAY | Your Actions Matter Our Most Valued Asse | M-RET1300 | 61549618 | # | Satisfactory | | 0.440 |
| 09/29/2016 | ALISON RAY | Great Coaching | LIQSLA14 | 61289631 | 61305052 | Satisfactory | | 0.383 |
| 09/29/2016 | ALISON RAY | Leading People HMM v12 | HMMV1222 | 61434248 | # | Satisfactory | | |
| 09/29/2016 | ALISON RAY | AT&T - The Integrated Provider | CLO001 | 61512594 | 61551725 | Satisfactory | | 0.083 |
| 09/23/2016 | ALISON RAY | Records and Info Management | RIMINFO | 61538393 | # | Satisfactory | | |
| 08/16/2016 | ALISON RAY | Comp 2016 Asst and Acknowledge | PRD529 | 61525373 | 61537952 | Satisfactory | | 0.017 |
| 07/19/2016 | ALISON RAY | Leaders New to National Retail | NRTNEW800 | 61593134 | 61603684 | Satisfactory | | 4.000 |
| 07/13/2016 | ALISON RAY | Leaders New to AT&T Retail | RETNEW800 | 61592266 | 61597391 | Satisfactory | | 4.000 |
| 06/30/2016 | ALISON RAY | Issuing Bill Credits in OPUS-ML | M-BCOPUS100 | 61586866 | # | Satisfactory | | 0.180 |
| 06/27/2016 | ALISON RAY | Billing Inquire Billing Adjustment-ML | M-BIBA_AR100 | 61586865 | # | Satisfactory | 90.000 | 0.340 |

DEF_0000396

| Completion Date | Learner Name | Course Type Name | Course Type Abbreviation | Course Type Number | Course (Session) Number | Completion Status | Score | Training Hours |
|---|---|---|---|---|---|---|---|---|
| 06/27/2016 | ALISON RAY | Mobility Credit Guidelines-ML | M-MCG100 | 61248052 | # | Satisfactory | 88.000 | 0.160 |
| 06/27/2016 | ALISON RAY | Merchandising Systems & Tools-ML | M-MERCH02 | 61523740 | # | Satisfactory | 100.000 | 0.950 |
| 06/27/2016 | ALISON RAY | Merchandising Resets-ML | M-MERCH03 | 61524904 | # | Satisfactory | | 0.400 |
| 06/27/2016 | ALISON RAY | Ergonomics in Retail Stores Review-ML | M-RCT1307 | 61476776 | # | Satisfactory | 80.000 | 0.220 |
| 06/27/2016 | ALISON RAY | Store Visits for Directors | RET498 | 61380491 | 61425080 | Satisfactory | 100.000 | 0.250 |
| 06/27/2016 | ALISON RAY | CSM Corporate Policy Review | POL_CSM16 | 61582120 | # | Satisfactory | | |
| 06/08/2016 | ALISON RAY | Leading with Distinction General Manager | LWDGM | 61533759 | 61538143 | Satisfactory | | |
| 06/05/2016 | ALISON RAY | Policy Review Insider Trading | POL_INSTRD | 61580427 | # | Satisfactory | | |
| 05/19/2016 | ALISON RAY | Merchandising Basics-ML | M-MERCH01 | 61523545 | # | Satisfactory | 100.000 | 0.340 |
| 05/19/2016 | ALISON RAY | Non-Barg Surplus Notification Process | NB-SNP | 60565696 | 60607732 | Satisfactory | 90.000 | 0.483 |
| 05/18/2016 | ALISON RAY | EH&S Orientation for New Employees-US | EHS_OR_US | 61289390 | 61308091 | Satisfactory | 100.000 | 0.033 |
| 05/03/2016 | ALISON RAY | Policy Review Corporate Accessibility | POL_TEC16 | 61518330 | # | Satisfactory | | 0.250 |
| 04/26/2016 | ALISON RAY | Job Accommodation Trng for Supervisor | JOBACCSUP | 60597823 | 61179058 | Satisfactory | | 0.483 |
| 04/14/2016 | ALISON RAY | Report Privacy Incidents Policy Review | POL_RPI16 | 61548947 | # | Satisfactory | | 0.250 |
| 04/01/2016 | ALISON RAY | Box Cutter Safety Acknowledgement-ML | M-PRD528 | 61512598 | # | Satisfactory | | 0.010 |
| 04/01/2016 | ALISON RAY | 2016 - Indirect Internal Comp ACK-ML | M-PRD533 | 61539182 | # | Satisfactory | | 0.030 |
| 04/01/2016 | ALISON RAY | EH&S Office & Retail Overview for US | OVERUS | 60874350 | 60881516 | Satisfactory | | 0.150 |
| 04/01/2016 | ALISON RAY | Global Anti-Bribery and FCPA | GABC_FCPA | 61345602 | 61534288 | Satisfactory | 100.000 | 0.600 |
| 04/01/2016 | ALISON RAY | AT&T Refunds for 3rd Party Charges 16 | REF301 | 61505856 | 61516560 | Satisfactory | | 0.200 |
| 03/06/2016 | ALISON RAY | Preventing Fraud R-ML | M-FR114R | 61510166 | # | Satisfactory | 90.000 | 0.300 |
| 03/06/2016 | ALISON RAY | mLearning Legal Disclaimer(d. 0616)-ML | M-LEGAL16 | 61505271 | # | Satisfactory | | 0.010 |
| 02/29/2016 | ALISON RAY | Disability Awareness Training R-ML | M-DISARR | 61511159 | # | Satisfactory | | 0.040 |
| 02/29/2016 | ALISON RAY | CPNI and Social Engineering R-ML | M-RT356R | 61510165 | # | Satisfactory | 92.000 | 0.740 |
| 02/20/2016 | ALISON RAY | AT&T Code of Business Conduct 2016 | COBC16 | 61497458 | # | Satisfactory | | |
| 02/11/2016 | ALISON RAY | LaC 3.0 for Market Leaders | RET9611 | 61498401 | 61519052 | Satisfactory | | 8.000 |
| 01/30/2016 | ALISON RAY | AT&T EEO and Harassment Policies | EEOHAR | 61143191 | 61160366 | Satisfactory | | 0.100 |
| 01/30/2016 | ALISON RAY | AT&T Emergency Preparedness Training | EMPREP | 61482818 | 61511333 | Satisfactory | | 0.217 |
| 10/05/2015 | ALISON RAY | Diversity-Many Backgrounds - One Focus | DIVERS_MB | 60269198 | 61022166 | Satisfactory | | 0.417 |
| 09/24/2015 | ALISON RAY | NPW Policy Training For AT&T Managers | NPWPOLICY | 60675403 | 61213878 | Satisfactory | 100.000 | 0.533 |
| 09/22/2015 | ALISON RAY | NPI 2015 Recorded - ML | M-RET7472 | 61436006 | # | Satisfactory | | 0.550 |
| 08/28/2015 | ALISON RAY | Policy Review Annual Compliance Video | POL_COMVT | 61412348 | # | Satisfactory | | |

DEF_0000397

| Completion Date | Learner Name | Course Type Name | Course Type Abbreviation | Course Type Number | Course (Session) Number | Completion Status | Score | Training Hours |
|---|---|---|---|---|---|---|---|---|
| 08/23/2015 | ALISON RAY | mLearning Legal Disclaimer(d.1215)-ML | M-LEGAL15V2 | 61405912 | # | Satisfactory | | |
| 08/23/2015 | ALISON RAY | AT&T Refunds for Third-Party Charges-ML | M-REF201 | 61405272 | # | Satisfactory | | |
| 08/19/2015 | ALISON RAY | Leading with Distinction 2015 (GM) | LWD2015GM | 61308068 | 61386038 | Satisfactory | | |
| 08/09/2015 | ALISON RAY | Offer & Activating Video Solutions-ML | M-PRD513 | 61340693 | # | Satisfactory | 100.000 | 0.300 |
| 07/30/2015 | ALISON RAY | Antitrust and Competition v3 | ANTTR | 61368314 | 61379228 | Satisfactory | | 0.533 |
| 07/29/2015 | ALISON RAY | Foster Inclusion Part 1 | FOSTERPT1 | 61100163 | 61149601 | Satisfactory | 100.000 | 0.133 |
| 07/29/2015 | ALISON RAY | Foster Inclusion Part 2 | FOSTERPT2 | 61100164 | 61149630 | Satisfactory | 100.000 | 0.067 |
| 07/28/2015 | ALISON RAY | Whitespace Construction Punch-1 | DLR444 | 61399676 | # | Satisfactory | | |
| 07/22/2015 | ALISON RAY | Policy Review Rpt On and Off Duty | POL_ONOFF | 61384426 | # | Satisfactory | | 0.250 |
| 06/19/2015 | ALISON RAY | AccessMyLAN-ML | M-RET1523 | 61048313 | # | Satisfactory | | 0.120 |
| 06/19/2015 | ALISON RAY | Fan Search Tool (FaST)_ML | M-RET1524 | 61065518 | # | Satisfactory | 80.000 | 0.320 |
| 06/19/2015 | ALISON RAY | Vantiv Mobile Payment Solution _ML | M-RET1525 | 61185533 | # | Satisfactory | | 0.120 |
| 06/19/2015 | ALISON RAY | Business in Retail Basics_ML | M-RET1530 | 61065521 | # | Satisfactory | 80.000 | 0.110 |
| 06/19/2015 | ALISON RAY | IRU Selling Skills_ML | M-RET1531 | 61065520 | # | Satisfactory | 100.000 | 0.130 |
| 06/19/2015 | ALISON RAY | CRU Selling Skills_ML | M-RET1532 | 61065519 | # | Satisfactory | 100.000 | 0.090 |
| 06/19/2015 | ALISON RAY | Enterprise CRU Retail Support_ML | M-RET1533 | 61293803 | # | Satisfactory | 100.000 | 0.210 |
| 06/03/2015 | ALISON RAY | 2015 AT&T Next Enhancements - ML | M-PRD515 | 61345433 | # | Satisfactory | | 0.250 |
| 06/03/2015 | ALISON RAY | Employee Resource Groups | ERGSATT_ | 60817773 | 60982651 | Satisfactory | 100.000 | 1.217 |
| 06/02/2015 | ALISON RAY | Business Expert Assessment | BEXP100 | 61345429 | 61352119 | Satisfactory | 90.000 | 0.533 |
| 05/27/2015 | ALISON RAY | #connected - Solutions RAE/ARSMi | DLR5982 | 61315839 | 61325903 | Satisfactory | | 3.500 |
| 05/27/2015 | ALISON RAY | Sales and Marketing Guidelines 2015 | POL_SMG15 | 61355658 | # | Satisfactory | | |
| 05/18/2015 | ALISON RAY | GoPhone for Non-Exclusive Dealers-ML | M-IND250 | 61336532 | # | Satisfactory | | 0.080 |
| 05/18/2015 | ALISON RAY | mLearning Legal Disclaimer(d.0615)-ML | M-LEGAL15V1 | 61345686 | # | Satisfactory | | |
| 05/18/2015 | ALISON RAY | Introducing Plenti -ML | M-PRD509 | 61316641 | # | Satisfactory | 80.000 | 0.160 |
| 05/13/2015 | ALISON RAY | Foreign Corrupt Practices Act v2 | FCPA2 | 60245544 | 60885060 | Satisfactory | | 0.950 |
| 04/15/2015 | ALISON RAY | Gifts Intl Policy Review | POL_GFIN | 61327370 | # | Satisfactory | | |
| 04/13/2015 | ALISON RAY | FLSA - Supervisor Review | FLSA_SUP2 | 60078339 | 60360627 | Satisfactory | 100.000 | 1.683 |
| 04/06/2015 | ALISON RAY | 2015_TU_Presents_Virtual | VMSW2V15 | 61227184 | # | Satisfactory | | |
| 04/06/2015 | ALISON RAY | Policy Review Mobile Device Security | POL_MDS | 61285792 | # | Satisfactory | | 0.250 |
| 04/06/2015 | ALISON RAY | Third Party Supplier Survey | POL_TPS | 61320373 | # | Satisfactory | | |
| 03/30/2015 | ALISON RAY | OPUS Top Transactions for Dealers | DLR3003 | 61159414 | 61340068 | Satisfactory | 90.000 | 0.450 |

DEF_0000398

| Completion Date | Learner Name | Course Type Name | Course Type Abbreviation | Course Type Number | Course (Session) Number | Completion Status | Score | Training Hours |
|---|---|---|---|---|---|---|---|---|
| 03/26/2015 | ALISON RAY | Protecting CPNI and Social Engineering | RCT356 | 60032887 | 61074150 | Satisfactory | 100.000 | 0.417 |
| 03/12/2015 | ALISON RAY | AT&T EEO and Harassment Policies-MLd | M-EEOHRS | 61149116 | # | Satisfactory | | 0.070 |
| 02/25/2015 | ALISON RAY | AT&T Code of Business Conduct 2015-ML | M-COBC15 | 61277156 | # | Satisfactory | | 0.030 |
| 02/25/2015 | ALISON RAY | Emergency Preparedness Ep 1 -Mld | M-EPREP1 | 61252948 | # | Satisfactory | | 0.190 |
| 02/25/2015 | ALISON RAY | Emergency Preparedness Ep 2 -Mld | M-EPREP2 | 61253075 | # | Satisfactory | | 0.160 |
| 02/25/2015 | ALISON RAY | Emergency Preparedness Ep 3 -Mld | M-EPREP3 | 61253085 | # | Satisfactory | | 0.130 |
| 02/25/2015 | ALISON RAY | Emergency Preparedness Ep 4 -Mld | M-EPREP4 | 61253086 | # | Satisfactory | | 0.160 |
| 02/25/2015 | ALISON RAY | Preventing Fraud-ML | M-FRA114 | 61211952 | # | Satisfactory | 90.000 | 0.140 |
| 02/25/2015 | ALISON RAY | Social Engineering Awareness-MLd | M-LO747 | 60965550 | # | Satisfactory | | 0.110 |
| 02/25/2015 | ALISON RAY | PCI Awareness Training - Module 1-MLd | M-PCIDSS | 61175502 | # | Satisfactory | | 0.120 |
| 02/25/2015 | ALISON RAY | Records & Info Mgmt Awareness-MLd | M-RIMAWR | 61005547 | # | Satisfactory | | 0.200 |
| 02/17/2015 | ALISON RAY | Policy Review Accessibility Complianc | POL_TEC15 | 61307241 | # | Satisfactory | | |
| 02/10/2015 | ALISON RAY | LaC 2.0 for Market Leaders | RET0955 | 61269397 | 61305979 | Satisfactory | | |
| 01/15/2015 | ALISON RAY | My phone is my... | RET505 | 61262684 | 61289866 | Satisfactory | 100.000 | 0.250 |
| 09/09/2014 | ALISON RAY | Foreign Corrupt Practices Act Policy | POL_FCPA4 | 61209128 | # | Satisfactory | | 0.250 |
| 08/22/2014 | ALISON RAY | Compliance Training for Managers | POL_MGRCO | 61184762 | # | Completed - Acknowledged/ | | |
| 07/25/2014 | ALISON RAY | EH&S Office & Retail Overview for US | OVERUS | 60874350 | 60881516 | Satisfactory | | 0.567 |
| 07/22/2014 | ALISON RAY | Selling Fire (Recorded) Assessment | L2-PRD492 | 61215605 | # | Satisfactory | 90.000 | 0.060 |
| 07/22/2014 | ALISON RAY | Introducing Fire | PRD490 | 61140777 | 61177919 | Satisfactory | 80.000 | 0.100 |
| 07/22/2014 | ALISON RAY | Selling Fire (Recorded) | PRD492 | 61145982 | 61189406 | Satisfactory | | 1.217 |
| 07/21/2014 | ALISON RAY | AT&T Multi-DeviceProtectionPack_LD-ML | M-IND479 | 61168994 | # | Satisfactory | 90.000 | ###### |
| 07/21/2014 | ALISON RAY | mLearning Legal Disclaimer(d.1214)-ML | M-LEGAL14V2 | 61192504 | # | Satisfactory | 100.000 | 21.000 |
| 07/21/2014 | ALISON RAY | 2014 EH&S Plan Overview - ML | M-PLAN14 | 61159605 | # | Satisfactory | | |
| 07/21/2014 | ALISON RAY | MDPP - Limited Lines - ML | M-PRD482 | 61169703 | # | Satisfactory | | 324.000 |
| 06/30/2014 | ALISON RAY | Even Better Together-ML | M-EBT101 | 61160738 | # | Satisfactory | 100.000 | 932.000 |
| 06/30/2014 | ALISON RAY | AT&T EEO and Harassment Policies-MLd | M-EEOHRS | 61149116 | # | Satisfactory | | 252.000 |
| 06/10/2014 | ALISON RAY | My Time Refresher Supervisors | POL_MTS14 | 61149925 | # | Satisfactory | | 0.250 |
| 05/19/2014 | ALISON RAY | Job Accomm for Supervisors Refresher | POL_JBACC | 61149644 | # | Satisfactory | | 0.250 |
| 05/15/2014 | ALISON RAY | LwD - Execute for Excellence 2020 | E4E2020GM | 61042092 | 61048314 | Satisfactory | | |
| 05/12/2014 | ALISON RAY | GM LwD 2020 Vision (Recorded) | GM2020VR | 60990608 | # | Satisfactory | | |
| 05/12/2014 | ALISON RAY | GM LwD Innovator's DNA (Recorded) | GMIDNAR1 | 60992246 | # | Satisfactory | | |

DEF_0000399

| Completion Date | Learner Name | Course Type Name | Course Type Abbreviation | Course Type Number | Course (Session) Number | Completion Status | Score | Training Hours |
|---|---|---|---|---|---|---|---|---|
| 05/12/2014 | ALISON RAY | GM LwD Innovator's DNA (Recorded) | GMIDNAR2 | 60992300 | # | Satisfactory | | |
| 04/21/2014 | ALISON RAY | Payment Card Industry (PCI) Policy | POL_PCI14 | 61080098 | # | Satisfactory | | 0.250 |
| 04/15/2014 | ALISON RAY | AT&T Code of Business Conduct 2014-ML | M-COBC14 | 61049155 | # | Satisfactory | | 58.000 |
| 04/15/2014 | ALISON RAY | Disability Awareness Training-MLd | M-DISAWR | 60975379 | # | Satisfactory | | 624.000 |
| 04/15/2014 | ALISON RAY | Emergency Preparedness - ML | M-EPREP | 60832188 | # | Satisfactory | 100.000 | 131.000 |
| 04/15/2014 | ALISON RAY | mLearning Legal Disclaimer(d.0714)-ML | M-LEGAL14V1 | 61059708 | # | Satisfactory | | 18.000 |
| 04/15/2014 | ALISON RAY | Snapshot-ML | M-RET126 | 60975970 | # | Satisfactory | | 651.000 |
| 04/15/2014 | ALISON RAY | Dealer Compensation Overview | IND115 | 61061861 | 61108408 | Satisfactory | | 0.067 |
| 04/15/2014 | ALISON RAY | Sales and Marketing Guidelines 2014 | POL_SLMKT | 61080095 | # | Satisfactory | | |
| 04/14/2014 | ALISON RAY | Data Management Policy | POL_DMGT | 61110765 | # | Satisfactory | | |
| 03/30/2014 | ALISON RAY | Antitrust Policy | POL_ANTIT | 61079095 | # | Satisfactory | | |
| 03/28/2014 | ALISON RAY | Retail mLearning Acknowledgement - ML | M-PRD478 | 61079725 | # | Satisfactory | | 13.000 |
| 03/28/2014 | ALISON RAY | Protecting CPNI and Social Engineering | RCT356 | 60032887 | 61074150 | Satisfactory | 92.000 | 0.133 |
| 03/26/2014 | ALISON RAY | Sales Compensation 2014 ACK - Indirec | M-ACK855 | 61074241 | # | Satisfactory | 100.000 | 514.000 |
| 03/20/2014 | ALISON RAY | Motivate to Engage | MOT2ENG | 61030637 | 61032963 | Satisfactory | | 9.000 |
| 03/01/2014 | ALISON RAY | OP123 | POL_OP123 | 61084561 | # | Satisfactory | | |
| 02/27/2014 | ALISON RAY | Inspired & Engaged Training 2014 T3 | RET9231 | 61058960 | 61076050 | Satisfactory | | 1.000 |
| 02/18/2014 | ALISON RAY | Emergency Preparedness | EMPREP_US | 60815857 | 61046766 | Satisfactory | 100.000 | 0.067 |
| 02/14/2014 | ALISON RAY | Accessibility Compliance Policy | POL_TEC14 | 61071524 | # | Satisfactory | | |
| 02/06/2014 | ALISON RAY | Fraud Prevention | TC_FRA113 | 60127026 | 60459771 | Satisfactory | 100.000 | 0.700 |
| 02/06/2014 | ALISON RAY | Seeding Acknowledgment WBT | NRT214 | 61042765 | 61049991 | Satisfactory | 100.000 | 0.017 |
| 02/05/2014 | ALISON RAY | Social Media Policy | POL_SOCP4 | 61064256 | # | Satisfactory | | |
| 02/04/2014 | ALISON RAY | Lead by Example: Be Proactive | RET5020 | 61054004 | 61055109 | Satisfactory | | 0.117 |
| 12/06/2013 | ALISON RAY | AT&T Mobile Share Value Plans | PRD472 | 60999671 | 61034400 | Satisfactory | 100.000 | 0.267 |
| 12/05/2013 | ALISON RAY | mLearning Legal Disclaimer(d.1213)-ML | M-LEGAL13V2 | 60971798 | # | Satisfactory | | 18.000 |
| 10/31/2013 | ALISON RAY | I&E mLearning 1-ml | M-PRD429 | 60907800 | # | Satisfactory | | 200.000 |
| 10/31/2013 | ALISON RAY | I&E mLearning 2 | M-PRD430 | 60912088 | # | Satisfactory | | 306.000 |
| 10/31/2013 | ALISON RAY | I&E mLearning 3 | M-PRD431 | 60912089 | # | Satisfactory | | 45.000 |
| 10/31/2013 | ALISON RAY | FLSA - Supervisor Review | FLSA_SUP2 | 60078339 | 60360627 | Satisfactory | 100.000 | 2.750 |
| 10/30/2013 | ALISON RAY | MyTime - Mgrs of Non-Exempt Emp v6 | TC_MYT215 | 60340329 | 60364126 | Satisfactory | 81.000 | 1.200 |
| 10/24/2013 | ALISON RAY | Leaders as Coaches for Directors | RET950 | 60953507 | 60978810 | Satisfactory | | 23.500 |

DEF_0000400

| Completion Date | Learner Name | Course Type Name | Course Type Abbreviation | Course Type Number | Course (Session) Number | Completion Status | Score | Training Hours |
|---|---|---|---|---|---|---|---|---|
| 09/29/2013 | ALISON RAY | Sales and Marketing Guidelines | POL_SMG13 | 60926731 | # | Satisfactory | | |
| 09/17/2013 | ALISON RAY | Inspired & Engaged Leadership Skills | PRD413 | 60840339 | 60939463 | Satisfactory | | 3.000 |
| 08/19/2013 | ALISON RAY | 2013 Compliance for Sr. Leadership | COMPL2013 | 60871807 | 60920602 | Satisfactory | | 0.017 |
| 08/05/2013 | ALISON RAY | Disability Awareness Video | RCT1305 | 60835179 | 60935361 | Satisfactory | 73.000 | 0.417 |
| 08/01/2013 | ALISON RAY | Woking with Suppliers Policy 2013 | POL_WWS13 | 60938545 | # | Satisfactory | | |
| 07/30/2013 | ALISON RAY | Sales Comp 2013 ACK | ACK852 | 60900103 | 60934129 | Satisfactory | 100.000 | 0.133 |
| 07/23/2013 | ALISON RAY | Hazard Communication - GHS Coverage | HZCMGHS | 60817772 | 60893941 | Satisfactory | 100.000 | 0.500 |
| 07/15/2013 | ALISON RAY | Digital Life for Dealer Internals | DLR379 | 60831458 | 60925487 | Satisfactory | | 8.000 |
| 07/12/2013 | ALISON RAY | Digital Life for Retail Overview | PRD377 | 60745418 | 60826415 | Satisfactory | | 0.283 |
| 07/11/2013 | ALISON RAY | Fraud Prevention | TC_FRA113 | 60127026 | 60459771 | Satisfactory | 100.000 | 0.717 |
| 06/25/2013 | ALISON RAY | LwD5: G2E for General Managers | LWD5GM | 60873911 | 60899377 | Satisfactory | | 10.250 |
| 05/31/2013 | ALISON RAY | Sponsorships Memberships (CSM) Policy | POL_13CSM | 60909953 | # | Satisfactory | | |
| 05/28/2013 | ALISON RAY | C&C Audit Essentials | IND310 | 60839620 | 60880408 | Satisfactory | 100.000 | 0.150 |
| 05/28/2013 | ALISON RAY | Introduction to C&C Audit Strategy | IND309 | 60872611 | 60881631 | Unsatisfactory | | 0.200 |
| 05/23/2013 | ALISON RAY | Job Accommodations for Supervisors | POL_JOBAC | 60907430 | # | Satisfactory | | |
| 05/01/2013 | ALISON RAY | Planning the eNPS Discussion | ENPSPLAN | 60873188 | 60896174 | Satisfactory | | 0.200 |
| 05/01/2013 | ALISON RAY | Conducting the eNPS Discussion | ENPSCON | 60873191 | 60877169 | Satisfactory | | 0.233 |
| 04/29/2013 | ALISON RAY | Mobile Insight Report Builder Update | NRT_270 | 60833572 | 60857193 | Satisfactory | 100.000 | 0.767 |
| 04/28/2013 | ALISON RAY | Protecting CPNI and Social Engineering | RCT356 | 60032887 | 60664253 | Satisfactory | 92.000 | 0.550 |
| 04/28/2013 | ALISON RAY | Job Accommodation Trng for Supervisor | JOBACCSUP | 60597823 | 60605210 | Satisfactory | | 0.267 |
| 04/26/2013 | ALISON RAY | Ergonomics for the Office | ERGOOFF | 60806100 | 60823787 | Satisfactory | 90.000 | 0.250 |
| 03/27/2013 | ALISON RAY | Selling BlackBerry 10 | PRD409 | 60845692 | 60864157 | Satisfactory | | |
| 03/25/2013 | ALISON RAY | Emergency Preparedness | EMPREP_US | 60815857 | 60840809 | Satisfactory | 100.000 | 0.017 |
| 03/25/2013 | ALISON RAY | Account Level CSS | RET4111 | 60845441 | 60874730 | Satisfactory | | 0.117 |
| 03/24/2013 | ALISON RAY | Conflict of Interest 2013 | POL_COI13 | 60835587 | # | Satisfactory | | |
| 02/19/2013 | ALISON RAY | AT&T Code of Business Conduct 2013 | COBC13 | 60817766 | 60820802 | Satisfactory | | 0.050 |
| 01/25/2013 | ALISON RAY | Accessibility Compliance | POL_TECHA | 60839674 | # | Satisfactory | | 0.250 |
| 01/14/2013 | ALISON RAY | AT&T Enhanced Push to Talk | PRD403 | 60810756 | 60827840 | Satisfactory | 90.000 | 0.267 |
| 10/24/2012 | ALISON RAY | Inspired & Engaged 2012 | RET9297 | 60686414 | 60734436 | Satisfactory | | 3.000 |
| 10/16/2012 | ALISON RAY | Protecting CPNI and Social Engineering | RCT356 | 60032887 | 60664253 | Satisfactory | 92.000 | 0.933 |
| 10/16/2012 | ALISON RAY | Asset Registration Policy 2012 | POL_ASTRG | 60782195 | # | Satisfactory | | |

DEF_0000401

| Completion Date | Learner Name | Course Type Name | Course Type Abbreviation | Course Type Number | Course (Session) Number | Completion Status | Score | Training Hours |
|---|---|---|---|---|---|---|---|---|
| 10/04/2012 | ALISON RAY | Corporate Memberships (CSM) Policy | POL_CSM12 | 60778508 | # | Satisfactory | | |
| 09/28/2012 | ALISON RAY | Our Inspired & Engaged Culture | RET9290 | 60729828 | 60773400 | Satisfactory | 80.000 | 0.433 |
| 09/24/2012 | ALISON RAY | Working With Suppliers Policy 2012 | POL_WSPL2 | 60667488 | # | Satisfactory | | |
| 09/19/2012 | ALISON RAY | Be an MVP with MPP! | DLR1050 | 60743991 | 60770072 | Satisfactory | 100.000 | 0.683 |
| 08/21/2012 | ALISON RAY | Agent National Retail Training | ANR100 | 60086781 | 60111031 | Satisfactory | 100.000 | 0.167 |
| 08/20/2012 | ALISON RAY | Sales Marketing Guideline Policy 2012 | POL_SMG12 | 60756042 | # | Satisfactory | | |
| 08/08/2012 | ALISON RAY | AT&T Mobile Share | PRD365 | 60675404 | 60750587 | Satisfactory | 90.000 | 0.167 |
| 07/26/2012 | ALISON RAY | Mobile Insight for the Advanced User | MOBINSADV | 60673847 | 60707323 | Satisfactory | 80.000 | 0.683 |
| 07/09/2012 | ALISON RAY | CSO Approver Reviewer Training | CSOAPRVRV | 60435285 | 60465317 | Satisfactory | | 0.533 |
| 06/13/2012 | ALISON RAY | Leading with Distinction 4 GM | LWD4GM | 60610790 | 60614102 | Satisfactory | | 20.250 |
| 05/16/2012 | ALISON RAY | AT&T Wireless Home Phone | PRD308 | 60589268 | 60681435 | Satisfactory | 100.000 | 0.517 |
| 04/30/2012 | ALISON RAY | Windows Phone OS Assessment | L2-PRD324 | 60658194 | # | Satisfactory | 80.000 | 0.210 |
| 04/30/2012 | ALISON RAY | HTC One X | PRD297 | 60658189 | 60682018 | Satisfactory | 88.000 | 0.367 |
| 04/25/2012 | ALISON RAY | OPS Assessment (COR) | L2-PRD311 | 60651672 | # | Satisfactory | 80.000 | 0.110 |
| 04/24/2012 | ALISON RAY | Offering Personalized Solutions | PRD311 | 60606841 | 60641218 | Satisfactory | | 8.000 |
| 04/23/2012 | ALISON RAY | AT&T Voicemail Security | PRD218 | 60090682 | 60090806 | Satisfactory | 90.000 | 0.200 |
| 04/23/2012 | ALISON RAY | 2012 Compliance for Sr. Leadership | COMPL2012 | 60619405 | 60638336 | Satisfactory | | 0.083 |
| 04/23/2012 | ALISON RAY | PDTS for Indirect Virtual ILV | IND2006 | 60635135 | 60655335 | Satisfactory | | 2.000 |
| 04/03/2012 | ALISON RAY | Social Media Standards 2012 | POL_SM12 | 60631224 | # | Satisfactory | | |
| 03/27/2012 | ALISON RAY | Helping Your Customer Choose a WP Device | PRD296 | 60630001 | 60672703 | Satisfactory | | 0.367 |
| 03/09/2012 | ALISON RAY | Non Wired Indirect Compensation Assess | L2-PRD344 | 60638405 | # | Satisfactory | 100.000 | 0.010 |
| 03/09/2012 | ALISON RAY | ATT Dealer Info Sharing | IND723 | 60270173 | 60279608 | Satisfactory | 100.000 | 0.017 |
| 03/09/2012 | ALISON RAY | 255 Disability Awareness Trng | SECT_255 | 60514554 | 60526817 | Satisfactory | | 0.033 |
| 03/09/2012 | ALISON RAY | AT&T Code of Business Conduct 2012 | COBC12 | 60595060 | 60600991 | Satisfactory | | 0.083 |
| 03/09/2012 | ALISON RAY | PDTS Training for Indirects | IND2002 | 60601328 | 60635502 | Satisfactory | 92.000 | 0.983 |
| 02/27/2012 | ALISON RAY | 2012 Sales Commission Acknowledgement | ACK0800 | 60623517 | 60640910 | Satisfactory | 100.000 | 0.017 |
| 02/23/2012 | ALISON RAY | 4G Speedway Wave 3 Assessment | L2_PRD319 | 60624583 | 60634626 | Satisfactory | 90.000 | 0.067 |
| 02/23/2012 | ALISON RAY | 4G Speedway Wave 3 Recorded | PRD318 | 60625311 | 60637030 | Satisfactory | | 0.617 |
| 02/23/2012 | ALISON RAY | Samsung Galaxy Note | PRD298 | 60627306 | 60632442 | Satisfactory | 80.000 | 0.067 |

DEF_0000402

| Completion Date | Learner Name | Course Type Name | Course Type Abbreviation | Course Type Number | Course (Session) Number | Completion Status | Score | Training Hours |
|---|---|---|---|---|---|---|---|---|
| 02/14/2012 | ALISON RAY | Northeast Region Indirect DOS | PRD358 | 60635409 | 60636732 | Satisfactory | | 1.000 |
| 02/01/2012 | ALISON RAY | Do Not Solicit | POL_DNS | 60618679 | # | Satisfactory | | |
| 01/26/2012 | ALISON RAY | 2012 MAPP Acknowledgement | ACK2000 | 60612243 | 60614105 | Satisfactory | 100.000 | |
| 01/15/2012 | ALISON RAY | Field Execution of the DSA New Hire | IND1005 | 60598639 | 60622227 | Satisfactory | | 0.033 |
| 01/10/2012 | ALISON RAY | Emergency Preparedness Policy 2012 | POL_EP12 | 60608407 | # | Satisfactory | | |
| 12/07/2011 | ALISON RAY | Management Agreement | POL_MGTAG | 60594440 | # | Satisfactory | | |
| 11/18/2011 | ALISON RAY | Leading an Extraordinary Experience | RET9900 | 60471541 | 60574626 | Satisfactory | | 8.000 |
| 10/25/2011 | ALISON RAY | PDC Oct 2011 Enhancements | DLR1110 | 60542985 | 60569332 | Satisfactory | 90.000 | 0.583 |
| 09/26/2011 | ALISON RAY | Compliance and Showroom Excellence Srvys | DLR413 | 60083958 | 60522122 | Satisfactory | 100.000 | 0.283 |
| 09/26/2011 | ALISON RAY | AT&T Voicemail Security | PRD218 | 60090682 | 60090806 | Satisfactory | 100.000 | 0.183 |
| 09/26/2011 | ALISON RAY | Do Not Solicit for Dealers | DLR198 | 60132738 | 60133320 | Satisfactory | 100.000 | 0.050 |
| 09/26/2011 | ALISON RAY | ATT Dealer Info Sharing | IND723 | 60270173 | 60279608 | Satisfactory | 100.000 | 0.017 |
| 09/26/2011 | ALISON RAY | 2011 Sales Commission Acknowledgement | ACK0700 | 60407230 | 60412851 | Satisfactory | 100.000 | 0.017 |
| 09/26/2011 | ALISON RAY | Selling Small Business Apps in Retail | RET537 | 60467896 | 60488274 | Satisfactory | 100.000 | 0.267 |
| 09/26/2011 | ALISON RAY | HTC Jetstream | PRD278 | 60485195 | 60539655 | Satisfactory | 90.000 | 1.050 |
| 09/26/2011 | ALISON RAY | Windows Phone 7 Mango Update | PRD279 | 60517861 | 60551514 | Satisfactory | 100.000 | 0.683 |
| 09/05/2011 | ALISON RAY | 4G Speedway Assessment | L2_PRD301 | 60504460 | 60529953 | Satisfactory | 90.000 | 0.183 |
| 09/01/2011 | ALISON RAY | Working with Suppliers | POL_WKSPL | 60514799 | # | Satisfactory | | |
| 08/22/2011 | ALISON RAY | 4G Speedway (Live) | PRD304 | 60496514 | 60500155 | Satisfactory | | 8.000 |
| 08/01/2011 | ALISON RAY | Sales and Marketing Guidelines Policy | POL_SMGP | 60518173 | # | Satisfactory | | |
| 07/05/2011 | ALISON RAY | Global Travel & Expense Policy | POL_GTEP1 | 60500603 | # | Satisfactory | | |
| 06/22/2011 | ALISON RAY | SPI/Financial Data 2011 | POL_SPI11 | 60480955 | # | Satisfactory | | |
| 06/14/2011 | ALISON RAY | CES Training | RET2000 | 60473036 | 60490666 | Satisfactory | 100.000 | 0.767 |
| 05/30/2011 | ALISON RAY | Social Media Policy 2011 | POL_SM11 | 60481574 | # | Satisfactory | | |
| 05/17/2011 | ALISON RAY | LwD3 GM Driving Loyalty | LWD3GMDL | 60370111 | 60378539 | Satisfactory | | 21.000 |
| 05/10/2011 | ALISON RAY | EH&S Office/Retail Annual Training | TC_EHSANN_O | 60211420 | 60258298 | Satisfactory | | 0.133 |
| 05/10/2011 | ALISON RAY | AT&T Privacy and Information Security | PRIVCYSEC | 60438216 | 60465811 | Satisfactory | | 0.233 |
| 05/05/2011 | ALISON RAY | Crucial Conversations | MDCRUC108 | 51228619 | 60468354 | Satisfactory | | |
| 04/27/2011 | ALISON RAY | Protecting CPNI and Social Engineering | RCT356 | 60032887 | 60212618 | Satisfactory | 100.000 | 0.833 |

DEF_0000403

| Completion Date | Learner Name | Course Type Name | Course Type Abbreviation | Course Type Number | Course (Session) Number | Completion Status | Score | Training Hours |
|---|---|---|---|---|---|---|---|---|
| 04/27/2011 | ALISON RAY | RIM/Electronic Communication Awareness | RIM_EC | 60109598 | 60211925 | Satisfactory | | 0.050 |
| 04/26/2011 | ALISON RAY | Ergonomics 101 | EHSERG101 | 51328000 | 60009581 | Satisfactory | 100.000 | 0.150 |
| 04/26/2011 | ALISON RAY | International Services Training | PRD048 | 60089229 | 60221593 | Satisfactory | 100.000 | 0.650 |
| 04/26/2011 | ALISON RAY | Do Not Solicit Acknowlegement Course | ACK104 | 60198594 | 60200183 | Satisfactory | 100.000 | 0.017 |
| 04/26/2011 | ALISON RAY | Antitrust and Competition Guidelines | ANTI_TRST | 60273290 | 60434066 | Satisfactory | 100.000 | 0.083 |
| 04/22/2011 | ALISON RAY | Fraud Prevention | TC_FRA113 | 60127026 | 60459771 | Satisfactory | 100.000 | 0.417 |
| 04/19/2011 | ALISON RAY | AT&T Code of Business Conduct 2011 | TC_COBC11 | 60373963 | 60398998 | Satisfactory | | 0.217 |
| 03/17/2011 | ALISON RAY | EEO and Harassment Policies | EEO_HAR | 60239896 | 60258800 | Satisfactory | 100.000 | 0.050 |
| 02/28/2011 | ALISON RAY | EH&S Office/Retail Overview | TC_EHSOVR_O | 60283376 | 60343650 | Satisfactory | | 0.267 |

DEF_0000404