**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALISON RAY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| AT&T MOBILITY SERVICES, | : | |
| LLC, | : | No. 18-3303 |
| Defendant. | : | |

## <u>MEMORANDUM OPINION</u>

**Timothy R. Rice**                                                     **December 28, 2020**
**U.S. Magistrate Judge**

Plaintiff Alison Ray has sued Defendant AT&T Mobility Services, LLC for terminating

her employment because of her age in violation of the Age Discrimination in Employment Act of

1967, 29 U.S.C. § 621 et seq. ("ADEA").  AT&T seeks summary judgment.  <u>See</u> S.J. Mot. (doc.

97).  Because Ray has presented sufficient evidence for a reasonable jury to find that AT&T's

asserted business reasons for terminating her employment were pretextual, AT&T's motion is

denied.

## I.     Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

evidence and any inferences from the evidence must be viewed in the light most favorable to the

non-moving party.  <u>See</u> <u>Ray v. Warren</u>, 626 F.2d 170, 173 (3d Cir. 2010).  If reasonable minds

could conclude that there are sufficient facts to support a plaintiff's claims, summary judgment

should be denied.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  It should be

granted if no "reasonable jury could return a verdict for the nonmoving party" based on the

evidentiary record.  <u>Reedy v. Evanson</u>, 615 F.3d 197, 210 (3d Cir. 2010).

The ADEA provides that it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Where there is no direct evidence of discrimination, as in this case, I must apply the three-step burden-shifting process set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). First, I must determine if Ray has established a <u>prima facie</u> case of age discrimination by showing: (1) she was at least 40 years-old; (2) she was qualified for the position she sought to retain; (3) she suffered an adverse employment action; and (4) AT&T retained sufficiently younger and similarly situated employees to support an inference of age discrimination. See <u>id.</u>; <u>Monaco v. Am. Gen. Assur. Co.</u>, 359 F.3d 296, 301 (3d Cir. 2004). If Ray meets this burden, I must next decide whether AT&T has articulated "some legitimate, nondiscriminatory reason" for its adverse employment action against Ray. <u>McDonnell Douglas</u>, 411 U.S. at 802. Finally, if AT&T satisfies this minimal burden, I must determine whether Ray has proven, by a preponderance of the evidence, that AT&T's articulated reason was a mere pretext for discrimination. <u>Id.</u>; <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994).

For this third step, Ray "cannot simply show that [AT&T's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated [AT&T], not whether [AT&T was] wise, shrewd, prudent, or competent." <u>Fuentes</u>, 32 F.3d at 765. Ray "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [AT&T's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [AT&T's] action." <u>Id.</u> at 764. For example, Ray may "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [AT&T's] proffered legitimate reasons for its

action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that AT&T did not act for [the asserted] non-discriminatory reasons." Id. at 765 (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992), Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)).

## II.     Facts Most Favorable to Ray

Ray was born in 1968 and was 49 when AT&T terminated her in 2018 during a reduction in force.  She had worked for AT&T for approximately 24 years in various positions.  Ray Statement of Facts ("SOF") (doc. 103-4) ¶ 1.  From 1994–1999, Ray was a Director of Business Development.  Id. ¶ 2.  For the next 11 years, Ray worked as a Director of Marketing Management.  Id.  In 2010, Ray became a Director of Sales Operations ("DOS") within AT&T's Mobility Sales and Service organization.  AT&T SOF (doc. 97-2) ¶ 3; Ray Resp. to AT&T SOF (doc. 103-3) ¶ 3.  During her first year as a DOS, Ray was responsible for the back–office operations of AT&T company–owned retail stores in the Liberty States Market, which included Southern New Jersey, Delaware, and Philadelphia.  Ray SOF ¶¶ 3-4.

The following year, Ray became responsible solely for indirect retail stores, such as Best Buy or local retail outlets authorized to sell AT&T products, within her sales territory of the Liberty States Market.  Id. ¶ 7; AT&T SOF ¶ 12; Ray Resp. to AT&T SOF ¶ 12; 12/18/2019 Ray Dep. (doc. 105-4) at 19.  She managed a team of approximately four or five people who helped the indirect retail stores "implement all the products and promotions and pricing, policies, training . . . that AT&T was executing."  12/18/2019 Ray Dep. at 20-21.

Five years later, in 2016, AT&T restructured the DOS position to make each DOS responsible for both the AT&T company–owned retail stores and the indirect retail stores located in their sales territory.  AT&T SOF ¶¶ 21; Ray Resp. to AT&T SOF ¶¶ 21.  Ray became

responsible for managing Area Retail Sales Managers ("ARSMs"), who managed AT&T store managers, who managed AT&T retail employees.  12/18/2019 Ray Dep. at 55-56; see also Ray Ex. 23 (doc. 106-11) at DEF0000796 (DOSs are primarily responsible for directing teams led by ARSMs "to manage the Retail Stores in a defined territory.  Responsible for successfully achieving sales, revenue targets, and customer satisfaction . . . hiring, coaching and development within his/her territory.").  Ray had never previously managed, directly or indirectly, AT&T retail salespeople so she received training from AT&T.  12/18/2019 Ray Dep. at 55, 122-23; AT&T SOF ¶ 23; Ray Resp. to AT&T SOF ¶ 23.

In November 2016, Ray's sales territory became part of the Ohio/Pennsylvania Market ("OH/PA Market"), which later became part of the much broader "East Region."  RAY SOF ¶¶ 10, 11.  Judy Cavalieri, a vice president who is one year older than Ray, supervised Ray and the other DOSs responsible for the Pennsylvania sales territories in the OH/PA Market.  RAY SOF ¶¶ 8-9; AT&T SOF ¶ 6; Ray Resp. to AT&T SOF ¶ 6.  Cavalieri also supervised Alyson Woodard, an assistant vice president ("AVP") who was responsible for managing the DOSs in the Ohio sales territories in the OH/PA Market.  AT&T SOF ¶ 10; Ray Resp. to AT&T SOF ¶ 10.

In February 2017, Cavalieri provided Ray with her 2016 annual performance evaluation. See Ray Ex. 8 (doc. 106-1) at DEF0000027.  Cavalieri rated Ray as "fully meets" or 3/5 for business results, and "exceeds" or 4/5 for leadership, with an overall rating of fully meets.  See id. at DEF0000025-26.  In the comments section, Cavalieri explained that Ray had transitioned well into the multi-channel (supervising both direct and indirect retail stores): "She welcomed the additional accountabilities and has done a tremendous job stepping into her new role.  She brings a great energy and passion to win to the team."  Id. at DEF0000026.  Cavalieri further

stated that Ray had helped the other DOSs in the region with managing the indirect retail stores: Ray "collaborated with her peers to help educate and guide their development on learning the Authorized Retail channel.  Likewise, she partnered to learn best practices across the team to execute within her territory."  Id.  Cavalieri noted that Ray had been asked "to deliver more aggressive plans to help build and grow the business," but she was confident that Ray would "raise her team's performance to greater heights in 2017."  Id.

In early 2017, AT&T conducted an employee engagement survey for leaders in the OH/PA Market.  AT&T SOF ¶ 43; Ray Resp. to AT&T SOF ¶ 43; Ray Ex. 34 (doc. 106-22). Ray's scores were not good.  12/18/2019 Ray Dep. at 156; 10/18/2019 Ray Dep. (doc. 97-7) at 68-69.  Because Ray had concerns with two of her ARSMs, who received bad scores that impacted her own, she asked Kyle Mundis, a human resources business partner, to investigate the engagement levels of the two ARSM teams.  12/18/2019 Ray Dep. at 156-58.  Mundis "put together meetings with various store managers and assistant managers from both those teams" to obtain feedback.  Id. at 158.  Ray never learned the results of those meetings.[1]  Id.

In 2017, Cavalieri also assessed Ray as part of an annual organizational talent review process.  4/21/2020 Cavalieri Dep. at 136-37.  She explained that this process was a little different than performance reviews because supervisors considered an employee's "overall capability . . . and how they are demonstrating it."  Id.  Ray received a calibrated "9–Box Score" of 4, meaning she obtained a high ranking in leadership and medium ranking in performance.  Id. at 142-45.  Ray Ex. 15 (doc. 106-8); Ray Ex. 14 (doc. 106-7).  The ranking system described a 4

---

[1]     Mundis testified that he summarized the interviews, shared the results with Cavalieri, and then discarded his summaries.  4/1/2020 Mundis Dep. (doc. 105-1, Ex. 2) at 253-54.  Cavalieri testified that she discussed the results with Ray.  4/21/2020 Cavalieri Dep. (doc. 105-1, Ex. 1) at 166-69.  Ray denies that any conversation took place.  12/18/2019 Ray Dep. at 157-58.

score as: "Delivers solid level of performance to achieve goals; May have particularly good year among other years of solid performance; Able to get work done through others; Generally effective at managing competing priorities; Leverages robust internal network to get results; Seizes opportunities to work collaboratively across organizations; Actively sponsors change initiatives."  Ray Ex. 14.

In October 2017, Ray prepared a presentation for her team managers concerning the team's metrics on key performance indicators ("KPIs"), such as traffic count, opportunity count, post-paid voice gross add count, mobility prepaid accounts, Direct TVs sold, Direct TVs installed, and business sales.  Id. at 123-25, 129-135; Ray Ex. 45 (doc. 106-30).  Ray's metrics in several KPIs for year-to-date growth in 2017 compared to the same period in 2016 ("YOY Growth") were lower than the metrics for the other DOS teams in the OH/PA Market.  See 12/18/2019 Ray Dep. at 126-35; Ray Ex. 45 at RAY430-431.  However, they were not significantly lower because many of the DOS teams were underperforming on several KPIs for YOY Growth.  Ray Ex. 45 at RAY430-431.  Ray's metrics also were not the lowest in terms of volume in October 2017, compared to volume in October 2016.  See Ray Ex. 45 at RAY430-431; see also 12/18/2019 Ray Dep. at 135 (depending on the metric, everyone was "up or down").

Around the same time, AT&T announced that it would be conducting a surplus or reduction in force (the "2017 Surplus") for the East Region of its Mobility Retail Sales and Service organization.  Id. at 137-38; Ray Ex. 23 (doc. 106-11) at DEF0000776.  The 2017 Surplus was intended "to achieve an organizational design with an increased span of control and reduction of layers in order to streamline work processes, meet headcount synergy targets and

gain efficiencies through integration to ensure [its] workforce is aligned with the needs of the business, [its] customers and the operating environment." Ray Ex. 23 at DEF0000776.

AT&T categorized employees with similar job titles and functions, and/or employees working in similar geographical locations, into 36 different affected work groups ("AWG"). Id. It proposed to eliminate between one and nine job positions from each AWG, totaling 98 positions in the East Region. Id. at DEF0000776-DEF0000830. Ray and the other DOSs in the OH/PA Market were placed in AWG 12. Id. at DEF0000796. There were eight DOSs in that AWG:

1.  Central Ohio - Anthony Schrader, age 51

2.  Southern Ohio - Emily Wiper, age 35

3.  Northern Ohio - Eric Decker, age 38

4.  Western Pennsylvania - Gerald Fornwalt, age 47

5.  Central Pennsylvania - Kevin Kuhn, age 43

6.  North Philadelphia and Scranton - Giovanni Quiros, age 41

7.  South Philadelphia and New Jersey - Danny Perez, age 33

8.  Southeast Pennsylvania - Ray, age 49

RAY SOF ¶¶ 13-16; Ray Ex. 13 (doc. 106-6).

In preparation for the 2017 Surplus, Cavalieri and Jeff Joss, the OH/PA Market's finance director, remapped the eight DOS sales territories in the OH/PA Market into seven sales territories. AT&T SOF ¶ 55; Ray Resp. to AT&T SOF ¶ 55; Ray Ex. 36 (doc. 106-21), DEF0003553-DEF0003555. However, they also decided that one of the remaining sales territories, the "Central Ohio" territory, which had been primarily managed by DOS Schrader, would now be directly managed by AVP Woodard. Ray SOF ¶ 41; Ray Ex. 36 at DEF0003553-

DEF0003555.  Thus, only six DOS sales territories remained and two DOSs from the OH/PA

Market would be eliminated in the Surplus.  AT&T SOF ¶ 63; Ray Resp. to AT&T SOF ¶ 63.

      Four of the remapped sales territories seemed to encompass much of the same geography

as they previously covered:

1. Southern Ohio – managed by DOS Wiper

2. Northern Ohio – managed by DOS Decker

3. Western Pennsylvania – managed by DOS Fornwalt

4. Northeastern Pennsylvania – managed by DOS Quiros

The two other remaining sales territories each contained a portion of Ray's Southeastern

Pennsylvania sales territory:

5. Heart of Pennsylvania – this area covered the Central Pennsylvania territory managed by DOS Kuhn, and some of the Southeastern Pennsylvania territory managed by Ray

6. Southeast Pennsylvania/New Jersey – this area covered the New Jersey and South Philadelphia territory managed by DOS Perez, and some of the Southeastern Pennsylvania territory managed by Ray

Ray SOF ¶ 42; Ray Ex. 36 at DEF0003553-DEF0003555.

      In October 2017, Cavalieri was asked to rate the five DOSs she supervised in the OH/PA

Market: Fornwalt, Kuhn, Quiros, Perez, and Ray.  AT&T SOF ¶ 66; Ray Resp. to AT&T SOF ¶

66; AT&T Ex. 16 (doc. 99-5).  AVP Woodard was asked to rate the three Ohio-based DOSs she

supervised: Schrader, Wiper, and Decker.  AT&T SOF ¶ 66; Ray Resp. to AT&T SOF ¶ 66;

AT&T Ex. 23 (doc. 99-12).

      Cavalieri and Woodard had to rate each DOS with a numerical score between 1 and 5,

with 1 being the lowest and 5 being the highest, in four equally weighted categories: (1)

experience; (2) leadership;[2] (3) skills; and (4) performance.  See Ray Ex. 23 (doc. 106-11) at

DEF0000797; AT&T Ex. 16 at DEF0002239-41.  They were provided spreadsheets that noted

each DOS's start date, years of service, 2015 Rating, 2016 Rating, 2016 Numerical Rating, and

2017 9-Box Score, and instructed to consider the prior ratings received by each DOS.  AT&T

SOF ¶ 66; Ray Resp. to AT&T SOF ¶ 66; AT&T Ex. 17 (doc. 99-6); AT&T Ex. 16 at

DEF0002239-340.

Cavalieri gave Ray a 4 in experience, 3.8 in leadership, 4 in skills, and 3 in performance,

for a total rating of 3.7.  Ray Ex. 25(a) (doc. 106-13).  Only Schrader received a lower total score

of 3.4.  Ray Ex. 26(a) (doc. 106-15).  Because they received the two lowest ratings, Ray and

Schrader were notified in November 2017 that their positions were being eliminated and they

had 60 days to pursue other positions with AT&T if they wished.  Ray SOF ¶ 151; AT&T Ex.

50.  Schrader ultimately obtained another job at AT&T.  AT&T SOF ¶ 82; Ray Resp. to AT&T

SOF ¶ 82.  Ray was unable to find another job in AT&T that would not require relocation, and

was terminated on January 15, 2018.  Ray SOF ¶ 152; 12/18/2019 Ray Dep. at 188.

## III.   Discussion

### A.  Prima Facie Case

AT&T does not dispute that Ray can satisfy the first three elements of a prima facie case:

(1) she was older than 40 years-old; (2) she was qualified for the DOS position; and (3) she

suffered an adverse employment action when she was terminated.  AT&T Br. (doc. 97-1) at 6.

---

[2]      The leadership score was an average of five different ratings: (1) character; (2) leading
change; (3) interpersonal skills; (4) personal capability; and (4) focus on results.  AT&T Ex. 16
at DEF0002239-41.

AT&T contends that Ray has not presented evidence to prove the fourth element: that she was replaced by another employee who was sufficiently younger.[3]  See id. at 6-8.  I disagree.

Where a plaintiff has lost her job as part of a reduction in force, she does not have to show she was replaced by a younger employee.  Instead, she may show that "similarly situated but substantially younger workers were retained."  Monaco, 359 F.3d at 301.  Ray satisfies this burden.  The five other DOS employees in the OH/PA Market (AWG 12) who maintained their jobs after the 2017 Surplus were similarly situated to Ray in that they had the same job title and rank and worked in the same market.  Yet, they also were sufficiently younger than Ray.  Three of the remaining DOSs (Perez, Wiper, and Decker) were more than ten years younger than Ray.  Although Kuhn was 43 and Quiros was 41, they were still sufficiently younger than Ray, who was 49.  Those age gaps are sufficient to support an inference of age discrimination at the prima facie stage.[4]  See Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995) (recognizing

---

[3]     AT&T also seems to contend that Ray cannot establish her prima facie case because: (1) she has not presented facts that suggest age was a factor in the Surplus selection; (2) Cavalieri was older than Ray; and (3) AT&T did not terminate other DOSs who were protected by the ADEA.  AT&T Br. at 6-7.  Ray does not need to present evidence of any facts beyond those necessary to meet the four prima facie case elements.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (recognizing that burden of establishing prima facie case is not onerous).  Ray's ability to establish a prima facie case also does not depend on Cavalieri's age or the age of other DOS employees who were not terminated.  See Mosberger v. CPG Nutrients, No. 01100, 2002 WL 31477292, at *5 (W.D. Pa. Sept. 6, 2002) ("the fact that [employer] was himself older than Plaintiff does not preclude finding that [Plaintiff] has stated a prima facie case of age discrimination"); see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."); O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996) (age discrimination can occur even if an employer did not fire other employees in the protected class).

[4]     AT&T argues that the age gaps between Ray and the five remaining DOSs were insufficient to establish a prima facie case because age gaps of less than ten years would not satisfy the prima facie case.  See AT&T Br. at 12-13 (citing Robinson v. City of Phila., 491 F. App'x 295, 299 n.1 (3d Cir. 2012); Ortiz v. Cedar Crest Coll., No. 5:16-CV-06703, 2017 WL 6422164, *3 (E.D. Pa. Dec. 18, 2017)).  None of those cases concerned a reduction in force.

that five-year age difference may be sufficient to support a prima facie case); Gottschall v.

Reading Eagle Co., No. CIV.A. 11-5361, 2013 WL 961266, at *2 (E.D. Pa. Mar. 12, 2013)

(plaintiff met prima facie case where employer retained some employees who were closer in age

to plaintiff and others who were 10-20 years younger); Martin v. Gen. Elec. Co., 891 F. Supp.

1052, 1057 (E.D. Pa. 1995) (plaintiff sufficiently established fourth prong of prima facie case

where she showed that employer retained some employees who were between eight and twenty

years younger).

    B.  AT&T's Nondiscriminatory Reasons for Ray's Termination

    AT&T asserts that it conducted the 2017 Surplus "to reduce management layers in the

East Region" of its Mobility Sales and Service organization so that each manager had, on

average, ten direct reports.  AT&T SOF ¶ 53.  "To achieve these spans of control and

management layer goals," Cavalieri and Joss remapped the OH/PA Market into seven sales

territories, one of which they assigned to AVP Woodard.  Id. ¶¶ 55-56.  Cavalieri then rated the

five Pennsylvania DOSs, including Ray, "taking into account each of their results, how their

teams were performing, their performance rating and their engagement scores."  Id. ¶ 68.

Because Ray's combined scores were the second lowest in the OH/PA Market, she was selected

for surplus.  Id. ¶ 82.  This constitutes a legitimate, nondiscriminatory reason for Ray's

termination.  See Marione v. Metropolitan Life Ins. Co., 188 F. App'x 141, 144 (3d Cir. 2006)

(at the prima facie stage, employer need only articulate business reasons for termination);

Martin, 891 F. Supp. at 1057 (employer articulated legitimate business reason for employee's

_____

Moreover, there was more than a ten-year age gap between Ray and three of the DOSs whom
AT&T retained.

termination where stated employee scored the second lowest in matrix conducted as part of reduction in force).

C.  Pretext

Ray argues that a reasonable jury could conclude that AT&T's reasons for her termination were a pretext for age discrimination.  Ray notes that AT&T not only selected the two oldest DOSs in the OH/PA Market, Schrader and Ray, for the 2017 Surplus, but also predetermined that their two DOS sales territories would be eliminated.  Schrader's territory would be managed by AVP Woodard, rather than a DOS, and Ray's territory would be divided into two other DOS territories.

Ray also asserts that "AT&T's ratings were riddled with inconsistencies, discrepancies, contradictions, and incoherencies only served to benefit the youngest DOSs in the Market." Ray's Resp. (doc. 103) at 12.  For the experience Surplus rating, Ray explains that she had many more years of experience as a DOS than Perez, Quiros, and Kuhn, especially in indirect retail. See Ray Dep. at 15 (Ray began as a DOS in 2010); 1/31/2020 Baehman Dep. at 121 (Perez became a DOS in 2015), 127 (Quiros became a DOS in October 2014); Ray Ex. 40 (doc. 106-26) at DEF0003667 (Kuhn began as a DOS in mid-January 2017).  Nevertheless, they were all rated the same score of 4/4.  Ray Ex. 25(a).

For the leadership Surplus rating, Ray argues that her 3.8/5 score, which was the lowest of the Pennsylvania DOSs, contradicted her 4/5 leadership rating in her 2016 performance review and her high leadership 2017 9–Box Score.  See Ray Exs. 8 (doc. 106-1) at DEF0000027, 14, 15, 25(a); see also 4/1/2020 Mundis Dep. at 127 ("leadership is leadership" and scores should not swing too much).  She further notes that although Kuhn and Perez obtained medium 2017 9–

Box Scores, they received high Surplus leadership scores: Kuhn obtained a 5/5 and Perez

obtained a 4.6/5. See AT&T Ex. 17; Ray Ex. 25(a).

Ray also asserts that her skills rating of a 4/5 was inconsistent with Cavalieri's testimony

about her skills and Cavalieri's 5/5 ratings of Kuhn and Perez. See Ray Ex. 25. Ray explains

that a 5/5 rating was warranted if an employee was recognized as a subject matter expert

("SME") in a skill relevant to the DOS position, Ray Ex. 7, DEF0000774, and Cavalieri testified

that Ray was recognized as a SME in two relevant DOS skills: AT&T's indirect retail business

and communications/marketing, 4/21/2020 Cavalieri Dep. at 192-93. In contrast, Cavalieri

testified that Kuhn and Perez were SMEs in essentially one area: coaching and developing their

teams to achieve sales results. See id. at 188-92. Nevertheless, the two younger men received a

higher skills rating than Ray.

For the performance Surplus rating, Ray notes that this rating was supposed to be

consistent with an employee's 2016 annual performance review unless a business justification

was provided. See Ray Ex. 7 at DEF0000773 ("If the current performance rating entered does

not match the 2016 end of year rating, a business justification explanation must be entered to

explain the change in performance."). Ray then explains that although she, Perez, and Quiros all

received a score of 3/5 in their 2016 performance reviews, she was the only one who maintained

the 3/5 performance Surplus rating. Ray Ex. 25. Perez received a 4/5 rating during the Surplus

with a note that his engagement scores were the best in the market and his sales results were #2

in the Northeast region.[5] Ray Ex. 25(a). Quiros received a 5/5 rating with a note that he had two

---

[5]     Ray argues that it was improper for Cavalieri to consider engagement scores in the
performance rating because she testified that the performance rating pertained to sales results.
4/21/2020 Cavalieri Dep. at 201-02.

underperforming ASRMs and his sales results were #3 in Northeast region.  Id.  However, according to the October 2017 metrics compiled by Ray, both Perez and Quiros were underperforming in several KPIs for YOY Growth.  Ray Ex. 45, RAY430-RAY431.

AT&T argues that Ray's attempts to discredit its legitimate business reasons for terminating her employment are insufficient.[6]  First, it contends that Ray's claim that she and Schrader were preselected for the Surplus is speculative.  AT&T, however, does not dispute that the Central Ohio territory managed by Schrader was assigned to AVP Woodard during the remapping, and that Ray's Southeast Pennsylvania territory was divided into a new Heart of Pennsylvania territory and a new Southeast Pennsylvania/New Jersey territory.[7]  Compare Ray Ex. 13, with Ray Ex. 36 at DEF0003555.

AT&T also states that the remapping of the sales territories "was done without regard to which DOSs may have had responsibility for which stores," especially because the Surplus guidelines noted that employees in the OH/PA Market could be asked to relocate.  AT&T Reply (doc. 107) at 12.  However, AT&T acknowledges that relocation would not be necessary if the DOSs responsible for the eliminated sales territories were the same ones whose territories were eliminated.  See id. at 12-13 (citing 4/1/2020 Mundis Dep. at 34-35); see also Ray Ex. 23 at DEF0000796 ("After assessment, if a location is vacated and must be filled, some employees may be asked to relocate.").  AT&T also asserts that it could not have preselected Schrader and

---

[6]     Although AT&T argues that Ray is simply challenging its credibility, Ray properly relies on evidence to support her position.  See Ray SOF; Decl. of Daniel Orlow and Exs. (doc. 105); see also Sempier, 45 F.3d at 728 ("plaintiff who has made a prima facie showing of discrimination need only point to evidence establishing a reasonable inference that the employer's proffered explanation is unworthy of credence").

[7]     AT&T contends that the remapping was done to achieve, on average, ratios of ten direct reports per manager and reduce management layers.  AT&T SOF ¶¶ 53-57.  However, it is not clear if these goals were achieved in its documents related to the remapping.  See Ray Ex. 36.

Ray because each DOS in the OH/PA Market was given the opportunity to leave their employment as part of the Surplus and it did not know if any of the DOSs would take that opportunity when it remapped the sales territories.  See AT&T Reply at 13; Pl. Ex. 23 at DEF0000796.  Although it was possible that one or more DOS may have decided on their own to leave AT&T, this does not foreclose a trier of fact from finding that AT&T took steps to make it easier to eliminate the two oldest DOS employees in case no DOS chose to leave, as apparently happened.

AT&T additionally contends that its ratings for Ray and the other DOSs are "well-supported in the record."  AT&T Reply at 18.  It explains that the experience rating involved more than just tenure with AT&T; it also involved experience in the responsibilities required of the DOS position at the time of the Surplus.  See Ray SOF ¶ 74; Ray Ex. 7 at DEF0000774 (experience rating relates to "competencies for your current position"); 4/21/2020 Cavalieri Dep. at 95, 97-98, 110.  Based on that criteria, AT&T argues that Cavalieri "used her business judgment" to rate Ray as 4/4 based on Ray's "extensive experience in authorized retail" and less experience in the other criteria for the DOS role.  AT&T Reply at 27; 4/21/2020 Cavalieri Dep. at 107-08.  However, even if the factfinder were to find that Ray's 4/4 experience rating was merely a business decision, it still could conclude that Cavalieri's 4/4 experience ratings of the other younger DOSs, particularly Kuhn—who had only been a DOS for nine months—were improperly inflated to allow them to receive a better overall score than Ray.[8]

_____

[8]     During a 2016 surplus, Cavalieri gave Perez and Quiros 3/5 experience ratings and Ray a 4/4 rating.  Ray Ex. 12 (doc. 106-5).  The next year, Cavalieri increased Perez's and Quiros's ratings by one point, but not Ray's rating, even though they all had the same additional amount of experience and Cavalieri stated Ray was doing a "tremendous job stepping into her new role" in her 2016 performance review.  Ray Ex. 8 at DEF000026; see also Ray Ex. 25(a).  Cavalieri's decision to give Kuhn a 4/4 in experience after only nine months in the DOS position also seems inconsistent with her decision to start Perez and Quiros with lower experience ratings in 2016.

AT&T asserts that Ray's leadership scores were based on Ray's 2017 engagement survey results and Mundis's findings after interviewing retail employees on Ray's team.  See AT&T Reply at 20.  Although Ray admitted that her engagement survey results were not good, she explained that they were the result of poor scores by two of her ARSMs.  See 12/18/2019 Ray Dep. at 156 ("two of my employees scored horrifically, which brought obviously my number down").  Furthermore, although Mundis testified that he obtained negative criticism about Ray when interviewing retail employees on her team, Ray contends that such criticism is inadmissible hearsay.  See 4/1/2020 Mundis Dep. at 254-55; Ray Resp. to AT&T SOF ¶ 49.  Ray further states that AT&T has failed to produce any documentation of Mundis's interviews even though he testified that he created a summary, which he shared with Cavalieri.  See 4/1/2020 Mundis Dep. at 253-56; see also 4/21/2020 J. Cavalieri Dep. at 169 (Mundis "documented" his interviews).  Moreover, although Cavalieri testified that she informed Ray about Mundis's interviews, Ray denies that this discussion happened and there is no documentation of it.  See 4/21/2020 Cavalieri Dep. at 168-69; 12/18/2019 Ray Dep. at 157-58.  Even if AT&T can introduce evidence about Mundis's interviews to support its Surplus ratings, a reasonable juror could question their legitimacy based on the lack of documentation.[9]

---

[9]     AT&T contends that "the critical inquiry" is whether AT&T had an honest belief that Ray's team criticized her during interviews with Mundis.  AT&T Reply at 20-21 (citing Isley v. Aker Phila. Shipyard, Inc., 275 F. Supp. 3d 620, 629 (E.D. Pa. 2017)).  However, this "honest belief" rule must be used "sparingly and with great caution, because it is too easily subject to manipulation whereby pretextual action can be disguised as legitimate."  Isley, 275 F. Supp. 3d at 629.  Indeed, the Isley court applied the rule because the employer put his beliefs about the employee in writing to Union representatives.  Id. at 629-30.  AT&T has failed to produce a written summary of Mundis's interviews.  In addition, any out of court statements made by employees to Mundis cannot be admitted for their truth absent a hearsay exception.  Fed. R. E. 801(c).

AT&T also contends that Cavalieri properly gave Ray a 4/5 skills rating because Ray still needed to develop her ability to coach her employees.  See 4/21/2020 Cavalieri Dep. at 209-10. Yet, even if Ray needed to develop these skills, Cavalieri admitted that Ray possessed certain skills that Kuhn and Perez, who both scored 5/5 in skills, lacked.  See id. at 192-95.  A reasonable juror could find that Ray's skills scores were inconsistent with those given to Kuhn and Perez.

As for Ray's 3/5 performance Surplus rating, AT&T argues that it is supported by Ray's October 2017 metrics and her 2017 engagement survey results.  Although the October 2017 metrics showed Ray underperforming in several KPIs for YOY Growth, Perez and Quiros, who received increases in their performance Surplus ratings from their 2016 annual performance rating, also underperformed in some of these same KPIs.  See Ray Ex. 45 at RAY430-431 (Perez at -12% and Quiros at -5% for Postpaid Voice Gross Add Count; Perez at -9% and Quiros at -5% for DirecTV Net Submit Sales Count).  And Ray's metrics were not the lowest of all the other DOSs in terms of volume in October 2017 compared to volume in October 2016.  See id.  Based on this evidence, a reasonable juror could question Cavalieri's decision to increase Perez's and Quiros's performance Surplus ratings above what they received in their 2016 performance reviews.

All of these genuine issues of material fact as to whether AT&T's asserted nondiscriminatory reasons for terminating Ray are pretextual preclude a grant of summary judgment.[10]

---

[10]    Ray makes numerous other arguments to establish that AT&T's asserted reasons for terminating her were a pretext for age discrimination.  See Ray's Resp. at 30-32, 50-52, 54-55 (AT&T and Cavalieri have a track record of discriminating against older employees and AT&T has expressed a desire for a younger workforce), 34-36 (AT&T's arguments about the Surplus contradict statements in its business case for the Surplus); RAY SOF ¶¶ 172-77 (statistics show

An appropriate order follows.

---

that a majority of the employees selected during the Surplus were over 40 years-old).  I need not address those claims because Ray has cited sufficient evidence related to the remapping and her Surplus ratings to allow a reasonable juror to discredit AT&T's claims that she was terminated as a result of her low Surplus rating.  See Fuentes, 32 F.3d at 764 ("if the plaintiff has pointed to evidence to sufficiently discredit the defendant's proffered reasons, to survive summary judgment, the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case").