IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALISON RAY,

     Plaintiff,     Case No.  2:18-cv-03303-TR

   v.      Magistrate Judge Timothy R.  Rice

AT&T MOBILITY SERVICES LLC,

     Defendant.

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR
JUDGMENT AS A MATTER OF LAW**

# TABLE OF CONTENTS

**Page**

I.  **INTRODUCTION**................................................................. 1

II.  **THE EVIDENCE AT TRIAL** .............................................. 3

  A.  **The Ohio/Pennsylvania Market** ........................................ 3

  B.  **Remapping the Ohio/Pennsylvania Market** ....................... 5

  C.  **Surplus Business Case 17-350** ........................................ 7

  D.  **Ray Chooses Not to Apply for Another Position at AT&T** ....... 12

  E.  **Relocation of Daniel Perez and Linda Gill** ...................... 13

  F.  **The Trial** ...................................................................... 14

III.  **ARGUMENT** .................................................................... 15

  A.  **There Is Insufficient Evidence To Support A Finding of Liability Under The ADEA.**................................................ 16

    1.  **Ray Presented No Evidence Of A Culture Of Age Bias.** .................. 17

    2.  **Ray Presented No Evidence that AT&T Deviated from Its Policies.**.......................................... 32

    3.  **Ray's Disagreement With the 2017 Surplus Ratings Cannot Support the Jury's Verdict.** ......................... 38

  B.  **There Is Insufficient Evidence To Support A Finding of Willfulness.**.......... 41

  C.  **Alternatively, AT&T Is Entitled To A New Trial Under Rule 50(b)(2).** ...... 45

    1.  **It Was Error to Prevent AT&T From Questioning Ray About the Scores She Assigned Her Direct Reports in the Same Surplus Exercise.**................................... 46

    2.  **Evidence of the 2016 Surplus Should Have Been Excluded Under Rule 401 and Rule 403** ......................... 48

    3.  **Ray Should Not Have Been Permitted To Introduce the ADEA Listing** .................................... 49

    4.  **Mundis Should Have Been Permitted to Testify About His Report to Cavalieri Regarding the Investigation Into Ray's Employee Engagement Scores.** ................. 50

    5.  **The Court Should Have Given A Curative Instruction To Mitigate Counsel's Improper Suggestion Of Misconduct**................. 51

IV.  **CONCLUSION** ................................................................. 53

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                         **Page(s)**

*Allen v. PetSmart, Inc.*,
   512 F. Supp. 2d 288 (E.D. Pa. 2007) ...................................................................28

*Am. Bearing Co. v. Litton Indus., Inc.*,
   540 F. Supp. 1163 (E.D. Pa. 1982), *aff'd*, 729 F.2d 943 (3d Cir. 1984)...........................45, 46

*Anastasio v. Schering Corp.*,
   838 F.2d 701 (3d Cir. 1988)...............................................................................44

*Ansell v. Green Acres Contracting Co.*,
   347 F.3d 515 (3d Cir. 2003)................................................................................21

*Billet v. CIGNA Corp.*,
   940 F.2d 812 (3d Cir. 1991), *overruled in part on other grounds by St. Mary's
   Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ........................................................38, 41

*Borzak v. City of Bethlehem*,
   No. 19-cv-5716-JMY, 2021 WL 6073095 (E.D. Pa. Dec. 23, 2021) ...............................21, 28

*Boyle v. City of Philadelphia*,
   476 F. Supp. 3d 101 (E.D. Pa. 2020) ...................................................................31

*Buskirk v. Apollo Metals*,
   307 F.3d 160 (3d Cir. 2002)................................................................................15

*Capps v. Mondelez Glob., LLC*,
   847 F.3d 144 (3d Cir. 2017)................................................................................34

*Carter v. Mid-Atl. Healthcare, LLC*,
   228 F. Supp. 3d 495 (E.D. Pa. 2017) ...................................................................31

*Dooley v. Roche Lab Inc.*,
   275 F. App'x 162 (3d Cir. 2008) (unpublished) ......................................................26

*E.E.O.C. v. Westinghouse Elec. Corp.*,
   632 F. Supp. 343 (E.D. Pa. 1986), *aff'd in part, vacated in part*, No. 86-1226,
   1988 WL 148606 (3d Cir. Nov. 30, 1988)..............................................................45

*Elwell v. PP&L, Inc.*,
   47 F. App'x 183 (3d Cir. 2002) (unpublished) .......................................................21, 28

*Ezold v. Wolf, Block, Schorr & Solis-Cohen*,
   983 F.2d 509 (3d Cir. 1992), *abrogated in part, on other grounds by St.
   Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)..................................................26

*Fieni v. Franciscan Care Ctr.*,
    Civil Action No. 09-5587, 2011 WL 4543996 (E.D. Pa. Sept. 30, 2011) .............................27

*Fowler v. AT&T, Inc.*,
    19 F.4th 292 (3d Cir. Nov. 26, 2021) ...................................................................................19

*Fowler v. AT&T Inc.*
    No. 20-2247 (3d Cir. Oct. 7, 2020), ECF No. 17 ..................................................................19

*Frost v. PetSmart, Inc.*,
    Civil Action No. 05-6759, 2007 WL 602990 (E.D. Pa. Feb. 26, 2007) .................................28

*Fuentes v. Perskie*,
    32 F.3d 759 (3d Cir. 1994) ................................................................................................ *passim*

*Glanzman v. Metro. Mgmt. Corp.*,
    391 F.3d 506 (3d Cir. 2004) ..................................................................................................19

*Gottschall v. Reading Eagle Co.*,
    Civil Action No. 11-5361, 2013 WL 961266 (E.D. Pa. Mar. 12, 2013) .................................28

*Hazen Paper Co. v. Biggins*,
    507 U.S. 604, 113 S. Ct. 1701 (1993) ..........................................................................22, 41, 42

*Healy v. New York Life Ins., Co.*,
    860 F.2d 1209 (3d Cir. 1988) ................................................................................................30

*Helfrich v. Lehigh Valley Hosp.*,
    No. CIV.A. 03-CV-05793, 2005 WL 670299 (E.D. Pa. Mar. 18, 2005) .................................28

*Keller v. Orix Credit Alliance, Inc.*,
    130 F.3d 1101 (3d Cir. 1997) ................................................................................................31

*Kelly v. Matlack, Inc.*,
    903 F.2d 978 (3d Cir. 1990) ............................................................................................43, 44

*Kraemer v. Franklin & Marshall Coll.*,
    941 F. Supp. 479 (E.D. Pa. 1996) .........................................................................................43

*Lightning Lube, Inc. v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993) ...................................................................................................15

*Marione v. Metropolitan Life Ins. Co.*,
    188 F. App'x 141 (3d Cir. 2006) (unpublished) .............................................................31, 41

*Martin v. Gen. Elec. Co.*,
    891 F. Supp. 1052 (E.D. Pa. 1995) .......................................................................................39

*McDermott Int'l, Inc. v. Wilander*,
    498 U.S. 337, 111 S. Ct. 807 (1991)........................................................................15

*Ortiz v. Cedar Crest Coll.*,
    No. 5:16-CV-06703, 2017 WL 6422164 (E.D. Pa. Dec. 18, 2017)
    (unpublished), *aff'd*, 764 F. App'x 257 (3d Cir. 2019).........................................29

*Rabinowitz v. Amerigas Partners, L.P.*,
    Civil Action No. 05-4278, 2006 U.S. Dist. LEXIS 64635 (E.D. Pa. Aug. 25,
    2006), *aff'd*, 252 F. App'x 524 (3d Cir. 2007) ......................................................27

*Robinson v. City of Phila.*,
    491 F. App'x 295 (3d Cir. 2012) (unpublished) ....................................................29

*Ryder v. Westinghouse Elec. Corp.*,
    128 F.3d 128 (3d Cir. 1997)....................................................................................24

*Spangler v. Moderne Glass Co., Inc.*,
    C.A. No. 6-1394, 2008 WL 919693 (W.D. Pa. Apr. 3, 2008)................................38

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502, 113 S. Ct. 2742 (1993)....................................................................16

*Willis v. UPMC Children's Hosp. of Pittsburgh*,
    808 F.3d 638 (3d Cir. 2015)......................................................................17, 18, 27

## Other Authorities

Fed. R. Evid. 403 ...........................................................................................................46

I.   **INTRODUCTION**

Plaintiff Alison Ray testified that she has no reason to believe that anyone at AT&T was biased against her because of her age—not Judy Cavalieri, who rated and ranked Ray and her peers in the surplus exercise, or anyone else. (Vol. II, 225:11-232:22.) Even when asked by a juror whether she thought Cavalieri was following an "unwritten" policy to rid the Company of older workers, Ray testified that she did not know. (Vol. II, 251:7-253:25.)

As described more fully below, there was insufficient evidence at trial for a reasonable jury to conclude it is more likely than not that age was a determinative factor in AT&T's selection of Ray for surplus in 2017, as is required by the Age Discrimination in Employment Act ("ADEA"). Ray did not come close to proving an age-discriminating corporate culture. In fact, the Third Circuit flatly rejected the notion that an article generally describing the need to reinvent the company is evidence of pretext. Nor was there any evidence AT&T failed to follow its own policies and processes when it selected Ray for surplus in its business-as-usual surplus exercise in 2017. Instead, Human Resources Business Partner Pat Slocum testified that the step Ray claims AT&T did not follow was *inapplicable* to this surplus exercise.

Finally, Ray failed to offer any evidence from which the jury could have reasonably inferred that Cavalieri's ratings were a "ruse" obfuscating some sort of

age bias. The cornerstone of Ray's argument is that Cavalieri should have awarded her higher scores in the skills and experience categories in the surplus rating process than her shorter-tenured peers. Ray is disingenuous; she, too, gave her shorter-tenured direct reports higher skills and experience ratings than their longer-tenured colleagues, applying the same definitions and instructions that Cavalieri had. Moreover, the jury heard evidence that Cavalieri is older than Ray, which undermines any reasonable inference that she selected Ray for surplus based on a protected characteristic they shared.

There was insufficient evidence to support a finding of willfulness according to the evidence or the clear standards set forth by the Third Circuit. It is not enough that AT&T knew that the ADEA existed and prohibits age discrimination. Ray must show that AT&T knew that it was violating the law or showed reckless disregard for whether its conduct was prohibited by law. Ray offered no evidence to satisfy her burden here.

In the alternative, AT&T is entitled to a new trial because certain evidentiary rulings resulted in a miscarriage of justice. For example, Ray was permitted to introduce irrelevant evidence about a 2016 surplus in which Ray was not selected to argue that it was the start of an 18-month scheme to discriminate against older workers. AT&T, however, was precluded from admitting evidence that an arbitrator had previously found no evidence of age bias in that earlier surplus.

Separately, AT&T was precluded from questioning Ray about the scores Ray gave her direct reports in the same surplus exercise, which cast doubt on the viability of Ray's principle argument at trial, that the scores she received were the product of impermissible age bias. AT&T's presentation of this evidence was limited to brief remarks during its closing arguments as a result of prior evidentiary rulings..

Therefore, this Court should direct the entry of judgment for AT&T Mobility Services LLC as a matter of law, pursuant to Fed. R. Civ. P., Rule 50(b)(3) or, alternatively, order a new trial pursuant to Rule 50(b)(2).

## II.    THE EVIDENCE AT TRIAL

### A.    The Ohio/Pennsylvania Market

In summer 2017, Ray was one of eight Directors of Sales in AT&T Mobility's Ohio/Pennsylvania market. (Vol. I, 101:17-103:3.) Each Director of Sales was responsible for a defined sales territory and managed a team of area retail sales managers ("ARSMs"), who in turn managed AT&T retail stores and relationships with authorized retailers within a defined sales district. (Vol. II, 181:13-182:8.)

Five of the eight Directors of Sales, including Ray, had territories in Pennsylvania and reported to Judy Cavalieri, the market's VP General Manager ("VPGM"). (Vol. I, 101:17-103:3.) The other three worked in Ohio and reported to an assistant vice president ("AVP"), Alyson Woodard. (Vol. I, 101:17-103:3; Vol.

III, 7:13-18.) Woodard and her team began reporting to Cavalieri in or about August 2016, when AT&T created the Ohio/Pennsylvania market. (Vol. I, 101:4-103:12; Vol. III, 5:23-7:12.) In addition to Woodard and the eight Directors of Sales, Cavalieri also oversaw a director of operations, Robert Wyllner, and an assistant. (Vol. I, 102:16-106:1.) Cavalieri reported to Jennifer Van Buskirk, President of the East Region. (Vol. I, 100:22-101:3, 102:13-15.)

Before May 2016, Ray worked in marketing and in indirect sales, managing relationships with authorized retailers. (Vol. I, 123:16-126:5; Vol. II. 16:7-17:7.) Starting in May 2016, because of a shift in AT&T Mobility's strategy, Ray for the first time assumed responsibility for company-owned retail (*i.e.*, managing AT&T-owned stores and the employees who worked in them). (Vol. II, 222:15-223:25.) By the summer 2017, all of the other Pennsylvania-based Directors of Sales had longer experience working company-owned retail than Ray. (Vol. II. 30:20-31:7, 93:9-24 (Cavalieri discussed with former VPGM Tiffany Baehman the team she was inheriting in 2016, which included Directors of Sales), 95:10-14 (those Directors of Sales included Danny Perez, Giovanni Quiros, and Jerry Fornwalt); 99:1-4 (all Directors of Sales on the team had already been working in company-owned retail but Ray worked in indirect sales).) At the time, approximately two-thirds of each Director of Sales' sales results were tied to performance in company-owned retail, as opposed to other sales channels. (Vol. I, 124:9-12.)

### B.      Remapping the Ohio/Pennsylvania Market

In or around September 2017, AT&T decided to increase management spans of control, requiring on average a 10:1 ratio of subordinates to managers (e.g. retail store managers to ARSMs, and ARSM to directors of sales, etc.). (Vol. I, 66:10-67:2; Vol. IV, 60:25-61:24, 118:10-16.) The change required the remapping of sales territories throughout the east region to accommodate the new reporting structure. (Vol. II, 23:17-25:5; Vol. IV, 60:25-61:24, 118:2-22.)

Cavalieri worked with Jeff Joss, a director of finance, to re-map Ohio/Pennsylvania market. (Vol. IV, 117:20-118:22.) Joss started with a clean slate, paying no regard to the then-existing sales territories or districts, or the directors of sales or ARSMs assigned to them. (Vol. IV, 119:20-120:20.) Starting in the east and working westward across Pennsylvania and Ohio, Joss clustered stores into new ARSM sales districts, and then clustered new ARSM districts into new sales territories, making sure the stores within each district and territory were clustered together geographically. (Vol. IV, 120:9-20, 130:2-14.) This resulted in a reduction in the number of Ohio/Pennsylvania sales territories from eight to seven. (Vol. IV, 118:23-119:11.) There also was a reduction in the number of sales districts that resulted in the need to reduce ARSM headcount in the market by 12 people. (Def. Ex. 22 at DEF_0003553.)

One of the newly-mapped territories in Ohio carried higher revenue than the

others because it generated wire-line sales from broadband internet in addition to revenue from wireless products sold throughout the Ohio/Pennsylvania market. (Vol. II, 24:22-25:5.) Given the increased revenues, Cavalieri decided that territory would be assigned to Woodard, a level four AVP,[1] who would directly manage a larger team of ARSMs, instead of three Directors of Sales, to increase her span of control. (Vol. II, 23:17-26:14, 133:18-134:7; Vol. III, 35:23-36:8.) Doing so would also reduce a layer of management because there no longer would be Directors of Sales in between Woodard and the ARSMs in that territory. (Vol. II, 23:17-26:14, 133:18-134:7.) Going forward the Directors of Sales across Ohio/Pennsylvania would all report directly to Cavalieri. (Vol. II, 23:17-25:5.) The change would not impact Woodard's other AVP responsibilities because she retained strategic responsibility for sales across the entire state of Ohio going forward. (Vol. II, 133:18-134:7; Vol. III, 35:23-37:17.)

At the end of the remapping exercise, there were only six new territories to assign but eight Directors of Sales then-currently working in the market. (Vol. III, 106:25-108:10.) Consequently, two Directors of Sales positions would need to be eliminated through a surplus. According to AT&T's established practices, the incumbent Directors of Sales (as well as others in roles that were impacted by the

---

[1] Directors of Sales like Ray are level 3 employees, while a VPGM like Cavalieri is a level 5 employee. (Vol. II, 28:11-16; Vol. III, 6:20-7:3.)

remapping) were rated and ranked pursuant to the company's surplus guidelines. (Vol. III, 130:23-131:9.)

### C.    Surplus Business Case 17-350

This surplus exercise, Surplus Business Case 17-350, affected the entire East Region. (Vol. I, 66:10-68:25; Vol. III, 54:11-16.) Overall, the East Region was "reducing positions to achieve an organizational design with an increased span of control and reduction of layers in order to streamline work processes, meet headcount synergy targets and gain efficiencies through integration . . . ." (Def. Ex. 39.) Within the East Region, there were 36 different Affected Work Groups, *i.e.*, portions of the organization "described in terms of job title, . . . geography, [and] level," among other characteristics. (Def. Ex. 39 at DEF_0000776.) The eight incumbent Directors of Sales in the Ohio/Pennsylvania market were all grouped in Affected Work Group 12 ("AWG 12"). (Def. Ex. 39 at DEF_0000796-97; Vol. III, 55:12-23.) Affected Work Group 13 ("AWG 13") was comprised of ARSMs in the Ohio/Pennsylvania market, another group that was reduced in size due to the remapping exercise. (Def. Ex. 39 at DEF_0000798-99.) Other employees reporting to Cavalieri, like Bob Wyllner, were placed in other Affected Work Groups. (Vol. I, 106:2-13; Vol. II, 149:4-24.)

To determine who in AWG 12 would fill the six remaining Director of Sales positions, AT&T followed its normal rating and ranking process. (Vol. II, 7:10-

15:3; Vol. III, 43:4-16, 133:19-135:25.) The eight incumbents were each rated on a five-point scale in four categories: Performance, Leadership, Skills, and Experience. (Def. Ex. 37; Vol. II, 7:17-8:21; Vol. III, 10:16-11:24, 133:19-135:25.) The rating for Leadership was itself a function of ratings given in the sub-categories of Character, Leading Change, Interpersonal Skills, Personal Capability, and Focus on Results. (Def. Ex. 37; Vol. II, 7:17-8:20; Vol. III, 10:16-12:5, 133:19-135:25.) AT&T averaged the ratings across the four categories for each employee, and the employees in the Affected Work group—here, Directors of Sales in Ohio/Pennsylvania—were ranked according to those averages. (Vol. II, 136:5-19). The two employees with the lowest average scores would be surplused. (Def. Exs. 39 at DEF_0000796 (identifying two positions for elimination in AWG 12), Ex. 36 at DEF_0004399-400 (explaining how employees are ranked according to score and employees "below the line" are identified for surplus).)

By October 25, 2017, Cavalieri completed her ratings of Ray and the other four Pennsylvania-based Directors of Sales, as well as Wyllner (who was in Affected Work Group 2 with other level 3 employees in sales operations roles across the East Region). (Pl. Ex. 39, 41; Def. Ex. 39 at DEF_0000778.) These ratings were based upon observations of her team and her best business judgment; they were not based upon age. (Vol. II, 91:24-92:7.) Cavalieri assigned Ray scores in each of the four categories that were nearly identical to the scores she assigned

Ray in a prior surplus exercise in 2016 in which Ray was not selected for surplus. (Pl. Ex. 12a; Pl. Ex. 38a.) There was only a slight difference in Ray's scores in the various leadership sub-categories. (*Id.*; Vol. II, 138:21-139:4.) According to Cavalieri, Ray "was a strong leader and she was really trying hard. […] Her effort was there. But she struggled in a couple of areas in terms of getting the team to the next level just because she was still learning." (Vol. II, 139:5-13.) Ray had only managed AT&T-owned retail for approximately one year at that point and had about 100 employees in her organization, whereas in her previous authorized retail role she had only four or five people directly reporting to her. (Vol. II, 139:14-23.)

The three remaining Directors of Sales rated by Cavalieri in both surplus exercises all received higher scores in 2017 for reasons explained at trial. Gerry Fornwalt (who was roughly the same age as Ray) had "outstanding" performance the prior year; his score would have been higher but for a slight decrease in his employee engagement scores. (Pl. Ex. 38a; Vol. II, 122:19-23.) Danny Perez had received the highest employee engagement scores in the Ohio/Pennsylvania market, and was ranked the number two salesperson in the region. (Pl. Ex. 38a; Vol. II, 15:17-21, 16:7-17.) Like Perez, Giovanni Quiros had an "exceptional" year in 2017 and his sales results placed him in the top three salespeople in the entire region as well. (Pl. Ex. 38a; Vol. II, 15:15-18.)

Kevin Kuhn had not been a part of Cavalieri's market during the prior

surplus exercise, but he, too, received high scores in several categories. (Pl. Ex. 38a.) He had been an ARSM in company-owned retail for many years and a high performer, having performed the responsibilities of the Director of Sales in his territory even before he took on that role himself. (Vol. II, 30:12-31:1.) Cavalieri reduced his performance score from a 5 to a 3 to account for the fact that as of October 2017 he was still new to the Director of Sales role. (Pl. Ex. 38a.)

Woodard rated the three Ohio-based Directors of Sales. (Pl. Ex. 37a; Vol. III, 11:19-12:3.) Those ratings also were based upon observations of her team and her best business judgment, and not based upon age. (Vol. III, 43:4-16, 48:19-22.) Emily Wiper received high scores in the surplus because she "was regularly contacted by her peer group on how she was hitting and exceeding her [sales] targets, so by definition a subject matter expert." (Vol. III, 22:1-6.) She had also "held every role that you could have in the retail organization, not just within the company-owned stores, but she also managed [AT&T's] franchise, [AT&T's] authorized retail stores." (Vol. III, 22:16-23:3.) Eric Decker brought both business and operations experience to the Director of Sales positions, which Woodard considered highly valuable. (Vol. III, 32:1-34:2.) He had recently turned around an under-performing sales territory and demonstrated "exceptional leadership capabilities" while doing so. (Pl. Ex. 38a.) Anthony Schrader received lower scores than both Wiper and Decker because while he "knew the geography very well, he

knew distribution, he knew where to put a store," he was not as successful at "running the sales part of the operation which was a really big part of the [Director of Sales] role." (Vol. III, 22:7-15.) Cavalieri and Woodard did not discuss their ratings with each other. (*Id.*, 8:9-9:16.)

At the same time, Ray and her peers each rated the ARSMs reporting to them as part of the same surplus exercise. (Pl. Ex. 39; Vol. II, 143:12-144:1.)[2] Ray received the same instructions for the rating process as Cavalieri and Woodard, and rated her direct reports against the same criteria. (Vol. III, 133:19-135:2.)

At the conclusion of the rating and ranking process, Ray and Anthony Schrader, a Director of Sales reporting to Woodard, were ranked seventh and eighth, respectively, among the Directors of Sales in the Ohio/Pennsylvania market. (Pl. Ex. 38a; Vol. I, 76:1-6.) As a result, they were identified for surplus (i.e., "below the line"). (Vol. I, 76:1-6.)

Sometime prior to the surplus notifications, Ray approached Cavalieri and expressed her concern that she would be selected for surplus because, among other things, her results on employee engagement surveys that year were among the lowest in the market. (Vol. II, 144:2-145:4; 233:19-235:8.) Ray acknowledged that

---

[2] AT&T was precluded by the Court's pretrial ruling from questioning Ray about the ratings she gave to her ARSMs, (ECF 139 at ¶ 6), but evidence of those ratings was admitted into evidence and therefore available for the jury's consideration. (Pl. Ex. 41.)

it was important to have good employee engagement survey results. (Vol. II, 233:13-15.) She was also aware that Kyle Mundis, the Human Resources Business Partner supporting the Ohio/Pennsylvania Market, was independently interviewing people on her team so Ray and Cavalieri could better understand the reasons for the engagement results and develop an action plan to help Ray improve.[3] (Vol. II, 122:1-13, 127:17-131:1.) As Ray discussed her concerns about being surplused, Cavalieri changed the topic because the surplus selections had not yet been announced, and she therefore could not tell Ray at the time that she had been selected. (Vol. II, 144:2-145:4.)

### D.    Ray Chooses Not to Apply for Another Position at AT&T

Ray and others were notified of their surplus selections on November 16, 2017. (Pl. Ex. 44; Vol. II, 191:23-193:1.) She and Schrader both had sixty days to find another job with AT&T or their employment would terminate. (Pl. Ex. 44; Vol. III, 74:7-11.) Schrader applied for and obtained another job with AT&T. (Vol. III, 47:23-48:18). Ray chose not to apply for other positions, and she left the Company in January 2018. (Vol. II, 211:16-18; 216:14-217:6.)[4]

---

[3] Mundis and Cavalieri conducted similar diligence into employee engagement scores on Gerald Fornwalt's team. (Vol. II, 122:14-18.)

[4] Ray thereafter signed and returned a General Release and Waiver releasing all claims she had or may have had against AT&T, including but not limited to claims under the ADEA. (ECF 13-4 at ¶ 13; ECF 13-5 at Exh. 8; ECF 19-4 at ¶ 17.) Ray then received full severance payments in exchange for that release. (ECF 19-4 at ¶ 17.) Ray nevertheless sued AT&T under the ADEA, arguing that the release was

### E.    Relocation of Daniel Perez and Linda Gill

Sometime prior to the surplus ratings, the VPGM of the New York market, Brian Gonterman, informed Cavalieri that one of his Director of Sales in New York, Linda Gill, had asked for a transfer to Pennsylvania for personal reasons; she had recently married and wanted to move closer to family in Pennsylvania. (Vol. II, 55:18-57:3; Vol. III, 109:20-110:7; Vol. IV, 49:10-21.) Meanwhile, one of Ray's peers in the Ohio/Pennsylvania market, Danny Perez, had separately asked for a transfer to New York for personal reasons; he had experienced a death in the family and needed to be closer to his remaining family members. (Vol. II, 55:18-57:3; Vol. III, 109:20-110:7; Vol. IV, 40:13-41:5, 49:10-21.) Because the East Region was in a surplus state there were no open positions, however. (Vol. II, 55:18-10.) So, both Gill and Perez were told that if—and only if—neither employee was surplused in her or his own market, a transfer would be possible. (Vol. II, 55:18-57:3, 59:8-60:12; Vol. III, 137:10-18; Vol. IV, 49:10-50:17.).

Neither Perez nor Gill was selected for surplus in their respective Affected

---

invalid because AT&T's accompanying disclosures did not comply with the Older Workers Benefit Protection Act. (ECF 1 at ¶ 88.) The Court granted Ray's partial summary judgment motion, noting that "[w]hether a 'decisional unit' like [AT&T's] satisfies the OWBPA's requirements is an issue of first impression in the Third Circuit . . . and some courts have observed that the OWBPA's imprecision and ambiguity frustrate its consistent application." (ECF 42 at 2-3.) The Third Circuit refused to certify an interlocutory appeal on this issue, but AT&T has filed a timely notice of appeal to challenge this ruling. (ECF 168.)

Work Groups, so management approved their transfer requests to New York and Philadelphia once the ratings and rankings were completed, respectively. (Vol. II, 55:18-57:3, 59:13-17.)[5] Gill's new assignment to the Ohio/Pennsylvania market and Perez's new assignment to the New York market were made part of the overall announcement regarding the new, post-surplus organization on November 16, 2017. (Pl. Ex. 46; Vol. II, 55:18-57:3, 58:3-59:17; Vol. III, 109:20-110:21, 130:2-18; Vol. IV, 41:13-22.)

F.    The Trial

Ray's case at trial was premised on three central theories: (1) senior executives at AT&T allegedly promoted a corporate culture that favored younger workers over older workers; (2) AT&T allegedly failed to follow its own policies and processes when it selected Ray for surplus in the 2017 surplus exercise; and (3) the ratings given by Cavalieri in the rating and ranking process allegedly were a "ruse" designed to hire age bias. Despite overwhelming evidence to the contrary, the jury found that age was a determinative factor in the decision to select Ray for surplus and that AT&T's violation of the ADEA was willful. (ECF 165 at ¶ 1.)

These theories, however, are not adequately rooted in the evidence,

---

[5] There was approximately three weeks between the date the ratings and rankings were finalized on October 25, 2017, and the surplus selections (and Perez's and Gill's transfers) were announced on November 16, 2017. (Pl. Ex. 41; Vol. II, 55:18-57:3, 59:13-17; Vol. III, 109:20-110:21, 130:2-18.)

according to the clear standards set forth by the Third Circuit. Accordingly, AT&T is entitled to judgment as a matter of law for all the reasons set forth in its Rule 50(a) motion at trial and under Rule 50(b) because the evidence is insufficient to support the jury's findings of liability of willfulness.

## III.   **ARGUMENT**

"A district court should grant [a Rule 50] motion only if 'viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.' '[A] directed verdict is mandated where the facts and the law will reasonably support only one conclusion.'" *Buskirk v. Apollo Metals*, 307 F.3d 160, 166 (3d Cir. 2002) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) and *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356, 111 S. Ct. 807, 818 (1991)). This is a case for a directed verdict.

The evidence does not support the jury's conclusions. Even viewing the evidence in a light most favorable to Ray, no reasonable interpretation of the evidence supports the conclusion that age more likely than not was a determinative factor in AT&T's selection of Ray for surplus. In the alternative, the evidence does not reasonably support a conclusion that AT&T willfully violated the ADEA.

A.     **There Is Insufficient Evidence To Support A Finding of Liability Under The ADEA.**

To succeed on her ADEA claim, Ray needed to prove by a preponderance of the evidence that age was "a determinative factor" in her surplus selection, "that is, that but for [age]" the alleged adverse action would not have taken place. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). According to the uncontroverted evidence, AT&T selected Ray for surplus because in late 2017 it reduced the number of Directors of Sales in the Ohio/Pennsylvania market from eight to six, and Ray was ranked seventh among the eight Directors of Sales based upon a good faith assessment of performance, leadership, skills and experience. She argued that this was merely pretext for intentional age discrimination, however.

"At trial," Ray needed to "convince the factfinder '*both* that the [AT&T's articulated] reason [for the decision] was false, *and* that discrimination was the real reason.'" *Fuentes*, 32 F.3d at 763 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752 (1993) (emphasis in original).) The Third Circuit rejected "out of hand" in *Fuentes* the argument that a plaintiff can succeed under the ADEA "simply by arguing that the factfinder need not believe" the employer's proffered legitimate explanation. *Id.* at 764.

Instead, Ray needed to prove that the rating and ranking process that led to her surplus selection "was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a

16

pretext)." *Id.* It is insufficient to simply show that AT&T's decision "was wrong or mistaken;" rather, she needed to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in" AT&T's reasons that the jury "*could rationally* find them 'unworthy of credence,' and hence infer 'that [AT&T] did not act'" for the asserted non-discriminatory reasons. *Id.* at 765 (citations omitted) (emphasis supplied).

Significantly, Ray herself could point to nothing suggesting bias by any employee of AT&T. Her entire case was premised on three theories advanced by her counsel: (1) that AT&T allegedly promoted a culture of bias against older workers; (2) AT&T allegedly failed to follow its own policies in the 2017 surplus exercise; and (3) the ratings allegedly were a "ruse" designed to hide age bias. None of these theories was supported by the evidence, however, and Ray failed to meet her burden under the law. *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 646-50 (3d Cir. 2015) (affirming summary judgment where plaintiff failed to identify any statements indicating age bias and failed to present sufficient proof that age was more likely than not a determinative cause of termination).

### 1. Ray Presented No Evidence Of A Culture Of Age Bias.

Ray's argument that AT&T promoted a culture of age bias has no support. She relied exclusively on the following evidence: (i) two postings written by Van

Buskirk and published on LinkedIn in early 2016 and a New York Times article published in February 2016, (Pl. Exs. 71, 72, 73); (ii) an email that Van Buskirk wrote encouraging her direct reports to identify opportunities for their employees to expand their experiences by changing roles, (Pl. Ex. 13); (iii) a happy birthday email Joss sent to Ray, (Pl. Ex. 16); (iv) a summary of employee engagement scores reflecting how a leader is viewed by employees of different generations, (Def. Ex. 5); (v) evidence that retail employees began wearing jeans (Vol. II, 197:7-20); and (vi) the ages of certain employees in the East Region. (Vol. II, 192:6-12, 197:7-13.)

    None of this could reasonably give rise to an inference that AT&T was biased against workers because of age as a matter of law or that Ray's surplus selection was a result of age bias.

>           **a)      The LinkedIn and New York Times Articles Do Not
>                    Reasonably Show Age Bias.**

    Neither Van Buskirk's early 2016 LinkedIn posts nor the February 13, 2016 New York Times Article can reasonably be interpreted to suggest a culture of age bias.

    All three pieces address common and legitimate business issues, are unrelated to the surplus process, and were written at least a year-and-a-half prior to the challenged actions. These facts alone deprive them of any utility in proving age discrimination in October 2017. *See Willis*, 808 F.3d at 649 (discussions with

plaintiff "about when she planned to retire" do not support discrimination because "it is a common business practice, and not impermissible discrimination, for an employer to inquire about retirement plans"); *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 513 (3d Cir. 2004) (statements "unrelated to the decisional process itself are not direct evidence" (citation omitted)).

Ray's counsel made a similar argument about this New York Times article in another case, *Fowler v. AT&T, Inc.*, 19 F.4th 292 (3d Cir. Nov. 26, 2021), which the Third Circuit rejected. "We are confident," the Court of Appeals stated, "that no reasonable juror would view the very general statements made by AT&T senior management about how the company has an aging workforce and the need to reinvent the company as evidence of pretext." *Id.* at 302 n.7; Opening Brief of Appellant at 46, *Fowler v. AT&T Inc*. No. 20-2247 (3d Cir. Oct. 7, 2020), ECF No. 17; Appendix at 1063-64, 1172-74, 1174 at ¶ 354, *Id.*, ECF No. 20.[6] Summary judgment in that case was affirmed for AT&T.

Notably, the New York Times article speaks to AT&T's legitimate efforts to *retrain* and *retain* employees. Ray agreed that these are legitimate business objectives. (*See, e.g.*, Vol. II. 232:9-22) (admitting it was important for AT&T employees to stay current on technology; that every workforce is aging; that every

---

[6] The relevant portions of the appendix from *Fowler* are attached as Exhibit A to the accompanying Declaration of Kenneth W. Gage, filed herewith.

workforce needed to continually be re-trained; and that there was nothing discriminatory about that reality). The article itself speaks to the experience of both shorter- and longer-tenured employees benefiting from the Company's training programs. (Pl. Ex. 71; Vol. IV, 54:9-55:7.)

The same is true for Van Buskirk's two LinkedIn pieces. The first, dated March 9, 2016 (a full 19 months before Ray's surplus selection), is entitled "#MyIndustry: Raise Your Hand to Lead Change." (Pl. Ex. 72.) It speaks to the importance of embracing STEM, continuous learning, and having the confidence to pursue new opportunities. (*Id*.) The second, dated May 19, 2016 (17 months before Ray's surplus selection), is entitled "The Sky is the Limit" and was written by Van Buskirk in response to LinkedIn's request for advice to "those just graduating college." (Pl. Ex. 73 ("In this month's LinkedIn editorial series – #IfIwere22 – we look at advice for those graduating college.").)  It discusses the importance of taking risks and encourages readers *not to* "let stereotypes, social norms, or other influences limit" their potential. (*Id.*)

Nothing about this evidence remotely suggests that Van Buskirk or AT&T is biased against older workers, let alone promotes such bias across the company. (Pl. Exs. 72, 73; Vol. IV, 21:25-26:5 (Van Buskirk accurately describing the New York Times piece as "a great article describing how we were investing in our workforce and the importance of personal and professional development"), 30:19-32:18,

50:18-55:7.) Indeed, these articles are not logically connected to the challenged surplus selection. Ray neither alleged not presented evidence that she was criticized failing to take risks or stay current with technology. (Vol. IV, 30:3-8.)

Van Buskirk is just five years younger than Ray, and at all relevant times was a member of the same protected class of individuals over 40. (Pl. Ex. 77; Vol. IV, 17:17-18:2.) The similarity in their ages undermines any inference that Van Buskirk harbored discriminatory animus against employees like Ray. *See Elwell v. PP&L, Inc.*, 47 F. App'x 183, 189 (3d Cir. 2002) (plaintiff's discrimination claim was "further weakened" by fact that decision maker was in the same protected class as the plaintiff) (unpublished); *Borzak v. City of Bethlehem*, No. 19-cv-5716-JMY, 2021 WL 6073095, at *12 (E.D. Pa. Dec. 23, 2021) (similarity in age between plaintiff and supervisor "further undermines [plaintiff]'s claim of age discrimination").

In addition, Plaintiff introduced evidence of only one specific personnel decision attributed to Van Buskirk: her March 2016 selection of Cavalieri as the VPGM of the Liberty States Market. (Vol. IV, 73:1-12.) Cavalieri is older than Van Buskirk, older than Tiffany Baehman whom she replaced, and older than Ray. (Pl. Ex. 77; Vol. II, 92:8-93:8.) It is therefore unlikely that Van Buskirk espoused discriminatory treatment of older workers. *Accord Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 523 (3d Cir. 2003) (evidence that supervisor

treated older employee favorably was relevant and admissible to "rebut [plaintiff]'s theory that he was fired as part of a broader plan to 'get rid of the older workers'").

>
> b) **The 2016 Time-In-Role Email Exchange Does Not Reasonably Show Age Bias.**

Ray's reliance on Plaintiff's Exhibit 13 and related testimony is also misplaced. In this email exchange written over a year-and-a-half before Ray was selected for surplus, Van Buskirk wrote to her direct reports that many employees in their organization had not *changed jobs* in 5, 10 or 15 years, and encouraged her direct reports to look for new experiences for these employees. (Pl. Ex. 13.) Nothing about this evidence supports a reasonable inference of age bias in the 2017 surplus process.

First, to the extent that time in role may correlate with age, the Supreme Court long ago rejected the notion that consideration of such factors gives rise to an inference of intentional age discrimination. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611, 113 S. Ct. 1701, 1707 (1993) ("[A]n employee's age is analytically distinct from his years of service. [...] Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'").

Second, the un-contradicted evidence shows that these early 2016 communications were *not* about employee's ages or identifying employees for

layoff, but rather placing people "in new jobs within the AT&T family" to get "fresh perspective across the business." (Pl. Ex. 13, Vol. I, 89:18-91:11.) Consistent with that message, the email's subject line was "FW:Private – Time in Position Data." (Pl. Ex. 13.) The attachments also confirm this plain reading of the email's text; they contain information about the employees' performance and tenure in role, but there is no mention of age in these documents. (Pl. Exs. 13a, 13b.)

Finally, Ray failed to introduce any evidence connecting this initiative with a surplus exercise eighteen months later. Nor did she introduce any evidence to suggest that this email was about anything other than diversifying the experiences of AT&T employees, only speculation and argument.

### c) Jeff Joss's "Happy Birthday" Wish Does Reasonably Show Age Bias.

Next, Ray argued that a happy birthday wish from Joss in January 2017 is evidence of age bias. (Pl. Ex. 16.) It is not.

In that email, Ray thanks Joss for wishing her a happy birthday, to which Joss responded, "49 right? Dang…" (Pl. Ex. 16 and DEF_00003682.) For her part, Ray responded, "Dang is right. […] I hope my DTV quota is the same as my age." (*Id.*) The context makes clear, and Ray conceded, that she was joking with Joss in the email exchange and that she did not believe that Joss was teasing her about her age. (Vol. II, 176:2-177:21, 217:11-218:12.) At most, the email shows that Joss

knew Ray's age; it utterly fails to support an inference that anyone at AT&T took any actions based on that information.

In any event, it is undisputed that Joss was not involved in the rating process that led to Ray's selection in October 2017. (Vol. IV, 122:19-21.) *See Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997) (to evaluate probative value of a statement the court should consider the relationship of the speaker to the plaintiff, the speaker's place in the corporate hierarchy, the context and purpose of the statement, and the temporal proximity to the adverse action); *Fuentes*, 32 F.3d at 767 (stray remarks by non-decision makers and statements unrelated to the decisional process "are rarely given great weight, particularly if they were made temporally remote from the date of decision.")

### d) Engagement Results Presented By Generational Cohort Does Not Reasonably Show Age Bias.

Ray argued that Defendant's Exhibit 5 is proof that AT&T is biased against older workers. Again, she is wrong. AT&T's decision to collect and report generational differences in engagement survey results is insufficient to show age bias.

Exhibit 5 was the result of the 2017 AT&T employee engagement survey for one of Ray's peers, Schrader. (Def. Ex. 5; Vol. III, 28:7-23.) As illustrated on the Exhibit and in the testimony, the presentation of results by generational cohort neither advantages or disadvantages older or younger workers. Woodard explained

that Exhibit 5 is a merely a summary report of engagement scores by generation in order to make Schrader a better leader within his organization.  (Vol. III, 44:3-47:22.) Pat Slocum, a Human Resources Business Partner, corroborated this testimony by confirming that "the purpose of the survey is for a leader to really evaluate their effectiveness and how healthy their culture is in their organization." (Vol. III, 95:5-18.)

Plus, nothing in the evidence even remotely suggests that these engagement survey results identify *individuals* by generation or age, or that any one age group received more or less favorable treatment as a result of their survey responses. Ray failed to make any connection between the way in which AT&T presented certain engagement survey results to managers and the surplus process that resulted in her lay-off.

### e)      Employees Wearing Jeans In the Workplace Does Not Reasonably Show Age Bias.

Ray's "proof" age bias also includes her disingenuous testimony about employees wearing jeans in retail stores. (Vol. II, 197:7-20.) This, too, is insufficient.

Ray herself conceded that she did not at the time (and still today does not) believe that employees wearing jeans is a sign of bias against older workers. (Vol. II, 218:5-219:18.) No reasonable jury could interpret this behavior as a sign that AT&T has a culture of age bias, especially when Ray herself did not.

### f)   Evidence Regarding Employee Ages Does not Reasonably Show Age Bias.

Ray also selectively pointed to the ages of other AT&T employees to suggest that AT&T favored younger workers and that her age was a determinative factor in the 2017 surplus selection. The evidence does not reasonably support either of these arguments as a matter of law.

At trial, Ray argued that the earlier decisions to hire Kevin Kuhn, Eric Decker, and Emily Wiper as Directors of Sales in the Ohio/Pennsylvania market and the May 2018 decision to hire Tricia Torres to replace Gill (months after Ray had left the business) somehow suggests corporate bias in favor of younger employees. The evidence at trial could not possibly support such an inference.

It is undisputed that each of them was hired in a competitive process. (Vol. II, 28:1-16, 107:10-108:5, 146:9-147:2; Vol. III, 12:8-16, 41:16-43:3.) There was no evidence of the ages of other applicants for those three positions, so there is no basis for the jury to infer that these hires were younger than any or all other candidates, much less that their hiring suggests corporate age bias against older workers. *See Dooley v. Roche Lab Inc.*, 275 F. App'x 162, 165 (3d Cir. 2008) (numbers of individuals in protected class in organization is not, on its own, probative of discriminatory intent "in the absence of 'analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period'") (citations omitted) (unpublished); *Ezold v. Wolf, Block, Schorr & Solis-*

26

*Cohen*, 983 F.2d 509, 542-43 (3d Cir. 1992) (same; "Because no conclusion can be drawn from [plaintiff]'s raw numbers on underrepresentation, they are not probative of [defendant]'s alleged discriminatory motive"), *abrogated in part, on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *see also Willis*, 808 F.3d at 649 (observing that "[n]atural staff turnover and increased hiring" does not support an argument that the employer discriminated against others in her protected class.)

Ray herself participated in the hiring process of one of those "younger" individuals that she now claims is evidence of discrimination, Kevin Kuhn (who, at 43 in 2017, is just six years younger than Ray). (Pl. Ex. 77; Vol. II, 107:10-108:5.) She testified, however, that she did not discriminate on the basis of age when hiring candidates, and that AT&T expected her hiring decisions to be based on identifying the best qualified candidate for the job, not age. (Vol. II, 236:12-19.)

Ray also relied heavily on the fact that the Directors of Sales retained in the Ohio/Pennsylvania market after the rating and ranking process were younger than her. Evidence of their relative ages, without more, is insufficient to support a reasonable inference of age bias. *See Fieni v. Franciscan Care Ctr.*, Civil Action No. 09-5587, 2011 WL 4543996, at *9 (E.D. Pa. Sept. 30, 2011) ("[T]he mere fact that similarly situated employees younger than [plaintiff] were not terminated is insufficient to withstand summary judgment."); *Rabinowitz v. Amerigas Partners*,

*L.P.*, Civil Action No. 05-4278, 2006 U.S. Dist. LEXIS 64635, at *10 (E.D. Pa. Aug. 25, 2006) ("The only evidence to which Plaintiff points to support her argument with respect to the elimination of her position is the fact that she was . . . the oldest person . . . Considering the undisputed facts of the case, this is insufficient to raise the specter of pretext."), *aff'd*, 252 F. App'x 524 (3d Cir. 2007); *Helfrich v. Lehigh Valley Hosp.*, No. CIV.A. 03-CV-05793, 2005 WL 670299, at *13 (E.D. Pa. Mar. 18, 2005) ("the mere fact that [plaintiff] was the oldest employee in his department does not create a discriminatory inference capable of surviving summary judgment. The ADEA does not prohibit employers from terminating the oldest employee.") (citation omitted).

Significantly, Cavalieri is older than Ray, which undermines any reasonable inference that she selected Ray for surplus based on a protected characteristic they shared. *See Elwell*, 47 F. App'x at 189 (plaintiff's discrimination claim was "further weakened" by fact that decision maker was in the same protected class as the plaintiff); *Borzak*, 2021 WL 6073095, at *12 (similarity in age between plaintiff and supervisor "further undermines [plaintiff]'s claim of age discrimination"). *Gottschall v. Reading Eagle Co.*, Civil Action No. 11-5361, 2013 WL 961266, at *5 (E.D. Pa. Mar. 12, 2013) (the fact a manager who selected the plaintiff for termination is older weakens any possible inference of discrimination); *Allen v. PetSmart, Inc.*, 512 F. Supp. 2d 288, 295 (E.D. Pa. 2007) (same); *Frost v.*

*PetSmart, Inc.*, Civil Action No. 05-6759, 2007 WL 602990, at *8 (E.D. Pa. Feb. 26, 2007) (same).[7]

Cavalieri also rated Fornwalt (who is approximately the same age as Ray) and Wyllner (who is older than Ray and Cavalieri) highly in the rating and ranking process, which belies any reasonable inference that she was biased against older workers. (Pl. Ex. 38a; Pl. Ex. 77.) Finally, other Directors of Sales less than ten years younger than Ray and in the protected category were retained in the Ohio/Pennsylvania after the surplus exercise. (Pl. Exs. 46 (identifying Fornwalt, Quiros, and Kuhn as Directors of Sales remaining post-surplus), 77 (indicating that as of November 16, 2017, they were 47, 41, and 43, respectively)). *See Robinson v. City of Phila.*, 491 F. App'x 295, 299 n.1 (3d Cir. 2012) (affirming summary judgment and observing that age differences of less than ten years are not significant enough for plaintiff to even make out a prima facie case) (unpublished); *Ortiz v. Cedar Crest Coll.*, No. 5:16-CV-06703, 2017 WL 6422164, at *3 (E.D. Pa. Dec. 18, 2017) (seven-year age difference insufficient to support even prima facie case) (unpublished), *aff'd*, 764 F. App'x 257 (3d Cir. 2019).

---

[7] Ray will undoubtedly argue that the fact that a supervisor is a member of the same protected class as a plaintiff does not foreclose a finding of discriminatory intent as a matter of law.  That argument misses the point and ignores well-established law that membership in the same protected class makes it *far less likely* that a supervisor acted with discriminatory intent, and therefore far less reasonable for a jury to infer discriminatory intent.

Ray also relied heavily on the ages of employees shown in the ADEA Listing provided at the time of her surplus notification. This is insufficient to support a reasonable inference of age bias in Ray's surplus selection for three reasons.

First, Ray was not compared with any employees except those in AWG 12, so the ages of other employees (selected or not selected for surplus) are irrelevant to whether Ray's age was a determinative factor in her selection. *See Healy v. New York Life Ins., Co.*, 860 F.2d 1209, 1218 (3d Cir. 1988) ("statistical evidence concerning the Company-wide discharge patterns is tangential to the behavior of the relevant decision makers.") Ray herself argued that Cavalieri's favorable treatment of her direct report, Wyllner (who is "significantly older" than Ray but outside of AWG 12), is irrelevant. (Vol. II, 231:9-10; Vol. V, 96:22-97:12.)

Second, employees shown in the ADEA Listing as selected for surplus were in their twenties, thirties, forties, fifties and sixties, and employees not selected for surplus were also in those same age cohorts. (Pl. Ex. 43 at DEF_0002305 (30 year old selected for surplus; 54 and 56 year olds in same position not selected), DEF_0002312 (27, 42 and 43 year olds selected for surplus; 45, 46, and 47 year olds in same position not selected); DEF_0002315 (29 year old selected for surplus; 31, 33, 36, 40, 42, and 43 year olds in same position not selected); DEF_0002317 (38, 40, 45, and 49 year olds selected for surplus; 40, 41, 46, 49,

and 52 year olds in same position not selected). *See Marione v. Metropolitan Life Ins. Co.*, 188 F. App'x 141, 145 (3d Cir. 2006) ("Marione claims that MetLilfe's age statistics show a pattern of discrimination. We disagree. Employees of all ages were terminated in the RIF, and employees of all ages were retained") (unpublished).

Third, "[w]ithout any demonstration of the statistical significance" of the surplus selection rates of employees aged 45 and above, as argued by Ray, (Vol. V, 39:23-40:12), "a factfinder could not reasonably accord it much if any weight." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1112 n.4 (3d Cir. 1997); *see also Boyle v. City of Philadelphia*, 476 F. Supp. 3d 101, 109, 112 (E.D. Pa. 2020) (plaintiffs failed to show that proffered statistical analysis demonstrated statistically significant differences; noting that "Third Circuit has affirmed that 'a finding of statistical significance with a probability level at or below 0.05, or at 2 to 3 standard deviations or greater, will typically be sufficient' to establish statistical significance") (citations omitted); *Carter v. Mid-Atl. Healthcare, LLC*, 228 F. Supp. 3d 495, 510 (E.D. Pa. 2017) (without sufficient analytical context explaining what reasonable inferences the jury may draw from raw data, it cannot possibly support an inference of discriminatory intent).

In short, the ADEA Listing provides no legitimate support for the jury's verdict.

31

Finally, Ray relied heavily on AT&T's April 2016 selection of Kathleen Sweeney for surplus. (Vol. I, 18:18-19:1; Vol. IV, 33:1-20; Vol. V, 28:3-5.)[8] For similar reasons, this, too, is insufficient to support a reasonable inference of age bias against Ray in October 2017. Ray was not selected for surplus at the time, which undermines any argument that the outcome of that exercise can support an inference of age bias against *her*. (Vol. IV, 75:7-9.) The 2016 surplus exercise also impacted the Liberty States Market, not the Ohio/Pennsylvania Market, and therefore the population of people rated and ranked was different than the one in October 2017. (Pl. Ex. 12a; Pl. Ex. 38a; Vol. I, 100:22-101:16, Vol. II, 101:20-103:8.) Contrary to Ray's arguments at trial, Sweeney was not the oldest Director of Sales in Liberty States, (Vol. I, 18:23-19:1); her title was National Indirect Director of Sales. (Pl. Ex. 12a.) Significantly, Cavalieri gave the oldest person in the Affected Work Group rated and ranked against Sweeney and Ray in the 2016 surplus, Wyllner, the highest rating. (Pl. Exs. 12, 77; Vol. II, 135:25-136:25.)

### 2. Ray Presented No Evidence that AT&T Deviated from Its Policies.

Ray also advanced three theories that AT&T failed to follow its policies: (1) that Woodard should have been rated and ranked with the Directors of Sales in

---

[8] As shown by the briefing on plaintiff's motion *in limine*, an arbitrator rejected Sweeney's claims of age discrimination, finding that she failed to prove that her age was a determinative factor in her surplus selection. (ECF 143, 145.)

AWG 12 because she was assigned one of the new sales territories in the Ohio/Pennsylvania market; (2) that Perez's and Gill's transfers should have occurred earlier in the surplus process, prior to the rating and ranking exercise; and (3) that Perez vacated his role when he transferred to New York and according to AT&T's surplus guidelines Ray should have moved up in the Ohio/Pennsylvania market rankings and avoided surplus selection.

These were theories only, unsupported by any reasonable interpretation of the evidence. There was no deviation from AT&T policy, and Ray is impermissibly asking the jury to second-guess AT&T's legitimate business judgment. *See Fuentes*, 32 F.3d at 765 ("To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.")

>           **a)**     **AT&T's Policies Prohibit Placing Employees of**
>                      **Different Levels Into the Same Affected Work Group.**

Ray's argument that AT&T's decision to exclude Woodard from AWG 12 gives rise to a reasonable inference of pretext is baseless.

According to the undisputed evidence AT&T's surplus guidelines prohibit rating and ranking employees of different management levels in the same Affected Work Group. (Def. Ex. 36 at DEF_0004311 ("AWG's are level-specific, levels

cannot be combined within an AWG."); Vol. III, 54:20-58:5, 130:23-131:9.) As an AVP (level 4), Woodard was at a higher management level than the Directors of Sales (level 3), and she had been running the entire Ohio market before it was even combined with Pennsylvania and brought under Cavalieri's leadership. (Vol. II, 23:17-26:2; Vol. III, 35:23-37:17.) AT&T made a business judgment that she would retain strategic responsibility for all sales in Ohio post-surplus.  (Vol. II, 23:17-26:2; Vol. III, 35:23-37:17.) This was entirely consistent with AT&T's policies.[9]

> **b)   This Was Not a "Follow-the-Work" Surplus Requiring that Relocations Occur Earlier in the Surplus Process.**

Ray argued that the surplus guidelines required that Perez's relocation to New York take place prior to the rating and ranking, at step three of the surplus process. (Def. Ex. 36 at DEF_0004315-16; Vol. V, 32:14-23, 37:6-38:25) If it had, she argued, there would only have been seven Directors of Sales remaining and only Schrader, the lowest ranked, would have been surplused. (Vol. V, 37:22-38:25.) She is wrong about this too.

---

[9] Ray argued that AT&T could have eliminated Woodard and one Director of Sales, as opposed to two Directors of Sales, in the surplus, but what AT&T *could have* done is irrelevant and in no way suggests that discrimination was at play. (Vol. V, 31:3-9.) *See Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 154 n.9 (3d Cir. 2017) (court's role is to assess whether an adverse employment action was discriminatory, not to "sit as a super-personnel department that reexamines an entity's business decisions") (citation omitted).

Step three of the Surplus Guidelines unambiguously applies only to "follow-the-work" surpluses, which occur only when "an employee is offered the opportunity to relocate because *the employee's existing job is unchanged*, but is moving to a new location." (Def. Ex. 36 at DEF_0004311 (emphasis in original); Def. Ex. 39 at DEF_0000796 ("These relocations do not constitute offers to Follow the Work as defined in the Non-Bargained Surplus Guidelines."); Vol. III, 69:1-71:18, 89:10-92:15, 96:2-19.) Surplus 17-350 was not a "follow-the-work" surplus, and therefore step three did not apply. (Vol. III, 69:2-71:18, 89:10-92:15, 96:2-19.) The testimony on this point was clear and uncontroverted.

In any event, nothing about Gill's and Perez's transfers for personal reasons reasonably suggests that age was a determinative factor in Ray's surplus selection. (Vol. II, 55:18-57:3; 59:8-60:12; Vol. III, 109:20-110:7, 137:10-18; Vol. IV, 40:13-41:5, 49:10-50:17.) Upon requesting transfers, Perez and Gill were both told that if either was selected for surplus in his or her respective markets, the transfers would not be possible. (Vol. II, 55:18-57:3, 59:8-60:12; Vol. III, 137:10-18; Vol. IV, 49:10-50:17.) Likewise, the evidence was undisputed that Gill's assignment to the Ohio/Pennsylvania market only occurred after she and Perez both were rated and ranked in their respective AWGs and not selected for surplus. (Pl. Ex. 46; Vol. II, 55:18-57:3; Vol. III, 109:20-110:21, 130:2-18; Vol. IV, 41:13-22.)

Ray argued that the decision to rate and rank Ray against Perez for purposes

of the surplus exercise was unfair if Perez was going to leave the market; Ray should have been rated and ranked against Gill who would (for reasons Ray never explained) have clearly been ranked below Ray. (Vol. V, 37:22-38:8.) This argument assumes far too much. The relocations were not a *fait accompli* as the uncontroverted evidence clearly shows, and were dependent on both Perez and Gill remaining "above the line." Had Gill or Perez been selected for surplus, the other would have stayed in her or his market and the transfer would never have occurred. Again, that evidence was uncontroverted.

Finally, Ray repeatedly asked the jury to speculate that AT&T attempted to "hide" the decision to relocate Perez and Gill because there should be more documentation for the decision. (Vol. V, 38:9-16.) There is no evidence suggesting that AT&T failed to create required documentation supporting the decision. The unrebutted testimony indicates that documentation was *not* required because such transfers for personal reasons are routine at AT&T and have nothing to do with the surplus process. (Vol. III, 66:6-67:21, 72:17-73:8.) In light of this evidence, Ray resorted to mere conjecture that discrimination may have been afoot: "If this is so on the up and up, if there's really, like, nothing wrong with thus, then why are you so afraid to put it in writing?" (Vol. V, 38:14-16.)

### c) Perez Did Not "Vacate" His Role During the Surplus Process.

Ray's final theory fares no better. Her argument that Perez "vacated" his role

and therefore only Schrader should have been surplused has no support in the evidence.

According to AT&T's policies, there are specific instances in which AT&T retains an employee initially selected for surplus because another employee in the Affected Work Group vacates his or her role. Patricia Slocum, who Plaintiff identified as an "HR subject matter expert" in the surplus process, (Vol. III, 97:16-17) testified about the specific instances where this is possible: if an employee "above the line" (*i.e.*, not selected for surplus) voluntarily resigns from the company; if that employee applies for an accepts a different job within AT&T; or if an employee "above the line" dies. (Vol. III, 63:6-23.)

None of these specific situations occurred here.  Instead, as Slocum testified, this was a normal-course-of-business swap of two employees performing the same job in two different markets. (Vol. III, 66:6-67:21, 72:17-73:8.) This is precisely why, as Slocum explained, the Surplus Guidelines do not address this type of employee transfer: because it has absolutely nothing to do with the surplus. (Vol. III, 63:6-23.) As such, there was never a vacancy requiring AT&T to move Ray above the line, and it would be unreasonable for the jury to draw an inference of discrimination on these facts. (Vol. III, 66:6-67:21.)

There is simply no basis in the record for Ray's argument that AT&T acted inconsistently with its own policies, let alone any basis from which "a reasonable

37

factfinder *could* rationally find" AT&T's proffered reasons for her selection

"'unworthy of credence,'. . ., and hence infer 'that [AT&T] did not act'" for the

proffered non-discriminatory reasons. *Fuentes*, 32 F.3d at 765 (internal citations

omitted).

### 3. Ray's Disagreement With the 2017 Surplus Ratings Cannot Support the Jury's Verdict.

Ray's central thesis for a finding of pretext is her disagreement with the

ratings given to Directors of Sales in the Ohio/Pennsylvania market. (Vol. II,

238:5-240:24.) This too is insufficient to support a verdict for five separate

reasons.

First, Ray conceded repeatedly that she was not in a position to evaluate her

peers and that others were. (Vol. II, 195:4-10, 230:15-20, 245:24-246:8.) She

therefore is not competent to express an opinion concerning her relative value to

the company. In any event, her view on this subject "is not at issue; what matters is

the perception of the decision maker." *Billet v. CIGNA Corp.*, 940 F.2d 812, 825

(3d Cir. 1991), *overruled in part on other grounds by St. Mary's Honor Ctr. v.

Hicks*, 509 U.S. 502 (1993) (citation omitted); *see also Spangler v. Moderne Glass

Co., Inc.*, C.A. No. 6-1394, 2008 WL 919693, at *9 (W.D. Pa. Apr. 3, 2008)

("[Plaintiff's] subjective opinions about her qualifications are insufficient to

overcome summary judgment. Whether a court thinks that an employer misjudged

a plaintiff's qualifications does not, in itself, make the employer's legitimate

reasons unworthy of belief.") (citation omitted); *Martin v. Gen. Elec. Co.*, 891 F.

Supp. 1052, 1058 (E.D. Pa. 1995) ("That [plaintiff] would rate himself higher than

[supervisor] did in certain areas is not sufficient to cast doubt on [employer's]

reason [for RIF selection]. This court does not sit as a super human resources

office, judging whether plaintiff indeed possessed better leadership,

communications, or analytical skills than others on the same matrix.").

Second, the decision maker, Cavalieri gave Ray ratings in 2017 that were

similar to the ratings she gave Ray in the April 2016 surplus, in which Ray was not

impacted. (*Compare* Pl. Ex. 12a *with* Pl. Ex. 38a.) The 2017 surplus ratings were

also consistent with the rating and comments that Cavalieri gave her in her 2016

performance review delivered in February 2017.[10] (Pl. Exs. 17, 38A; Vol. II

109:19-112:24.) There was nothing in that performance review, *according to Ray*,

suggesting age bias. (Vol. II, 229:19-230:14.) These ratings were based on

---

[10] Ray's composite leadership score (a 3.8 out of 5) is also consistent with the 9-box rating Cavalieri gave her earlier in the year, despite Ray's arguments to the contrary. (Def. Ex. 27a; Pl. Ex. 22.) As Cavalieri testified, the 9-box leadership rating used a 3-point scale, while the surplus leadership criteria relied on a 5-point scale. (Vol. II, 141:1-9.) The 9-box exercise assesses leadership for a distinct purpose, and a high leadership score on a 9-box indicates that the employee is "doing something incremental that may or may not be related to their specific position to help the organization overall." (Vol. II, 141:10-20.) This is precisely why Ray earned a higher 9-box score in leadership than some (but not all) of her peers, because she had been involved in women's leadership initiatives in Philadelphia and things of that nature that did not bear on whether she was an effective leader in her specific role as Director of Sales. (Vol. II, 141:21-142:23.)

Cavalieri's good faith judgment about Ray's and her peers' capabilities. (Vol. II, 91:24-92:18, 100:15-17, 138:3-6, 143:2-144:1.)

Third, Ray conceded that she was concerned about being selected for surplus in 2017. (Vol. II, 233:19-235:1.) Her team's performance was among the lowest in the region. (Vol. II, 233:19-235:1.) Her concerns were also consistent with conclusions reached by Cavalieri after Mundis's field interviews and before Cavalieri's ratings in the surplus exercise. (Vol. II, 127:17-131:1.) Ray knew that relative to others she was a weaker employee.

Fourth, Ray's opinion that she should have been rated higher because of her longer tenure is unsupported in the record. As an initial matter, none of the criteria against which Cavalieri rated Ray and her peers correlates to tenure. (Vol. II, 15:4-16:6 (skills rating does not correlate to time in role), 19:4-16, 140:16-18 (experience rating not correlated to tenure); Vol. III, 32:1-33:19 (same).) In any event, Ray had significantly less experience managing company-owned retail than some of her shorter-tenured peers because she had spent the majority of her career in marketing and the authorized retail sales channel. (Vol. I, 123:16-126:5; Vol. II, 16:8-17:7, 30:20-31:7, 95:10-14, 96:13-97:18, 104:7-107:2, 112:3-24, 139:5-23.)

The tenuous connection between skills or experience ratings and tenure is best illustrated by the ratings Ray herself gave her direct reports in the 2017 surplus: she gave shorter-tenured employees higher ratings in both skills and

experience than her longer-tenured direct reports. (Pl. Ex. 41 (assigning employee with 28 years of service a 2 in skills and experience categories, and employee with only 8 years of service a 4 and 3 in each of those categories.) Ray can hardly argue that Cavalieri's decision to give shorter-tenured employees higher skills and experience ratings indicates age bias when Ray applied these criteria in the exact same manner.

Finally, as a matter of law Ray's disagreement with Cavalieri's ratings is insufficient to prove her claims. *See Marione*, 188 F. App'x at 145 (finding plaintiff's disagreement with employer's "assessment of his potential in comparison to others" insufficient to support finding of pretext; "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd or competent" (quoting *Fuentes*, 32 F.3d at 765)); *Billet*, 940 F.2d at 825 (same).

## B.    There Is Insufficient Evidence To Support A Finding of Willfulness.

An ADEA violation is "willful" and liquidated damages are warranted only "if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Hazen Paper Co.*, 507 U.S. at 614. Ray has made no such showing. Indeed, her argument that there was willful conduct here misstates the legal standard.

A plaintiff cannot establish willfulness by showing merely that the employer was aware the ADEA prohibits age discrimination. *Id.* at 614-15 (rejecting this "broader definition of 'willful' providing for liquidated damages whenever the employer knew that the ADEA was 'in the picture'" because "it would 'virtually obliterate[e] any distinction between willful and nonwillful violations.'") (citations omitted) (alteration in original). Yet this is *exactly* what Ray relied upon to argue willfulness:

> It goes to, did they know that a law exists? Does AT&T know that there's an ADEA; without a doubt, yes. Did they terminate [Ray] anyway? Yes. That's willful. That's reckless indifference to the law.

(Vol. V, 45:12-16.) She is wrong. There is insufficient evidence in the record from which the jury could conclude that anyone at AT&T violated the ADEA, let alone willfully.

First, AT&T directed managers to follow a detailed and rigorous process for rating and ranking employees in connection with a surplus exercise that ensures decisions were based on legitimate, business criteria (performance, leadership, skills, and experience) to the exclusion of any impermissible factors. (Vol. IV, 37:3-38:14.) The people responsible for the ratings for AWG 12, Cavalieri and Woodard, both testified that their ratings had nothing to do with age but instead were based upon observations of their direct reports and their good faith business judgments about each individual. (Vol. II, 24-92:22; Vol. III, 43:4-16, 47:18-22,

48:19-22.) The evidence demonstrates the company structured the process to prevent age bias rather than allow it to occur flagrantly and unchecked. *Accord Kraemer v. Franklin & Marshall Coll.*, 941 F. Supp. 479, 481 (E.D. Pa. 1996) (jury acted reasonably in concluding no willful or reckless conducted occurred under ADEA where employer concluded department had legitimate, non-discriminatory reasons for selecting younger incumbent for position over older qualified applicant with more experience, even where one decision-maker was alleged to have selected younger incumbent because he did not "want to be the youngest person in the department").

Second, the Third Circuit has found insufficient evidence of willfulness on records far more egregious than this one.  In *Kelly v. Matlack, Inc.*, 903 F.2d 978, 984 (3d Cir. 1990), the Third Circuit reversed the district court's denial of defendant's motion for judgment notwithstanding the verdict on the issue of willfulness under the ADEA where the defendant outright admitted its proffered reasons for plaintiff's lay-off were pretextual and defendant misled plaintiff into believing she would be retained after the reduction in force. The panel noted:

> While the employer's pretextual reasons for [plaintiff]'s termination and its action in misleading her into believing she would be retained could have been evidence to support the jury's verdict of age discrimination, an issue that is not before us, we see insufficient evidence from which the jury could have found willful conduct to support liquidated damages.

(*Id.*) The Third Circuit reached similar conclusions in *Anastasio v. Schering Corp.*, 838 F.2d 701, 705-07 (3d Cir. 1988) (affirming district court's order granting judgment notwithstanding verdict on issue of willfulness where older worker's position was ostensibly eliminated for budgetary reasons, but company hired much younger manager prior to plaintiff's termination and filled three additional postings for same position with people in their thirties shortly after the termination). There is no evidence of such comparable conduct here.

Any argument Ray makes to the contrary is unsupported by evidence. Ray implied that the conduct was willful because she knew of older employees who were allegedly laid off on the basis of age in unrelated surpluses. (Vol. II, 206:6-208:1.) The only individual about whom she adduced any evidence at trial was Kathleen Sweeney; as discussed above, an arbitrator concluded that decision did not violate the ADEA.[11] (ECF 143-1.) Similarly, the ages of individuals selected and not selected for surplus in Surplus Business Case 17-350 are insufficient to establish a pattern of age discrimination at AT&T absent any expert testimony regarding the statistical significance of selection rates. (*See* section III.A.1.f, *supra*.)

---

[11] Ray also mentioned Anthony Shrader in her list of older surplused employees, but as the Court rightly noted, Woodard—not Cavalieri—rated the Ohio-based Directors of Sales and the two did not discuss their scores. (Vol. IV, 106:22-107:8.) Moreover, Ray testified that she had never seen Woodard do or say anything that suggested she was biased against anyone because of their age. (Vol. II, 231:11-16.)

Finally, Ray will no doubt argue that no one allegedly reviewed the results of the surplus exercise for age bias, and this constitutes a reckless disregard for the law. The argument assumes too much. Unless AT&T believed that its managers were disregarding the clear instructions to evaluate employees according to the four legitimate business criteria (and there is no evidence to support that theory), there would be no reason to take any additional steps. It is Ray's burden to show that AT&T knew that its conduct violated the ADEA to warrant liquidated damages, not AT&T's burden to prove that its conduct was not reckless or made in good faith. *See E.E.O.C. v. Westinghouse Elec. Corp.*, 632 F. Supp. 343, 372 n.22 (E.D. Pa. 1986), *aff'd in part, vacated in part*, No. 86-1226, 1988 WL 148606 (3d Cir. Nov. 30, 1988).

### C. Alternatively, AT&T Is Entitled To A New Trial Under Rule 50(b)(2).

A district court has a duty "essentially to see that there is no miscarriage of justice." *Am. Bearing Co. v. Litton Indus., Inc.*, 540 F. Supp. 1163, 1168 (E.D. Pa. 1982), *aff'd*, 729 F.2d 943 (3d Cir. 1984). A jury's verdict may be set aside if "manifest injustice will result if it were allowed to stand." *Id.*

Five evidentiary rulings resulted in a miscarriage of justice. In some instances, Ray was permitted to introduce evidence that should have been excluded under the Federal Rules of Evidence, and in others, Ray was permitted to introduce evidence on issues that AT&T was precluded from probing or countering with its

45

own evidence on the same topic. Therefore, in the event the Court denies AT&T a judgment in its favor, a new trial should be ordered.

> **1.      It Was Error to Prevent AT&T From Questioning Ray About the Scores She Assigned Her Direct Reports in the Same Surplus Exercise.**

The Court upheld Ray's objection to AT&T inquiring into the scores she gave her direct reports in the same surplus exercise that resulted in her ultimate termination. AT&T was only permitted to "cross-examine Ms. Ray about her involvement in rating employees during the 2017 reduction-in-force," but was prohibited from "inquiring about the individual ratings she provided." (ECF 139 at ¶ 6.) The Court held, "[a]ny probative value of specific ratings of individuals unrelated to this trial is substantially outweighed by risks of jury confusion and waste of time." (*Id.*) (citing Fed. R. Evid. 403.)

This was error and it prevented A&T from challenging the central premise of Ray's case: that higher ratings in the skills and experience categories for shorter-tenured employees in the surplus exercise is evidence of discrimination. In Ray's own words:

> And per the definition, you know, the experience, you know, me being with the company over 23 years warrants a higher number than those peers that have only been with the company, you know, 12, 10 years. By definition, I have much more experience. I don't believe I should have been ranked or rated at the same number as my peers, as my younger peers.

> And then from a skillset perspective, again, you know, based on my experience, and the fact that I worked. I had five different director positions with AT&T over the course of 23 and a half years versus, you know, she was giving ratings to a couple of my younger peers who had only been at director level for less than 4 years. […]

> And so to score me or rate me less than that – them on that, that, to me, there's bias there.

(Vol. II, 239:1-240:10.) AT&T was precluded from questioning Ray about the fact that she, too, gave shorter-tenured employees higher ratings than their longer-tenured counterparts in the same exercise, following the same instructions Cavalieri had when rating Ray. (Vol. III, 133:19-135:2.) Had AT&T been able inquire into this highly relevant evidence, the jury would have heard Ray's reasons for interpreting the rating criteria in a manner similar to how Cavalieri did in her ratings of Ray and others.

The impact of this ruling cannot be understated, and Ray's counsel's conduct during the trial illustrates why. Ray introduced into evidence the scores she assigned her direct reports during the surplus exercise. (Pl. 41 (tab 2).) AT&T sought a ruling from the Court that it be permitted to argue from that evidence in closing. (Vol. V, 18:12-19:9.) Plaintiff made no objection at the time, yet during closing argument when AT&T did precisely what it sought permission to do Ray's counsel impermissibly objected and demanded a side bar. (Vol. V, 77:20-78:23.)

The reason is obvious: the impact of this evidence diminishes Ray's credibility in her own theory of the case.

### 2. Evidence of the 2016 Surplus Should Have Been Excluded Under Rule 401 and Rule 403

AT&T objected to Ray's introduction of evidence concerning the 2016 surplus. Specifically, AT&T objected on the grounds that the probative value of that evidence was substantially outweighed by the potential to confuse the issues, mislead the jury, and result in undue delay pursuant to Fed. R. Evid. 403. (ECF 132 at 13-14.)

The Court overruled the objection and held that the evidence of the 2016 surplus was admissible "for the limited purpose of showing that AT&T began a planned effort of eliminating the jobs of older employees in this reduction-in-force that took place 18 months before the reduction-in-force during which Ms. Ray was selected." (ECF 139 at ¶ 3.) The Court gave a limiting instruction that it was not for them to decide whether there was discrimination in 2016. (Vol. I, 93:2-94:9.) Still, Ray argued that Cavalieri and Van Buskirk's alleged discriminatory scheme began with the selection of Kathleen Sweeney for surplus in 2016. (Vol. I, 18:18-19:1; Vol. IV, 33:1-20; Vol. V, 28:3-5.)

This evidence should have been excluded for the reasons stated above in section III.A.1.f, *supra*. Alternatively, AT&T should have been permitted to introduce evidence of an arbitrator's order that Sweeney's selection for surplus in

2016 was not the product of age discrimination. (ECF 143; 143-1.) If Ray was

permitted to offer evidence concerning the 2016 surplus and argue that it reflected

age discrimination starting "18 months before the reduction-in-force during which

Ms. Ray was selected," (ECF 139 at ¶ 3), then AT&T should have been permitted

to present proof on precisely the same subject.

### 3. Ray Should Not Have Been Permitted To Introduce the ADEA Listing

The ADEA Listing should have been excluded as irrelevant under Fed. R.

Evid. 401. (ECF 117-2 at 1.) This Court had already disposed of Ray's claim

challenging the validity of the release, (ECF 28), and as such, the evidence related

only to a claim or issue that had already been decided. (ECF 117-2 at 2.) The Court

overruled AT&T's objection and held that this evidence was admissible because

"the Listing provides statistical information about the positions and ages of the

persons chosen for the Surplus, [so] it is relevant to whether Plaintiff Alison Ray

was chosen for the Surplus due to her age." (ECF 126 at ¶ 1.) This was error.

Evidence at trial undisputedly showed that the only employees rated and

ranked with Ray were Directors of Sales in the Ohio/Pennsylvania Market (AWG

12). The only employees rated by Cavalieri were those Directors of Sales and Bob

Wyllner; other employees on the listing were rated by other supervisors. (Pl. Ex.

38a.) Ray impermissibly asked the jury to infer discriminatory intent based on

these irrelevant surplus selections while, paradoxically, arguing that Cavalieri's

ratings of Wyllner (who was in a different AWG) were irrelevant to the jury's

deliberations. (Vol. II, 231:9-10; Vol. V, 96:22-97:12.)

> **4.      Mundis Should Have Been Permitted to Testify About His
> Report to Cavalieri Regarding the Investigation Into Ray's
> Employee Engagement Scores.**

It is undisputed that the scores Cavalieri gave Ray in the 2016 surplus were

very similar to those she gave her in the 2017 surplus, save for a slight decrease in

certain leadership categories. (Pl. Ex. 12a; Pl. Ex. 38a.) Ray argued that the

leadership scores Cavalieri gave her were indicative of age bias because they were

inconsistent with the 9-box score Ray received earlier that year. (Vol. V, 29:6-

30:3.) Cavalieri's perception of Ray's leadership capabilities was undeniably

relevant evidence.

It is also undisputed that Kyle Mundis conducted a field investigation the

dramatic decline in Ray's scores. (Vol. II, 122:3-13, 127:19-128:18.) Mundis

performed this diligence in "later summer, early fall," close in time to the surplus

exercise at issue. (Vol. II, 130:14-17.) What Mundis communicated to Cavalieri

about his findings and Ray's leadership was clearly relevant to Cavalieri's

evaluation of Ray as a leader. AT&T was not permitted to ask Cavalieri what

Mundis told her, however. Instead, the Court restricted questioning only to the

conclusions Cavalieri reached after her conversation with Mundis. (Vol. II, 128:16-

129:24.) Cavalieri was not able to explain why she reached those conclusions based on what she heard.

The jury should have been permitted to hear what Mundis told Cavalieri around the time of the surplus exercise. Instead, they were permitted only to hear Ray's argument that the leadership scores given to Ray were inconsistent with the earlier 9-box rating, without further explanation as to why her opinion of Ray may have changed leading up to the surplus exercise. The jury only heard part of the story—the part Ray wanted them to hear.

### 5. The Court Should Have Given A Curative Instruction To Mitigate Counsel's Improper Suggestion Of Misconduct

Ray's counsel suggested that AT&T and its counsel engaged in misconduct and inappropriately interfered with witness testimony throughout the trial. Indeed, counsel laid bare that strategy in her opening statement when she stated, "AT&T is a very sophisticated company, they have a lot of lawyers, they have a lot of resources." (Vol. I, 17:19-20.) Ray's counsel then asked *three separate witnesses* about their contact with AT&T's attorneys:

- She asked the first witness, David Carlucci whether he was represented by AT&T lawyers and whether "they prepared [him] for [his] testimony today." (Vol. I, 46:11-16.)

- Judy Cavalieri, AT&T's courtroom designee, testified on day one of the trial and continued testimony into the second day. When she resumed the stand

on day two, the first question counsel asked was whether she spoke with AT&T's attorneys after she left the stand the day prior. (Vol. II, 4:10-17.) Despite the fact that Cavalieri clearly testified that she had not spoken with the lawyers about her testimony, (*id.*), Ray's counsel demanded a sidebar and even requested permission to divert the trial and question AT&T's attorneys about the subject of those discussions. (Vol. II, 5:18-6:22.) As the Court rightly noted, no improper conduct occurred, and AT&T's attorneys were of course permitted to speak to their courtroom designee about the case. (Vol. II, 6:18-21.)

- Counsel then impermissibly attempted to probe into the contents of Patricia Slocum's conversations with attorneys about Mr. Perez's relocation. (Vol. III, 58:6-59:6.) The Court sustained AT&T's privilege objection, but only after a sidebar. (Vol. III, 59:6-60:7.)

Separately, Ray's counsel repeatedly implied that AT&T had withheld evidence regarding the Danny Perez and Linda Gill transfers. This was part of Ray's strategy from the very beginning. In her opening statement, she presented the jury with a picture of a black hole, stating:

> And the image of the black hole is that AT&T, despite being the world's leading telecommunications company, has failed to produce any emails or documents which talk about how the heck Ms. Gill, at 28 years old, takes the exact same position that Ms. Ray had, southeast

> Pennsylvania, when they knew they make this decision
> before they even tell her about the surplus.

(Vol. I, 23:21-24:2.) She also questioned Human Resources Business Partner Kyle

Mundis about his document collection efforts in the matter and the absence of any

documents about Perez's and Gill's transfers. (Vol. III, 121:8-19.)

As AT&T's counsel noted, documents concerning Perez's and Gill's

transfers were never the subject of discovery, so their absence at trial could hardly

suggest improper conduct on AT&T's part. (Vol. IV, 133:21-134:13.) The Court

declined to give a jury instruction to address the absence of these documents. (Vol.

IV, 134:21-25.) Ray's counsel then asked the jury in her closing argument to draw

an adverse inference from the absence of these documents that were never

requested in discovery. (Vol. V, 38:9-16.) It was improper for her to do so, and the

absence of a curative instruction likely resulted in the jury following counsel's

inappropriate suggestion.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, AT&T's motion for judgment as a matter of law

should be granted, the verdict should be set aside, and judgment should be entered

dismissing Ray's claims with prejudice.

Dated:  January 14, 2022

Respectfully submitted,

Kenneth W. Gage*
Sara B.  Tomezsko*
Paul Hastings LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000
kennethgage@paulhastings.com
saratomezsko@paulhastings.com
*Admitted pro hac vice*

James Bucci
Genova Burns LLC
1600 Market Street
Suite 3800
Philadelphia, PA 19103
(215) 564-0444
jbucci@genovaburns.com

*Attorneys for Defendant
AT&T Mobility Services LLC*